# ATTACHMENT

AO 450 (Rev.5/85) Judgment in a Civil Case

**FILED**
CLERK, U.S. DISTRICT COURT
March 1, 2016 (10:25am)
DISTRICT OF UTAH

# United States District Court

Central Division for the District of Utah

SCO Group

v.

International Business Machines
Corporation

**JUDGMENT IN A CIVIL CASE**

Case Number: 2:03cv00294 DN

This action came to trial or hearing before the Court.  The issues have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED

that pursuant to the orders of the court entered on July 10, 2013, February 5, 2016, and February 8, 2016, judgment is entered in favor of the defendant and plaintiff's causes of action are dismissed with prejudice.

March 1, 2016
*Date*

D. Mark Jones
*Clerk of Court*

*(By) Deputy Clerk*

UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| THE SCO GROUP, INC., A DELAWARE CORPORATION;<br><br>         Plaintiff,<br><br>v.<br><br>INTERNATIONAL BUSINESS MACHINES CORPORATION,<br><br>         Defendant. | **ORDER GRANTING IBM'S [783] MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>2:03-CV-00294-DN<br><br>District Judge David Nuffer |

This case arises out of the relationship between The SCO Group, Inc. ("SCO") and International Business Machines Corporation ("IBM") regarding IBM's production of its LINUX operating system. SCO held a majority of the UNIX-on-Intel market with its UNIX operating system in 1998 when IBM and SCO agreed to collaborate to produce a new operating system, Project Monterey. SCO claimed that IBM used this project to gain access SCO's UNIX source code and then copied thousands or millions of lines of that code into LINUX. Because LINUX was offered at no cost in the open-source community, it rapidly displaced UNIX, and SCO's UNIX sales rapidly diminished. SCO publicized the alleged copyright infringement and the alleged wrongs committed by IBM, and IBM argued that SCO's tactics were improper and in bad faith, and that it had the right to use any lines of code it added to LINUX. Previously in this litigation, many claims have been resolved. This order addresses SCO's tortious interference claims, granting summary judgment on those claims in favor of IBM.

# TABLE OF CONTENTS

Table of Contents ........................................................................................................... 2
Case and Motion Background ......................................................................................... 2
Statement of Undisputed Facts on [783] ....................................................................... 6
    A.    SCO's Complaints and Disclosures. ............................................................ 6
    B.    Background on SCO in the UNIX-On-Intel Market ................................... 22
    C.    IBM's Position Relative to SCO's ............................................................ 24
    D.    IBM's Alleged Tortious Interference with SCO's Business  Relations in the
           UNIX-On-Intel Market ............................................................................. 25
    E.    IBM's Efforts to Prevent SCO from Asserting Intellectual Property Rights ........ 27
    F.    SCO's Failure of Proof. ............................................................................. 32
          I.      BayStar ........................................................................................ 32
          II.     Computer Associates, Oracle, and Intel ..................................... 37
          III.   Hewlett-Packard ......................................................................... 44
          IV.   OpenSource Conference in Scottsdale, Arizona. ...................... 47
    G.    IBM's Purpose in Supporting LINUX. ..................................................... 48
    H.    SCO's Lack of Injury. ............................................................................... 51
    I.    No Disputed Facts Regarding Baystar and Lawrence Goldfarb ........................ 54
Summary Judgment Standard ...................................................................................... 55
Analysis ....................................................................................................................... 56
    A.    No Evidence Supports Direct Interference with the Companies SCO Specifically
           Identified and Claims Regarding Market Competition are Not Actionable. ........ 57
    B.    IBM's Alleged Interference with Hewlett-Packard May Constitute Interference 61
    C.    There Is No Causal Link Between IBM's Alleged Acts and SCO's Injury. ........ 62
          I.      Causation and Injury Generally ................................................. 62
          II.     Causation and Injury Regarding Hewlett-Packard ..................... 63
    D.    SCO Has Waived Any Claim Regarding the OpenSource Conference ............... 64
Conclusion .................................................................................................................. 65
Order ........................................................................................................................... 65

# CASE AND MOTION BACKGROUND

This case has been assigned to multiple judges in the District of Utah since it was filed in

2003. The case was administratively closed by Judge Kimball on September 20, 2007 due to

SCO's filing for bankruptcy,[1] and on September 10, 2010, Judge Campbell denied SCO's

request to re-open the case to resolve two of the several pending motions.[2] SCO filed a motion to

---

[1] Order Regarding Temporary Administrative Closure of Case, docket no. 1081, filed Sept. 20. 2007.

[2] Order, docket no. 1093, filed Sept. 10, 2010.

reopen the case to resolve some pending motions,[3] and after the case was reassigned again, that

motion was denied with the intent of keeping the case closed during the bankruptcy.[4] On May 7,

2013, SCO filed a motion for reconsideration of that order.[5] Because IBM did not oppose this

motion or the reopening of the case, SCO's motion was granted, the previous order denying the

motion to reopen[6] was vacated, and the case was reopened on June 14, 2013.[7]

Following the resolution of separate litigation between Novell, Inc. ("Novell") and SCO,[8]

SCO proposed that six of SCO's claims be dismissed with prejudice: breach of IBM Software

Agreement (Count I), breach of IBM Sublicensing Agreement (Count II), breach of Sequent

Software Agreement (Count III), breach of Sequent Sublicensing Agreement (Count IV),

copyright infringement (Count V), and interference with the 1995 Asset Purchase Agreement at

issue in the *Novell* case (Count VIII).[9] On July 22, 2013, IBM filed a motion for partial summary

judgment regarding remaining claims based on the *Novell* judgment.[10] On December 15, 2014,

partial summary judgment was granted in IBM's favor on IBM's counterclaims seeking a

declaration of non-infringement of the copyrights to the pre-1996 UNIX source code (IBM's

Counterclaims IX and X), and on SCO's unfair competition claim (Count VI) and tortious

interference claims (Counts VII and IX) "insofar as they alleged that SCO, and not Novell, owns

the copyrights to the pre-1996 UNIX source code and/or that Novell does not have the right to

---

[3] The SCO Group, Inc.'s Motion to Reopen the Case, docket no. 1095, filed Nov. 4, 2011.

[4] Memorandum Decision and Order Denying Motion to Reopen the Case, docket no. 1109, filed Apr. 24, 2013.

[5] The SCO Group, Inc.'s Motion for Reconsideration of the Court's Order Denying Motion to Reopen the Case, docket no. 1110, filed May 7, 2013.

[6] Memorandum Decision and Order Denying Motion to Reopen the Case, docket no. 1109, filed Apr. 24, 2013.

[7] Order Reopening Case and Vacating Prior Order, docket no. 1115, filed June 14, 2013.

[8] *SCO Group, Inv. v. Novell, Inc.*, Case No. 2:04-cv-00129-TS.

[9] Partial Judgment Dismissing SCO Claims, docket no. 1123, filed July 10, 2013.

[10] IBM's Motion and Memorandum for Partial Summary Judgment on the Basis of the Novell Judgment, docket no. 1126, filed July 22, 2013.

3

waive IBM's alleged breaches of the licensing agreements pursuant to which IBM licensed pre-1996 UNIX source code."[11]

On March 13, 2015, SCO and IBM filed a Joint Status Report[12] outlining the claims and motions that remain pending. SCO's only remaining claims are unfair competition (Count VI), tortious interference with a contract (Count VII), and tortious interference with prospective a business relationship (Count IX), all of which are challenged by summary judgment motions. IBM has eight pending counterclaims, seven of which are challenged by summary judgment motions.[13] An order entering summary judgment against SCO on its unfair competition claim (Count VI) was entered February 5, 2016.[14] This order addresses only SCO's remaining claims, for tortious interference (Counts VII and IX).

On September 25, 2006, IBM filed a motion for summary judgment on SCO's tortious interference claims,[15] followed shortly thereafter by a memorandum in support.[16] On November 11, 2006, SCO filed its opposition brief,[17] to which IBM replied on January 12, 2007.[18] The

---

[11] Memorandum Decision and Order Granting in Part and Denying in Part IBM's Motion for Partial Summary Judgment on the Basis of the *Novell* Judgment, docket no. 1132, filed Dec. 15, 2014.

[12] Docket no. 1134, filed Mar. 13, 2015.

[13] IBM's pending counterclaims are breach of contract (Counterclaim I), a violation of the Lanham Act (Counterclaim II), unfair competition (Counterclaim III), intentional interference with prospective economic relations (Counterclaim IV), a violation of the New York State Unfair and Deceptive Trade Practices Act (Counterclaim V), breach of the General Public License (Counterclaim VI), promissory estoppel (Counterclaim VII), and copyright infringement (Counterclaim VIII). SCO has not challenged IBM's breach of contract counterclaim by dispositive motions.

[14] Order Granting IBM's Motion for Partial Summary Judgment, docket no. 1159, filed Feb. 5, 2016.

[15] IBM's Motion for Summary Judgment on SCO's Interference Claims (SCO's Seventh, Eighth and Ninth Causes of Action) ("IBM's Interference Motion"), docket no. 783, filed Sept. 25, 2006.

[16] IBM's Memorandum in Support of Its Motion for Summary Judgment on SCO's Interference Claims (SCO's Seventh, Eighth and Ninth Causes of Action) Filed Under Seal Pursuant to 9/16/03 Protective Order, Docket #38 ("IBM's Interference Memorandum"), docket no. 803, filed Sept. 29, 2006.

[17] SCO's Memorandum in Opposition to IBM's Motion for Summary Judgment on SCO's Interference Claims (SCO's Seventh, Eighth and Ninth Causes of Action) Filed Under Seal ("SCO's Interference Opposition"), docket no. 868, filed Nov. 11, 2006.

parties argued the motion before Judge Kimball on March 5, 2007.[19] Pursuant to a request in the

March 2015 Joint Status Report[20] to supplement the older briefing, the parties were given the

opportunity to provide five additional pages of authority.[21] On May 21, 2015, IBM filed its

supplemental brief,[22] and SCO filed its supplement on June 5, 2015.[23]

A status conference was held on June 11, 2015 in which the parties gave brief educational

and background summaries on the remaining claims and motions.[24] As part of this background

presentation, both parties relied heavily on both Utah and New York case law, agreeing that

there was not an important distinction in the bodies of law regarding this case and stipulating to

the use of both. In that hearing, the parties also agreed to engage in settlement negotiations

conducted by a magistrate judge, but were not amendable to a settlement conference when the

magistrate judge attempted to arrange one.[25]

Having reviewed the parties' original and supplementary briefing as well as their oral

argument before Judge Kimball, it is unnecessary to hold additional oral argument to decide this

motion. Therefore, for the reasons stated more fully below, summary judgment is GRANTED in

IBM's favor on SCO's tortious interference claims.

---

[18] IBM's Reply Memorandum in Further Support of Its Motion for Summary Judgment on SCO's Interference Claims (SCO's Seventh, Eighth and Ninth Causes of Action) Filed Under Seal Pursuant to 9/16/03 Protective Order, Docket #38 ("IBM's Interference Reply"), docket no. 946, filed Jan. 12, 2007.

[19] *See* Minute Entry, docket no. 974, filed Mar. 5, 2007.

[20] Docket no. 1134, filed Mar. 13, 2015.

[21] *See* Docket Text Order, docket no. 1142, filed May 28, 205.

[22] IBM's Case Law Update with Respect to Its Motion for Summary Judgment on SCO's Unfair Competition Claim (SCO's Sixth Cause of Action) and Its Motion for Summary Judgment on SCO's Interference Claims (SCO's Seventh and Ninth Causes of Action) ("IBM's Interference Supplement"), docket no. 1140, filed May 21, 2015.

[23] SCO's Response to IBM's Case Law Update with Respect to Its Motion for Summary Judgment on SCO's Unfair Competition Claim (SCO's Sixth Cause of Action) and Its Motion for Summary Judgment on SCO's Interference Claims (SCO's Seventh and Ninth Causes of Action) ("SCO's Interference Supplement"), docket no. 1144, filed June 5, 2015.

[24] *See* Minute Order, docket no. 1150, filed June 11, 2015.

[25] *See* Order Regarding Settlement Conference Referral, docket no. 1155, filed July 7, 2015.

## STATEMENT OF UNDISPUTED FACTS ON [783]

The below collection of undisputed facts is distilled from the above listed filings. IBM's Interference Memorandum provided a statement of facts[26] and separate supporting exhibits.[27] SCO's Interference Opposition responded to IBM's statement of facts[28] and provided a statement of additional facts[29] and its own set of exhibits. IBM's Interference Reply replied to SCO's responses to IBM's statement of facts[30] and included an addendum in which it objected to SCO's additional facts.[31] In the June 11, 2015 hearing, the parties agreed to reconcile the facts on IBM's Interference Motion and IBM's summary judgment motion[32] regarding SCO's unfair competition claim.[33] The parties were ordered to reconcile the facts on IBM's unfair competition motion first, to be completed within 30 days; however, after seeking an extension, the parties failed to reconcile the facts as ordered. Determination of the undisputed facts has been made by the court.

The headings in this statement of facts are descriptive, not declaratory or substantive.

### A. SCO's Complaints and Disclosures.

1.     SCO's first complaint in this case, filed on March 6, 2003, included a claim for interference with contract. In it, SCO identified seven companies as purported examples of companies with whose contracts IBM is alleged to have interfered: The Sherwin-Williams

---

[26] IBM's Interference Memorandum at 3–35.

[27] *See* Declaration of Todd M. Shaughnessy Filed Under Seal Pursuant to 9/16/03 Protective Order, Docket #38 ("IBM's First Exhibits"), docket no. 804, filed under seal on Sept. 25, 2006.

[28] SCO's Interference Opposition at 56–94, Appendix A: Response to IBM's "Statement of Undisputed Facts."

[29] *Id.* at 4–27.

[30] IBM's Unfair Competition Reply at Addendum A: IBM's Undisputed Facts: IBM Interference Brief.

[31] *Id.* at Addendum B: IBM's Objections to SCO's Alleged Evidence.

[32] IBM's Motion for Summary Judgment on SCO's Unfair Competition Claim (SCO's Sixth Cause of Action), docket no. 782, filed Sept. 25, 2006.

[33] *See* Minute Order, docket no. 1150, filed June 11, 2015.

Company ("Sherwin-Williams"), Papa John's Pizza, AutoZone, Inc. ("AutoZone"), Hewlett-Packard Company ("Hewlett-Packard"), Fujitsu Ltd., NEC, and Toshiba Group.[34]

2.      SCO's Amended Complaint, filed on July 22, 2003, also contained a claim for interference with contract, but this time listed only three companies as purported examples of companies with which IBM is alleged to have interfered: Sherwin-Williams, Papa John's Pizza and AutoZone.[35]

3.      IBM propounded its first set of interrogatories on June 13, 2003, asking, in Interrogatory No. 8, that SCO, among other things, "identify all agreements with which plaintiff alleges IBM interfered and describe, in detail, each instance in which plaintiff alleges or contends that IBM interfered with those agreements, including but not limited to . . . all persons involved in the alleged interference . . . and . . . the specific trade secret or confidential or proprietary information, if any, involved in the alleged interference."[36]

4.      On August 4, 2003, SCO responded to IBM's Interrogatory No. 8 only with stock objections, stating that "discovery has just begun and [SCO] has not received responsive discovery from IBM that would allow it to fully answer this question because part of this information is peculiarly within the knowledge of IBM."[37]

5.      On October 1, 2003, IBM filed a motion to compel SCO to provide complete responses to its interrogatories, including Interrogatory No. 8.[38]

---

[34] Complaint ¶ 125, attached as Exhibit 1 to IBM's First Exhibits.

[35] Amended Complaint ¶ 157, attached as Exhibit 2 to IBM's First Exhibits.

[36] Defendant IBM's First Set of Interrogatories and First Request for the Production of Documents at 4-5 Interrogatory No. 8, attached as Exhibit 11 to IBM's First Exhibits.

[37] Plaintiff's Responses to Defendant's First Set of Interrogatories and First Request for the Production of Dcouments at 12 Interrogatory Response No. 8, attached as Exhibit 31 to IBM's First Exhibits.

[38] Defendant/Counterclaim Plaintiff International Business Machines Corporation's Memorandum in Support of Motion to Compel Discovery, attached as Exhibit 62 to IBM's First Exhibits.

6.      On October 23, 2003, the same day it filed an opposition to IBM's motion to compel, SCO served IBM with a supplemental response to IBM's first set of interrogatories.[39] In it, SCO claimed that IBM had interfered with SCO's contracts or prospective relationships with 12 entities- Sherwin-Williams, AutoZone, Target Corporation ("Target"), The Kroger Company ("Kroger"), Advanced Auto, Shaw's Supermarkets, State of Maine (Department of Labor), Eckerd Corporation/CVS Pharmacy ("Eckerd/CVS"), Safeway, Inc. ("Safeway"), Hewlett-Packard, Intel Corporation ("Intel") and Computer Associates International, Inc. ("Computer Associates") – nine of whom had never before been identified by SCO.[40]

7.      On December 12,2003, Magistrate Judge Wells granted IBM's motions to compel, and ordered SCO "[t]o respond fully and in detail to Interrogatory Nos. 1–9 as stated in IBM's First Set of Interrogatories" on or before January 12, 2004.[41]

8.      After the January 12, 2004 deadline, SCO submitted its "Revised Supplemental Response to Defendant's First and Second Set of Interrogatories" on January 15, 2004. In it, SCO claimed that IBM had interfered with SCO's contracts or prospective relationships with seven – not 12 – entities: Sherwin-Williams, AutoZone, Target, Hewlett-Packard, Intel, Computer Associates, and Oracle Corporation ("Oracle").[42]

9.      The next month, SCO filed a Second Amended Complaint, dated February 27, 2004, and the list of companies shrank further. There, SCO's Seventh Cause of Action again

---

[39] Plaintiff's Supplemental Response to Defendant's First Set of Interrogatories, attached as Exhibit 32 to IBM's First Exhibits.

[40] *Id.* at 32 Supplemental Interrogatory Response No. 8.

[41] Order Granting International Business Machine's Motions to Compel Discovery and Requests for Production of Documents, filed Dec. 12, 2003, at 2, 3, attached as Exhibit 55 to IBM's First Exhibits.

[42] Plaintiff's Revised Supplemental Response to Defendant's First and Second Set of Interrogatories at 50-56 Supplemental Interrogatory Response No. 8, attached as Exhibit 33 to IBM's First Exhibits (SCO dropped Kroger, Advanced Auto, Shaw's Supermarkets, State of Maine (Department of Labor), Eckerd's/CVS, and Safeway, and added Oracle for the first time).

alleged interference with contract, this time specifically identifying only two companies

(Sherwin-Williams and AutoZone, purportedly as examples) with which IBM is alleged to have

interfered. SCO reiterated that its claim also extended to "existing or potential economic

relationships with a variety of companies in the computer industry, including but not limited to

Hewlett-Packard."[43] SCO's Ninth Cause of Action claiming interference with business relations

identified only one company (Hewlett-Packard) with whose business relationship IBM is alleged

to have interfered.[44] Thus, as of February 27, 2004, the three companies involved in SCO's

interference claims that were specifically identified were Sherman-Williams, AutoZone, and

Hewlett-Packard.

10.     By Order dated March 3, 2004, the Court reiterated its December 2003 Order,

compelling SCO again to provide meaningful responses to IBM's interrogatories, this time on or

before April 19, 2004.[45] Specifically, the Court required SCO to "fully comply within 45 days of

the entry of this order with the Court's previous order dated December 12, 2003."[46] The

Magistrate Judge further observed that SCO had made "good faith efforts to comply with the

Court's prior order."[47]

11.     On January 22, 2005, IBM propounded its sixth set of interrogatories, including

Interrogatory No. 24, which states:

> For each of the claims asserted by plaintiff in this lawsuit, please describe in
> detail all of the alleged damages to plaintiff that were proximately caused by
> IBM, including, but not limited to; (a) the amount of the alleged damages; (b) the
> basis for the alleged damages; (c) the precise methodology by which the damages

---

[43] Second Amended Complaint ¶ 209, attached as Exhibit 3 to IBM's First Exhibits.

[44] *Id.* ¶¶ 208-14.

[45] Order Regarding SCO's Motion to Compel Discovery and IBM's Motion to Compel Discovery, filed Mar. 3, 2004, at 2, attached as Exhibit 56 to IBM's First Exhibits.

[46] *Id*.

[47] *Id.* at 3.

were calculated; documents or other materials relied upon or considered in determining the alleged damages; and (d) all efforts undertaken by plaintiff to mitigate the alleged damages.[48]

12.     On April 21, 2005, at a hearing before the Court, counsel for SCO stated:

IBM has served interrogatories on SCO, and SCO is under an obligation to respond to those interrogatories. We will do so as soon as we can. If it arises that IBM is of the view that it has not received our responses to their interrogatories in enough time to complete discovery, that is an issue to raise with the Court at that point. The Court is full of arsenal [sic] of measures it can take to allow more time or to preclude us from using evidence if we haven't produced responses to those interrogatories in time.[49]

13.     On July 1, 2005, the Court entered a Revised Scheduling Order, setting October 28, 2005, as the "Interim Deadline for Parties to Disclose with Specificity All Allegedly Misused Material" and December 22, 2005, as the "Final Deadline for Parties to Identify with Specificity All Allegedly Misused Material."[50] The Court required SCO to update interrogatory responses accordingly, including its response to Interrogatory No. 8.[51]

14.     Having received no further update to its response to Interrogatory No.8 despite the three Court orders, on September 2, 2005, IBM served SCO with a Rule 30(b)(6) deposition notice, asking that SCO designate a corporate representative to testify about SCO's relationships, and IBM's alleged interference, with the 13 entities identified in all of SCO's interrogatory responses to that point (Sherwin-Williams, AutoZone, Target, Kroger, Advanced Auto, Shaw's Supermarkets, State of Maine (Department of Labor), Eckerds/CVS, Safeway, Hewlett-Packard, Intel, Computer Associates, and Oracle), as well as with Novell.[52]

---

[48] Defendant/Counterclaim-Plaintiff IBM's Sixth Set of Interrogatories and Sixth Request for Production of Documents at 3 Interrogatory No. 24, attached as Exhibit 17 to IBM's First Exhibits.

[49] Transcript of Motion Hearing, dated Apr. 21, 2005, at 95:20-96:4, attached as Exhibit 417 to IBM's First Exhibits.

[50] Order, filed July 1, 2005, at 4, attached as Exhibit 58 to IBM's First Exhibits.

[51] *Id.*

[52] Defendant/Counterclaim-Plaintiff IBM's Notice of 30(b)(6) Deposition ("IBM's 30(b)(6) Deposition Notice") at 5-6, attached as Exhibit 20 to IBM's First Exhibits.

15.     SCO designated Jeff Hunsaker, Senior Vice-President and General Manager of

SCO's UNIX division and former Vice-President of Worldwide Sales, to testify about SCO's

business relationships with the 14 entities listed in IBM's notice.[53] SCO also designated Ryan

Tibbitts, SCO's general counsel, to testify about the remaining subtopics, including "the date,

nature and particulars of any conduct by IBM interfering with the relationship" and "the impact

on SCO of IBM's conduct."[54]

16.     On October 7, 2005, at a hearing before the Court, counsel for SCO committed to

supplementing SCO's responses to IBM's interrogatories, including its response to Interrogatory

No. 8, by December 22, 2005, as required by the Court in its July 1, 2005, Order:

> Counsel for SCO: Now, with respect to material that has been produced, Judge
> Kimball ordered us by October 24th to provide our interim disclosures of the
> technology and supplement that with the final disclosure in December. We are
> working on that and. We intend to fully comply with the order, which is the
> current order we understand we are operating under with respect to those
> mentioned by identification.[55]

17.     At his deposition on November 10, 2005, Mr. Hunsaker (SCO's 30(b)(6)

designee) could name no companies other than the 14 listed in IBM's 30(b)(6) notice as having

relationships with SCO with which IBM allegedly interfered:

> Q: Could you please answer if, aside from the companies mentioned in Topic 10,
> there is any other company or entity with whose relationship with SCO IBM has
> allegedly interfered with?
>
> A: As relates to specific names of companies, no. As it relates to the impact of
> IBM on SCO's business to all of our customers, it's broad.[56]

---

[53] Letter from E. Normand to A. Sorenson, dated Sept. 26, 2005, attached as Exhibit 47 to IBM's First Exhibits.

[54] IBM's 30(b)(6) Deposition Notice at 6.

[55] Transcript of Motion Hearing, dated Oct. 7, 2005, at 56:1-7, attached as Exhibit 418 to IBM's First Exhibits.

[56] Deposition Transcript of Jeff Hunsaker, dated Nov. 10, 2005 ("Hunsaker Nov. 10, 2005 Depo."), at 19:10-17, attached as Exhibit 312 to IBM's First Exhibits.

18.     In response to questions concerning SCO's historical revenues from each of the

14 companies and the SCO products purchased by these companies, Mr. Hunsaker could not

provide any specific information, but instead referred to certain "financial records" that he stated

had already been provided to IBM.[57] Counsel for IBM requested that "the records that Mr.

Hunsaker has referred to that he reviewed regarding revenue products and other information for

the [14] Subject Companies be produced to [IBM], and if it already has been produced, that it be

specifically identified to [IBM]."[58]

19.     On November 30, 2005, counsel for IBM wrote to counsel for SCO, requesting

that SCO produce the "financial and other information dating from 1996 and pertaining to SCO

customers, revenues and product sales" that Mr. Hunsaker testified he had reviewed.[59] Counsel

for IBM stated, "It became readily apparent that IBM was seeking reasonably detailed and

specific information with respect to the Subject Companies. Mr. Hunsaker was not prepared to

provide this type of information."[60]

20.     On December 1, 2005, SCO produced two documents to IBM. One document

purported to contain "Revenue Information" from 1999 to 2005 for 12 of the 14 companies listed

in IBM's notice (omitting Advanced Auto and Oracle). The other document purported to contain

"Invoicing" information from 1996 to 1998 for 13 of the 14 companies listed in IBM's notice

(omitting Advanced Auto).[61]

---

[57] *Id.* at 63:15–20, 138:2–25, 140:21–141:16,146:22–147:8.

[58] *Id.* at 159:18–23.

[59] Letter from C. Drake to E. Normand, dated Nov. 30, 2005, at 3, attached as Exhibit 209 to IBM's First Exhibits.

[60] *Id.* at 3-4.

[61] Revenue Information for Select Customers for the Period of FY1999 to FY2005, attached as Exhibit 49 to IBM's First Exhibits; Invoicing Only -- Not Revenue for the Period of Fiscay 1996 to 1998, attached as Exhibit 50 to IBM's First Exhibits.

21.     The next day, IBM deposed Darl McBride, SCO's President and CEO. When Mr.

McBride was asked to confirm that the 13 companies identified in the documents were the only

companies with which IBM was alleged to have interfered, he declined to do so and instead went

on to identify ten new "sets" of relationships, constituting at least 43 entities, with which he

claimed IBM interfered.[62] The ten "sets" identified by Mr. McBride were: (i) the "Members of

United Linux"; (ii) SCO's "Customers" in its typical distribution channel; (iii) "Third-Party

Software and Hardware Vendors"; (iv) "Industry Event Companies"; (v) the "Chicago 7"

companies; (vi) "Industry Analysts"; (vii) the "Project Monterey Group"; (viii) "Standards

Bodies or Companies Related to Standards Bodies; (ix) "SCO Investors"; and (x) the "Media".[63]

At his deposition, Mr. McBride could not identify all of the members of these groups.[64]

22.     Mr. McBride also testified that he "[knew] there are other names," that "the list of

those companies would be much longer than what I could just recall off the top of my head," and

that he could not "tell . . . specifics of everyone that should be on that list."[65]

23.     On December 5, 2005, counsel for IBM sent SCO's counsel a letter, objecting to

Mr. McBride's testimony and the expansion of SCO's interference claims.[66] Counsel for IBM

stated:

> It is difficult to view Mr. McBride's testimony as anything other than a misguided
> attempt by SCO to gain an unfair tactical advantage by expanding the scope of its
> interference and unfair competition claims and trying to force an extension of the
> discovery schedule. If SCO were allowed to expand its claims by Mr. McBride's
> assertions, which (like most of his testimony) lacked any basis in personal

---

[62] Deposition Transcript of Darl McBride, dated Dec. 2, 2005 ("McBride Dec. 2, 2005 Depo."), at 63:12-83:24, attached as Exhibit 317 to IBM's First Exhibits.

[63] Persons or Entities Whose Relationship with SCO IBM is Alleged to have Interfered with, such that SCO was Damaged, that are the Subject of SCO's Claims Against IBM – Identified by Mr. McBride at Deposition, attached as Exhibit 51 to IBM's First Exhibits.

[64] McBride Dec. 2, 2005 Depo. at 67:19-68:9.

[65] Id. at 64:4–5, 64:9–10, 83:21-22.

[66] Letter from T. Shaughnessy to E. Normand, dated Dec. 5, 2005, attached as Exhibit 52 to IBM's First Exhibits.

knowledge, then IBM would be required to undertake substantial additional third-party discovery at great expense, burden and prejudice to IBM.[67]

Counsel for IBM also requested that SCO confirm that SCO's interference claims were limited to IBM's alleged interference with only the persons or entities listed in its interrogatory responses, at its Rule 30(b)(6) depositions and in the two documents produced the day before Mr. McBride's deposition.[68]

24.     In response, counsel for SCO stated that IBM's objections to Mr. McBride's testimony were "mistaken," that Mr. Tibbitts would testify on behalf of the company on the remainder of IBM's Rule 30(b)(6) subtopics regarding SCO's interference claims, including the identity of all companies with whom IBM is alleged to have interfered, and that "SCO's supplemental interrogatory responses . . . will be consistent with SCO's 30(b)(6) testimony on the same topics as the interrogatory responses."[69] More completely, SCO's counsel explained:

> Mr. Hunsaker was not designated to testify as a 30(b)(6) witness on the topic of IBM's interference with SCO's business relationships underlying SCO's claims for tortious interference with contract and/or unfair competition. As per SCO's objection at the time that IBM questioned Mr. Hunsaker (which objection you do not acknowledge in your December 5 letter), any question about the scope of SCO's interference or unfair competition claims "exceeds the scope of the topic, the designation, for the witness."[70]

25.     IBM took the Rule 30(b)(6) deposition of Mr. Tibbitts as to SCO's interference claims the following week, on December 16, 2005. During Mr. Tibbitts's deposition, SCO produced a spreadsheet describing "the interferences that [SCO is] alleging and currently

---

[67] *Id.* at 2.

[68] *Id.*

[69] Letter from E. Normand to T. Shaughnessy, dated Dec. 8, 2005, at 5, attached as Exhibit 60 to IBM's First Exhibits.

[70] *Id*. (citing Hunsaker Nov. 10, 2005 Depo. at 18:22-24).

investigating."[71] This spreadsheet, marked as Exhibit 90 to Mr. Tibbitts's deposition, identifies

some 250 entities in at least seven countries.[72] Exhibit 90 provides little meaningful information,

if any, concerning the nature of SCO's claim, IBM's alleged misconduct, SCO's relationships

with the companies identified, SCO's historical or prospective business with the companies or

SCO's alleged damages.[73]

26.     Although counsel for SCO stated to counsel for IBM that Exhibit 90 would "assist

[Mr. Tibbitts] in answering these questions,"[74] when asked to provide information beyond what

was represented on the chart, Mr. Tibbitts testified that "Well, as a general proviso, I don't know

much about these entities other than what's on the spreadsheet here."[75] Mr. Tibbitts testified that,

other than certain additions he had, it was SCO's "intent that this document basically be our

answer to this category."[76]

27.     When asked whether he could provide any additional information about any of the

entities listed in Exhibit 90, Mr. Tibbitts testified, "So first page, no; second page, no; third page,

no; fourth page, no; fifth page, no; sixth page, no; seventh page, no; eighth, no."[77] Mr. Tibbitts

further testified:

> Q: [W]ith the exception of those that you've identified, which we'll talk about in
> just a minute, you are not prepared today to provide information beyond that
> which appears in Exhibit 90?
>
> A: Correct, and as I've already testified to.

---

[71] Deposition Transcript of Ryan E. Tibbitts, dated Dec. 16, 2005 ("Tibbitts Dec. 16, 2005 Depo."), at 43:9-14, 44:3-5, attached as Exhibit 319 to IBM's First Exhibits.

[72] Alleged IBM Interference Subject of and to Discovery 12/15/2005, attached as Exhibit 61 to IBM's First Exhibits.

[73] *Id.*

[74] Tibbitts Dec. 16, 2005 Depo. at 43:16-17.

[75] *Id.* at 53:5–7.

[76] *Id.* at 53:8-12.

[77] *Id.* at 85:7–9.

Q: Right. And that would include information regarding the specifics of IBM's conduct?

A: Correct.[78]

28.     At times, where Mr. Tibbitts purported to provide additional information beyond what appeared on the face of Exhibit 90, his testimony was frequently based on mere speculation. For example, when asked to elaborate on the meaning of an entry on Exhibit 90 that stated "Dell shifted over to IBM's plan," Mr. Tibbitts responded, "No. I mean I can guess that it means shifted over to IBM's Linux plan, but that's a guess on my part."[79]

29.     Although many of the entries on Exhibit 90 contain the identical allegations that "IBM's sales representatives persuad[ed] SCO's customers that SCO has no viability"[80] and that there was "direct pressure from IBM to stop dealing with SCO,"[81] Mr. Tibbitts was unable to substantiate or clarify these allegations in any way.

> Q: Are you able to testify concerning the specifics of any statements by IBM to any customers or prospective customers identified in Exhibit 90 concerning SCO's viability?
> A: No.
> Q: And are you able to provide any information about IBM's alleged direct pressure to these customers and prospective customers to stop dealing with SCO?
> A: No.[82]

30.     Mr. Tibbitts, SCO's Rule 30(b)(6) witness on SCO's relationship with BayStar Capital Management, LLC ("Baystar"), also testified that all he knew about IBM's alleged interference with BayStar was as briefly stated in SCO's Exhibit 90: "No, I think this is all I know about IBM's alleged involvement with -- behind the scenes with BayStar": that BayStar's

---

[78] *Id.* at 87:2–9.

[79] *Id.* at 110:7–14.

[80] Alleged IBM Interference Subject of and to Discovery 12/15/2005, attached as Exhibit 61 to IBM's First Exhibits.

[81] *Id.*

[82] Tibbitts Dec. 16, 2005 Depo. at 89:14-22.

principal, Lawrence Goldfarb, "told [SCO's CEO] Darl [McBride] sort of after the dust settled

that IBM was on him, on him, on him, or something like that."[83]

32.     The next week, on December 20, 2005, counsel for IBM spoke with counsel for

SCO regarding Mr. McBride's and Mr. Tibbitts's testimony and SCO's expansion of its

interference claims.[84] Counsel for SCO stated that SCO had now determined to limit the number

of specific companies for which SCO was claiming interference to ten, and possibly to five, and

that SCO would provide an updated interrogatory response reflecting this as soon as possible.[85]

In response, counsel for IBM stated that if such a response was not promptly provided, IBM was

prepared to bring the matter to the attention of the Court.[86]

32.     On December 22, 2005, SCO served its final disclosures, but failed to update its

interrogatory responses, including its response to Interrogatory No. 8.[87]

33.     On December 28, 2005, counsel for SCO informed counsel for IBM that the

number of specific companies at issue would in fact be only six; that they would be BayStar,

Hewlett-Packard, Oracle, AutoZone, Intel, and Novell; and that SCO would promptly

supplement its interrogatory answers accordingly.[88]

---

[83] *Id.* at 86:15–19.

[84] Declaration of Todd M. Shaughnessy ("Shaughnessy Declaration") ¶ 2, attached as Exhibit 70 to IBM's First Exhibits.

[85] *Id.* ¶ 3.

[86] *Id.*

[87] SCO's Disclosure of Material Misues by IBM, attached as Exhibit 54 to IBM's First Exhibits.

[88] Shaughnessy Declaration ¶ 4.

34.     On January 13, 2006, after the December 22, 2005, deadline for finally submitting its final disclosures and updated interrogatory responses, SCO served a revised Supplemental Response to Interrogatory No. 8.[89]

35.     Despite SCO's commitment to limit its interference claims to approximately six companies, the Supplemental Response identifies over 150 entities whose relationship with SCO IBM allegedly interfered with.[90] The Supplemental Response also identifies six companies or entities with which SCO claims IBM interfered through various direct contacts with the companies: BayStar, Hewlett-Packard, Computer Associates, Oracle, and Intel, as well as an "OpenSource Conference" in Scottsdale, Arizona.[91]

36.     As to these, SCO makes the following allegations:

        a.      <u>BayStar</u>: SCO alleges that, following BayStar's investment in SCO in October 2003, "IBM on one or more occasions communicated with BayStar in order to induce BayStar to threaten litigation against SCO and to terminate its business relationship with and/or withdraw or reduce its investment in SCO" and that "[a]s a proximate result of IBM's communications with BayStar, BayStar terminated its business relationship with SCO in May 2004."[92]

        b.      <u>Computer Associates, Oracle, and Intel</u>: SCO alleges "[o]n information and belief" that IBM contacted Computer Associates, Oracle, and Intel during or shortly

---

[89] SCO's Supplemental Response to Interrogatory No. 8 ( "Supplemental Response"), attached as Exhibit 46 to IBM's First Exhibits.

[90] *Id*.

[91] *Id*. at 2–7.

[92] *Id.* at 2–3.

after the LinuxWorld 2003 convention and informed them that IBM was "cutting off all business ties with SCO" and that IBM wanted each of them to do the same.[93]

c. <u>Hewlett-Packard</u>: SCO alleges that "[Karen] Smith [of IBM] contacted Rick Becker of Hewlett-Packard during or shortly after the LinuxWorld 2003 convention and stated that IBM was cutting off all business ties with SCO and wanted Hewlett-Packard to do the same."[94] SCO relies entirely on the deposition testimony of Mr. Becker, that at the LinuxWorld 2003 convention, Ms. Smith "indicated to me that IBM was going to withdraw all their business activities from SCO, and that in the interest of the best outcome for our joint Linux initiatives that she was going to suggest that HP, and I was representing HP, and following me, Intel should do the same."[95] SCO also alleges that, although Hewlett-Packard and SCO "still have a good business relationship, Hewlett-Packard has provided SCO with significantly less support than it did in 2002."[96]

d. <u>OpenSource Conference in Scottsdale, Arizona</u>: SCO alleges that Darl McBride "entered into an oral business relationship with John Terpstra, who was hosting an OpenSource Conference in Scottsdale, Arizona, in the spring of 2004, to speak at the conference."[97] SCO further claims that IBM thereafter "contacted Mr. Terpstra and informed him that IBM did not want Mr. McBride to speak at the conference, and

---

[93] *Id.* at 4.

[94] *Id.*

[95] Deposition Transcript of Rick Becker, dated Oct. 15, 2003 ("Becker Oct. 15, 2003 Depo."), at 54:3-20, 55:6-11, attached as Exhibit 118 to IBM's First Exhibits.

[96] Supplemental Response at 4.

[97] *Id.* at 7.

intimated that IBM would withdraw its participation in the conference if Mr. McBride did speak."[98]

37.    The Supplemental Response also alleges that IBM "encourag[ed] and improperly enabl[ed] numerous companies to migrate to or to use an enterprise-hardened Linux platform operating on Intel-based hardware rather than use SCO's UnixWare or OpenServer products[,]" thereby interfering with SCO's prospective business relationships with 19 "former SCO customers who migrated to an enterprise-hardened Linux platform" (Actual Systems, Advantage Business Computers, AmCom Software, Auto Zone, Avaya, Avnet, Bebe, Frazee Paints, Kmart, Prime Clinical, Radical System, Safeway, Save Mart, Shaw's Supermarkets, Sherwin-Williams, Shopper's Drug Mart, Snyder Drug Stores, Target Pharmacies, and West Communications) and 156 "other Linux users who chose an enterprise-hardened Linux platform[.]"[99]

38.    On June 28, 2006, Magistrate Judge Wells issued an Order Granting in Part IBM's Motion to Limit SCO's Claims. In the Order, Judge Wells states:

> In an order signed by Judge Kimball on July 1, 2005, both SCO and IBM were given two important dates, October 28, 2005 and December 22, 2005 respectively. These dates were court ordered deadlines for the parties "to disclose with specificity all allegedly misused material'. With the October date being the interim deadline and the December date being the final deadline. Pursuant to this same order, the parties were also ordered to "update interrogatory responses."[100]

39.    Because Mr. Tibbitts was unable to provide meaningful information about SCO's claims at his December 16, 2005 deposition, and because SCO's claims continued to evolve,

---

[98] *Id.*

[99] *Id.* at 7–13.

[100] Order Granting In Part IBM's Motion to Limit SCO's Claims, filed June 28, 2006, at 14-15, attached as Exhibit 59 to IBM's First Exhibits.

IBM deposed Mr. Tibbitts a second time in his capacity as SCO's Rule 30(b)(6) witness on the interference claims on June 30, 2006.[101]

40.     At this deposition, SCO confirmed that the Supplemental Response sets forth "the complete and accurate" response to IBM's Interrogatory No. 8 as it understood it to date, that it "supersede[s]" and "replace[s]" SCO's prior responses to Interrogatory No.8, and that – at least as to pages one through ten of the Supplemental Response – SCO has "no plan to update anything" therein.[102]

41.     Mr. Tibbitts further acknowledged that SCO was "abandoning" its tortious interference claims with respect to five of the 19 "former SCO customers" identified in the Supplemental Response – Avnet, Frazee Paints, Save Mart, Snyder Drug Stores, and Target because these companies had not switched to a LINUX platform at all.[103]

42.     As set out in the Supplemental Response and Mr. Tibbitts's testimony, SCO now asserts its Seventh and Ninth Causes of Action with respect to:

a.     Six identified contractual or existing business relationships with which IBM allegedly interfered by specific conduct or communication to the companies or persons with whom SCO had the relationships: BayStar, Hewlett-Packard, Computer Associates, Oracle, Intel, and the OpenSource Conference.

b.     Possible business relationships that allegedly might have been established with companies in a second group, consisting of the 14 "former SCO customers" and 156 "other Linux users." SCO "is not alleging that IBM contacted any one of these companies individually and somehow wrongfully induced them to switch to Linux on that basis";

---

[101] Deposition Transcript of Ryan Tibbitts, dated June 30, 2006 ("Tibbitts June 30, 2006 Depo."), attached as Exhibit 345 to IBM's First Exhibits.

[102] *Id*. at 9:10–10:1, 22:24–23:21.

[103] *Id.* at 24:23–26:22.

instead, the alleged acts consists of IBM's alleged activities relating to LINUX affecting the marketplace in general.[104] SCO has characterized this claim as one for "indirect" interference or interference with "the UNIX on Intel market as a whole."[105] SCO asserts that, but for IBM's alleged interference, these companies and entities "foreseeably would have chosen a SCO platform" rather than a LINUX platform.[106] SCO also does not claim that the more than 150 "other Linux users" were SCO customers or that SCO necessarily had any direct contact or communication with them. In fact, during Mr. Tibbitts's June 30, 2006 Rule 30(b)(6) deposition, counsel for SCO admitted that SCO generated the list of the 156 companies by lifting companies named in an IBM document which purports to identify certain companies as "Linux wins[.]"[107] In its Supplemental Response, SCO expressly states that the claims as to these 156 companies are made only "on information and belief."[108]

### B.  Background on SCO in the UNIX-On-Intel Market

43.    The Santa Cruz Operation ("SCO" or "Santa Cruz")[109] was founded 1979 as a UNIX system porting and consulting company.[110] In 1983, SCO delivered the first packaged

---

[104] *Id*. at 29:16–30:10.

[105] McBride Dec. 2, 2005 Depo. at 67:22–25; Tibbitts June 30, 2006 Depo. at 26:19–22, 35:4–11.

[106] Supplemental Response at 7–13.

[107] Tibbitts June 30, 2006 Depo. at 42:6–11.

[108] Supplemental Response at 11-13.

[109] The Santa Cruz Operation was historically referred to as "SCO" and many documents in this action use the term "SCO" in reference to that entity. In May 2001, Santa Cruz transferred its UNIX assets to plaintiff, which was then called Caldera International, Inc. ("Caldera"). Immediately after the sale, Santa Cruz changed its name to Tarantella. Caldera International Inc. remained Caldera after the transaction but later, in 2002, changed its name to The SCO Group, Inc., the plaintiff in this action, in order to leverage the UNIX assets and business it had acquired. The term "SCO" is used herein, as it is in many documents, to refer to the entity in possession of the UNIX assets, although that entity changed from Santa Cruz to The SCO Group, previously Caldera, in May 2001.

[110] The History of The SCO Group at 1, http://www.sco.com/company/history.html, attached as Exhibit 250 to Declaration of Brent O. Hatch ("SCO's Opposition Exhibits"), docket no. 876, filed under seal on Nov. 11, 2006.

UNIX System for Intel processor-based PCs, and continued to focus on UNIX systems on Intel processors (referred to as Intel architecture or simply, IA).[111]

44.    As one industry analyst described it, "SCO established the market for advanced operating systems on industry-standard Intel platforms in the 1980s, pioneering such features as a full 32-bit implementation, security, and multiprocessing."[112]

45.    At least as far back as 1989, SCO was described as "the largest vendor of Unix-like operating systems on Intel-based computers."[113]

46.    In 1997, SCO was the worldwide UNIX market leader in terms of unit shipments, with roughly 40 percent of total market unit sales.[114]

47.    SCO dominated the UNIX-on-Intel market to an even greater extent – with an 80% market share.[115]

48.    The strength of SCO's market position at this time was described in detail in the expert reports of Dr. Gary Pisano and Dr. Jeffrey Leitzinger, and those findings are incorporated herein by reference.[116]

---

[111] Id.

[112] Christopher Thompson, SCOring a Hit against Microsoft Windows NT at 6, GARTNER (Apr. 21, 1997), attached as Exhibit 244 to SCO's Opposition Exhibits.

[113] Evan O Grossman, UNIX Users Look Forward to Advantages of Intel '486 at 1, PC WEEK (Apr. 17, 1989), attached as Exhibit 246 to SCO's Opposition Exhibits.

[114] Project Monterey, The Volume Enterprise UNIX Platform, A Value Proposition to ISVs, dated Feb. 2000, at 1912022968, attached as Exhibit 190 to SCO's Opposition Exhibits; UNIX Server License Share by Vendor (Units), dated Dec. 1997, at 1710009530, attached as Exhibit 185 to SCO's Opposition Exhibits; Strategic Issue Discussion, dated Aug. 5, 1998, at 1710136591, attached as Exhibit 197 to SCO's Opposition Exhibits.

[115] Project Monterey Update CTC Executive Committee Presentation, dated Mar. 26, 1999, at 1710090997, 1710090986, attached as Exhibit 171 to SCO's Opposition Exhibits.

[116] Expert Report of Gary Pisano, Ph.D., dated May 19, 2006 ("Pisano Report), at 40-46, attached as Exhibit 284 to SCO's Opposition Exhibits; Expert Report of Dr. Jeffrey Leitzinger, dated May 19, 2006 (Leitzinger Report), at 9-20, attached as Exhibit 281 to SCO's Opposition Exhibits.

## C.  IBM's Position Relative to SCO's

49.     In a July 30, 1998 summary of IBM's UNIX Strategy addressed to IBM's CEO

Lou Gerstner, IBM recognized SCO's strong competitive position, and, indeed, dominance of the

UNIX-on-Intel market.[117] Mr. Gerstner was informed: "While HP and Sun have been successful

at driving commitments to 64-bit Intel, today's clear leader in the UNIX on Intel market is Santa

Cruz Operation (SCO) with over 80% of the $3B UNIX-Intel market."[118]

50.     On August 5, 1998, IBM executives again presented Mr. Gerstner with a

summary of SCO's strong market position, which provided: "Based on 1997 estimates, SCO

captured 15% of the revenue and 40% of the volume in the UNIX industry . . . . In the segment

of UNIX operating systems running on Intel processors, SCO was believed to have 80% of the

revenue."[119] IBM further explained that "SCO's operating system is an important component for

solutions in the Intel high-volume server market" and that "[s]olutions built on SCO provide the

robustness and extendability of UNIX with the cost advantages of an Intel platform."[120]

51.     In addition, IBM identified for Mr. Gerstner SCO's key market segments,

customers, and applications.[121] For instance, IBM recognized that independent software vendors

(ISVs) work with SCO because SCO has "[o]ne of the industry's strongest support infrastructure,

with over 10,000 authorized resellers, 100 distributors, 250 vertical solution providers and

system integrators, and 140 education centers" and because SCO "[d]ominated market share in

---

[117] Memorandum to L. Gerstner regarding IBM's UNIX Strategy, dated July 30, 1998, at 1710117641, attached as Exhibit 284 to SCO's Opposition Exhibits.

[118] *Id*.

[119] Strategic Issue Discussion, dated Aug. 5, 1998, at 1710136584, attached as Exhibit 197 to SCO's Opposition Exhibits.

[120] *Id*. at 1710136589.

[121] *Id*. at 1710136590-91.

Telecom and In-store Systems in Retail Industries (e.g. installed in 14 out of top 16 biggest pharmacies, all major auto-part stores and grocery stores)."[122]

52.     IBM further acknowledged in an April 1999 "IBM Linux Initiative" that SCO's UnixWare was not then competitively impacted by LINUX.[123]

### D.  IBM's Alleged Tortious Interference with SCO's Business Relations in the UNIX-On-Intel Market

53.     In early 2000, IBM began disclosing proprietary UNIX technologies to LINUX for the purpose of commercially hardening LINUX for use in core enterprise functions.[124]

54.     The impact of IBM's disclosures on SCO's business was direct, immediate and profound.[125] SCO's revenues declined "precipitously in 2000 through 2002, dropping 74%, immediately after the first alleged contributions of IBM in February of 2000."[126] SCO's revenues dropped as customers migrated to the LINUX operating system, as noted by both industry analysts and SCO distributors.[127]

55.     The reason for this swift impact on SCO's business was that IBM's disclosures to the LINUX community enabled LINUX to be used within corporations for the same functions as SCO's UNIX operating systems.[128] In reaching this conclusion, SCO's experts relied in part on evidence that IBM had focused its efforts on LINUX's shortcomings as compared to UNIX.[129]

---

[122] *Id.*

[123] IBM Linux Initiatives ("Easter2" Update), dated Apr. 1999, at 181437823, attached as Exhibit 192 to SCO's Opposition Exhibits.

[124] Pisano Report at 31-34, 50; Leitzinger Report at 45-48.

[125] Response to the Reports and Declarations of IBM Experts by Gary Pisano, Ph.D., dated Aug. 28, 2006 (Pisano Response Report), at 20, attached as Exhibit 286 to SCO's Opposition Exhibits; Leitzinger Report at 56-58; 62-69; Expert Report of Avner Kalay, Ph.D., *Valuation of Lost Asset*, dated May 19, 2006, at 12, 27, attached as Exhibit 279 to SCO's Opposition Exhibits.

[126] Pisano Response Report at 21.

[127] *Id.* at 25-26.

[128] Pisano Report at 52; Pisano Response Report at 31, 39; Leitzinger Report at 54–56.

[129] Pisano Response Report at 43-44.

56.     In 1999, prior to IBM's disclosures, LINUX had not been used for these functions and did not compete with SCO's UNIX operating systems.[130]

57.     In early 2000, an IBM representative announced at LinuxWorld that IBM had contributed certain AIX technology to LINUX as part of its commitment to improving LINUX for commercial workloads.[131]

58.     In 2000, even before the disclosures were implemented in LINUX but after they were made, the expectation of such implementation impacted customers' buying patterns and drove buyers away from SCO's UNIX products to LINUX.[132]

59.     SCO's experts conclude that, but for IBM's disclosures to LINUX, LINUX would not have been in a position to compete for the same functions with the same customers as SCO's UNIX operating systems.[133]

60.     SCO did not encourage its partners or its customers to use or support LINUX instead of UNIX. SCO consistently positioned LINUX as a complimentary solution to UNIX, and something that could be used in addition to (not in place of) UNIX.[134]

61.     Specifically, SCO positioned its UNIX product, Open Unix 8, for use in "business critical applications" and "for hardened reliability and scalability."[135] In contrast, SCO

---

[130] Pisano Report at 43; Pisano Response Report at 19, 26; Leitzinger Report at 22-24.

[131] Deposition Transcript of Robert LeBlanc, dated Nov. 8, 2005, at 222:12-25, attached as Exhibit 15 to SCO's Opposition Exhibits.

[132] Pisano Report at 47-49; Pisano Response Report at 48.

[133] Pisano Response Report at 39; Leitzinger Report at 52-54.

[134] Declaration of Erik W. Hughes ("Hughes Declaration") ¶ 3, attached as Exhibit 1 to SCO's Opposition Exibits; Declaration of Janet Sullivan ("Sullivan Declaration") ¶ 3, attached as Exhibit 369 to SCO's Oppositon Exhibits.

[135] Caldera, Powerful Choices, Operating System Roadmap, dated Dec. 2001, at SCO1521021, attahced as Exhibit 380 to SCO's Opposition Exhibits.

positioned OpenLinux "for use as a back office server and Internet access point" or "for applications at the department level."[136]

62.     Consistent with this message, SCO did not encourage Oracle, Computer Associates, or Intel to support LINUX instead of UNIX. To the extent SCO was involved in LINUX activities with these customers, it was only after these companies had decided to support LINUX. This was an effort to preserve some revenue in connection with these companies after they made a decision adverse to SCO's UNIX business, *i.e.*, an effort to mitigate its losses.[137]

63.     IBM itself recognized that SCO's strategy was not to replace UNIX with LINUX in its existing customers. In August 2002, Dr. Sen-Ming (SM) Chang, LINUX Manager of IBM's Greater China Group, frankly assessed IBM's strategy and risks with respect to SCO customer base.[138] First, he acknowledged that, with "Caldera's revenue stream . . . 85% based on SCO and related products" it would be "highly unlikely you will get their help short-term to conduct a SCO 'rip and replace'" of SCO UNIX with LINUX. However, he worried: "If we go after the SCO install base without Caldera in the loop, obviously Caldera will seek to partner with our competition including HP-Compaq."[139]

### E.  IBM's Efforts to Prevent SCO from Asserting Intellectual Property Rights

64.     In late 2002 and early 2003, SCO began researching the intellectual property surrounding LINUX. At this time, SCO discovered that customers were using its proprietary UNIX libraries with LINUX – which was not permissible.[140]

---

[136] *Id.*; Hughes Declaration ¶ 6.

[137] *Id.* ¶11; Sullivan Declaration ¶¶ 7, 19.

[138] Email from C. Carson to P. Byers, R. Michos, dated Aug. 12, 2002, attached as Exhibit 23 to SCO's Opposition Exhibits.

[139] *Id.* at 181500977.

[140] Declaration of Darl McBride ("McBride Declaration") ¶ 3, attached as Exhibit 165 to SCO's Opposition Exhibits.

65.     In response to such discoveries and customer requests, SCO attempted to implement a strategy in late 2002 and early 2003 (after the disclosures were already made and in an effort to mitigate its damages) by which customers could license from SCO the right to use SCO's proprietary UNIX libraries with LINUX.[141] SCO later devised a license by which customers could legitimately use LINUX more broadly, without violating SCO's intellectual property rights.[142]

66.     SCO presented its library licensing plan to multiple partners, including Oracle, Intel, and Computer Associates, and was met with favorable response.[143] Until IBM, no company objected to the plan or expressed disapproval.[144]

67.     IBM, however, reacted with antagonism to SCO's plan to license the UNIX libraries and source code included in LINUX.

a.     IBM affirmatively discouraged SCO from putting out a press release regarding its library licensing program.[145]

b.     IBM executive Karen Smith recalls a conversation with IBM executive Steve Solazzo and Mr.Darl McBride around December 2002 in which Mr. Solazzo endeavored to discourage SCO from proceeding with the plan.[146]

c.     SCO's plans to issue a press release regarding its library licensing program, and IBM's exception to SCO doing so, was the impetus for an additional call in

---

[141] *Id*.

[142] *Id.*

[143] Declaration of Christopher S. Sontag ("Sontag Declaration") ¶ 4, attached as Exhibit 9 to SCO's Opposition Exhibits.

[144] *Id.*

[145] Deposition Transcript of Karen L. Smith, dated Jan. 24, 2006 ("Smith Jan. 24, 2006 Morning Depo."), at 83:22-25, attached as Exhibit 310 to SCO's Opposition Exhibits.

[146] Deposition Transcript of Karen L. Smith, dated Jan. 24, 2006 ("Smith Jan. 24, 2006 Afternoon Depo."), at 17:25-19:20, attached as Exhibit 164 to IBM's First Exhibits.

December with IBM including SCO executives Darl McBride and Chris Sontag, SCO attorneys, and IBM executives and attorneys.[147] In that call, IBM again tried to persuade SCO not to issue the press release and begin its program.[148]

      d.      IBM ultimately persuaded SCO to delay its press release until January 2003, allegedly because IBM was concerned that the release would impact its ability to reach its December LINUX-revenue numbers.[149] Based upon the representations made by IBM, SCO agreed to push the release and the initiation of the program back to January 2003.[150]

      e.      IBM again expressed negativity about SCO's efforts in a call in mid-January 2003. This call included Darl McBride and IBM executives Karen Smith and Bob Butler.[151] While IBM again sought to dissuade SCO from issuing a press release about its plan, Mr. McBride, in that meeting or later, never gave any assurances to IBM that the press release would not go out.[152]

      f.      On January 22, 2003, SCO issued its press release announcing the formation of its new business division, SCOsource, to manage the licensing of its intellectual property.[153] The press release further explained that SCO had retained the law

---

[147] *Id*. at 26:14-17.

[148] McBride Dec. 2, 2005 Depo. at 178:18-179:15; Sontag Declaration ¶ 5.

[149] McBride Declaration ¶ 5.

[150] *Id.*

[151] Smith Jan. 24, 2006 Afternoon Depo. at 49:6 – 50:2.

[152] McBride Declaration ¶ 6.

[153] SCO Establishes SCOsource to License Unix Intellectual Property, http://ir.sco.com/releasedetail.cfm?ReleaseID=99965, attached as Exhibit 201 to SCO's Opposition Exhibits.

firm of Boies, Schiller and Flexner "to help research and advise SCO on the company's intellectual property."[154]

g.     The next day, on January 23, 2003, Karen Smith and Darl McBride met for a breakfast meeting at LinuxWorld 2003, at Ms. Smith's request.[155] At this meeting, Ms. Smith informed Mr. McBride that IBM was displeased with SCO's announcement, and that it would "kill" LINUX. She further indicated that, as a result of SCO's licensing announcement, IBM was going to cut off all of its business ties with SCO, and would instruct other IBM business partners do the same.[156]

h.     That afternoon, Ms. Smith met with Hewlett-Packard Executive Richard Becker. This meeting was shortly after Ms. Smith's breakfast meeting with Mr. McBride.[157]

i.     Ms. Smith claims to not recall specifically what she said at that meeting with Mr. Becker,[158] but acknowledges that the topic of SCO's recent press release and its licensing plan came up in her conversation with Mr. Becker because she was "bothered and concerned" about SCO's actions.[159]

j.     Mr. Becker stated that "[Ms. Smith] indicated to me that IBM was going to withdraw all their business activities from SCO, and that in the interest of the best

---

[154] *Id.* at 1.

[155] McBride Dec. 2, 2005 Depo. at 164:20-22.

[156] *Id.* at 163:13-166:12.

[157] Smith Jan. 24, 2006 Morning Depo. at 147:15-19.

[158] *Id.* at 149:12-17.

[159] *Id.* at 150:11-23.

outcome for our joint Linux initiatives that she was going to suggest that HP, and I was representing HP, and following me, Intel should do the same."[160]

68.     Just a day later, Ms. Smith began to execute on her threat that IBM would discontinue its business relationships with SCO: A January 24, 2003 internal IBM email stated: "We have received direction from Karen Smith who is responsible for IBM's Linux Strategy & Market Development. Because of recent public announcements from SCO (a Linux distributor) around intellectual property, we in RSS [Retail Stores Solution] have been asked to discontinue any plans to work with SCO and avoid any association with SCO in our development, sales & marketing efforts."[161]

69.     IBM engaged with SCO partners at a meeting or meetings referred to in the press as the "Chicago Seven Meetings":

k.     In July of 2003, representatives from seven different companies engaged or involved in the LINUX business community met in Chicago.[162] The participants represented IBM, Novell, Computer Associates, Oracle, Dell, Intel and Hewlett-Packard.[163]

l.     The meeting was motivated by, at least in part, concerns shared by LINUX distributors arising from SCO's claims against IBM.[164] Novell's CEO Jack Messman acknowledged that the group discussed SCO's claims that LINUX contained UNIX

---

[160] Becker Oct. 15, 2003 Depo. at 54:5-11.

[161] Email from P. Kooler to T. Garneau, dated Jan. 27, 2003, at 181008215-16, attached as Exhibit 202 to SCO's Opposition Exhibits.

[162] Smith Jan. 24, 2006 Afternoon Depo. at 78:12-13.

[163] *Id.* at 83:9-84:18.

[164] *Source Strategy, Sound Products and Strong Support Give CIOs Alternative IT Choices*, LINUX EXECUTIVE REPORT (Aug. 2004), www.ibm.com/linux, attached as Exhibit 256 to SCO's Opposition Exhibits.

code.[165] According to Mr. Messman, there existed a perceived problem in the market arising from SCO's challenge that LINUX contained UNIX, and Novell proposed to solve the issue by acquiring Suse LINUX; it's reasoning was that, because Novell contended that it still held the copyrights to UNIX, if there in fact were any UNIX in LINUX, Novell had the right to use it, and to indemnify its customers if they used it.[166]

m.    The ostensible purpose of the "Chicago Seven" meeting was to discuss a distribution of LINUX to which all of the partners would contribute (and, of course, benefit).[167] According to IBM's vice president, the group discussed the respective investments each was making in the Open Source Development Labs ("OSDL"), including certification and testing of LINUX. OSDL, notably, was not invited to participate in this discussion with the "Chicago Seven."[168]

### F.  SCO's Failure of Proof.

70.    SCO has not identified any evidence of improper conduct by IBM that interfered with any of its contracts or business relationships, as shown below.

## I.    BayStar

71.    Baystar invested $50 million in SCO in October 2003. The investment had been made through a preferred stock transaction.[169]

---

[165] Ex. Deposition Transcript of Jack L. Messman, dated Apr. 14, 2006, at 239:9-12, attached as Exhibit 145 to SCO's Opposition Exhibits.

[166] *Id.* at 240:11-15.

[167] *Source Strategy, Sound Products and Strong Support Give CIOs Alternative IT Choices*, LINUX EXECUTIVE REPORT (Aug. 2004), www.ibm.com/linux, attached as Exhibit 256 to SCO's Opposition Exhibits.

[168] *Id.*

[169] McBride Declaration ¶ 27.

72.     SCO sought the investment from Baystar to fund its ongoing operations, which included continuing development and marketing of its UNIX and other products, protection of its intellectual property, and its lawsuits against IBM and other companies.[170]

73.     When Baystar initially spoke to SCO about the investment, its representatives – namely, Lawrence Goldfarb – expressed that Baystar "believed that SCO had a great opportunity with the lawsuit" and that Baystar was interested in the value of SCO's intellectual property assets.[171]

74.     However, after the investment was finalized, Mr. Goldfarb began making wildly inconsistent demands upon SCO.[172] At one moment he would criticize SCO for focusing too much on the lawsuits, and in the next he would dramatically reverse his position and attack SCO for its focus on its ongoing businesses.[173] Mr. McBride explained:

> I recall that after the Baystar transaction was complete and we started moving forward, within some relatively short period of time we started getting extreme pressure coming from Baystar, and the content of the pressure was ever changing. One minute it was we were not doing our business – doing enough core business, the next minute it was we're not doing enough legal lawsuits, and it seemed to go back and forth. And there wasn't a good theme as to what their issues were, other than we kept getting threats of them to sue us over one thing or another, if we didn't respond to what their immediate demand was.[174]

Even in the midst of this erratic behavior, Mr. Goldfarb's enthusiasm for SCO's litigation strategy did not wane.[175]

---

[170] Id.

[171] Deposition Transcript of Ralph J. Yarro, III, dated Mar. 14, 2006, at 93:9-20, attached as Exhibit 21 to SCO's Opposition Exhibits.

[172] Id. at 94:9-22, 95:15-22.

[173] Id. at 95:7-14.

[174] Deposition Transcript of Darl McBride, dated Mar. 15, 2006 ("McBride Mar. 15, 2006 Depo.), at 248:17-249:5, attached as Exhibit 330 to IBM's First Exhibits.

[175] Tibbitts Dec. 16, 2005 Depo. at 30:17-23.

75.     Nevertheless, on April 15, 2004, Baystar sought redemption of its SCO shares. In its redemption notice, Baystar claimed that SCO was in breach of its agreements with Baystar, and that Baystar was going to redeem its shares.[176]

76.     However, Baystar never could substantiate, or even fully explain, the nature of its claims of breach against SCO. Mr. Tibbitts testified that "Nolan [Taylor] started corresponding with them, I believe, trying to find out what the problem was and could never . . . get . . . enough information to do much about it."[177]

77.     SCO originally believed that Mr. Goldfarb's erratic behavior was attributable to an interest he expressed to Mr. McBride early in his investment. Mr. Goldfarb stated: "Look, Darl I'm a trader, and I don't really care whether your stock goes up or down, I just need it volatile because I can make money if it goes up and I can make money if it goes down."[178] Based on this comment, SCO suspected that Mr. Goldfarb's difficult and troubling behavior was simply an attempt on his part to manipulate the stock of his company to his own advantage.[179]

78.     In the partial redemption of Baystar's investment, SCO lost a significant source of funding for its ongoing operations and protection of its intellectual property. In April 2004, SCO settled Baystar's request for the return of its investment with a $13 million cash payment, and the issuance of approximately 2.1 million shares of common stock. In return, Baystar relinquished its preferred stock. The value of the cash and stock issued to Baystar pursuant to this resolution amounted to $20 million from SCO.[180]

---

[176] *Id*. at 32:3-10.

[177] *Id*. at 32:1-10.

[178] *Id*. at 31:1-32:1; McBride Declaration ¶ 28.

[179] McBride Declaration ¶ 28.

[180] *Id*. ¶ 30.

79.     No one from IBM ever communicated with any representative of BayStar concerning SCO or BayStar's investment in SCO.

a.      In a sworn declaration, Lawrence Goldfarb, managing member of BayStar, states: "No one from IBM ever had any communications with me or, to my knowledge, anyone at BayStar relating to SCO."[181]

b.      Mr. Goldfarb also states: "No one from IBM ever contacted me or anyone else at BayStar about SCO, BayStar's investment in SCO, or anything else."[182]

80.     BayStar's threats of litigation against SCO and its decision to terminate or reduce its business relationship with SCO were not induced or caused by any action or communication by IBM.

a.      BayStar's Mr. Goldfarb states: "BayStar terminated its relationship with SCO for multiple reasons. BayStar's decision to terminate its relationship with SCO had nothing whatsoever to do with any communications with or conduct of IBM."[183]

b.      Mr. Goldfarb further states: "BayStar's decision to redeem its shares in SCO and retire its investment in SCO had nothing whatsoever to do with IBM or any representative of IBM."[184]

81.     BayStar's decision to redeem its investment in SCO was caused by reasons having nothing to do with IBM.

a.      Shortly after BayStar made the investment in SCO, SCO's stock price, financial performance and the viability of its UNIX products all appeared to be in

---

[181] Declaration of Lawrence R. Goldfarb ("Goldfarb Declaration") ¶ 4, attached as Exhibit 165 to IBM's First Exhibits.

[182] Id. ¶ 16.

[183] Id. ¶ 4.

[184] Id. ¶ 16.

decline. Mr. Goldfarb states: "SCO's stock price declined ... I was also very concerned about SCO's high cash burn rate and whether its UNIX products were viable in the marketplace."[185]

      b.    Microsoft's conduct suggested that it might not guarantee BayStar's investment in SCO as it had promised to Mr. Goldfarb. Mr. Goldfarb states: "Mr. Emerson [Microsoft's senior vice president of corporate development and strategy] and I discussed a variety of investment structures wherein Microsoft would 'backstop,' or guarantee in some way, BayStar's investment."[186] Mr. Goldfarb states that, after BayStar made the investment, "Microsoft stopped returning my phone calls and emails, and to the best of my knowledge, Mr. Emerson was fired from Microsoft."[187]

      c.    When BayStar's concerns about SCO's business were not adequately addressed by SCO, BayStar decided to retire its investment in SCO. Mr. Goldfarb states:

> In [an April 7, 2004 letter to Darcy Mott] I noted that "BayStar's initial investment [in SCO] was due, in significant part, to management's representations regarding the prospects for [SCO's] core UNIX business," but that "it had become clear that [SCO's] only business strategy [was] the monetization of its intellectual property rights through litigation." I pointed out my belief that SCO's management "deceived BayStar about [SCO's] true business strategy" and that "current management is absolutely incapable of executing that strategy." Finally, I noted my belief that SCO did not have any prospect of generating significant revenue or profitability from its existing UNIX product and service business lines.[188]

Mr. Goldfarb further states: "Having received no satisfactory response from SCO, I determined BayStar's obligations to its investors required the Fund to get out of the

---

[185] *Id.* ¶¶ 10, 11.

[186] *Id.* ¶ 7.

[187] *Id.* ¶ 10.

[188] *Id.* ¶ 13 (internal citation omitted).

investment. I negotiated the terms of the deal to retire the investment on behalf of BayStar."[189]

## II. Computer Associates, Oracle, and Intel.

82. SCO's relationship with Computer Associates began in the mid to early 1990's.[190] Computer Associates licensed UNIX source code from AT&T, and also executed a SCO source license in 2003.[191] Computer Associates was also a tier one partner to SCO in that they had "various solutions that work on [SCO] operating systems, such as ARC Serve and Unicenter, Ingress . . . ."[192] Computer Associates and SCO would disclose roadmaps for their technology to each other in order to facilitate work on certificates of their products and services on SCO operating systems.[193] Computer Associates certification of their products and services on SCO operating systems would create revenue for SCO from other joint Computer Associates and SCO customers.[194]

83. Computer Associates' certification to SCO's products has declined since 2003.[195]

84. Oracle and SCO's business relationship began in approximately 1996.[196]

85. Oracle is an ISV, meaning that they provided software, such as database and other solutions, to their customers. For many years, Oracle would certify its software to run on SCO

---

[189] *Id.* ¶ 14.

[190] Hunsaker Nov. 10, 2005 Depo. at 25:5-8.

[191] Deposition Transcript of William Broderick at 52:24-53:10, attached as Exhibit 336 to IBM's First Exhibits.

[192] Hunsaker Nov. 10, 2005 Depo. at 33:17-34:1.

[193] *Id.* at 34:2-8.

[194] Sullivan Declaration ¶ 12.

[195] *Id.*

[196] Hunsaker Nov. 10, 2005 Depo. at 61:21-62:1.

platforms such that customers using SCO's operating systems could use Oracle's software on those operating systems.[197]

86. Oracle certifications on SCO operating systems benefited SCO. While SCO made little revenue from Oracle directly, the Oracle certifications were important to both existing and prospective customers.[198] SCO's customers demanded the ability to port their operating system with Oracle, and SCO recognized that without this capability, customers would replace their UNIX operating systems with LINUX platforms capable of porting with Oracle.[199]

87. After LINUX became commercially hardened by IBM's improper disclosures of SCO's proprietary technology, Oracle decided to support only LINUX on the Intel platform, and to forego its support for SCO's UNIX-on-Intel operating systems.[200] This would not have been an economically or technically feasible decision if IBM had not hardened LINUX, because the then current state of LINUX would not have been capable of handling the demands of all of Oracle's UNIX customers.[201]

88. When SCO first proposed its SCOSource library licensing program to Oracle, the proposal was received without opposition.[202]

89. In the 2000 to 2001 time frame, after IBM had begun hardening LINUX, Oracle began to focus its efforts on LINUX.[203]

---

[197] *Id*. at 34:20–35:16; Sullivan Declaration ¶ 14a.

[198] Sullivan Declaration ¶ 14.

[199] Email from R. Broughton to J. Mace, A. Nagle, dated Nov. 7, 2002, attached as Exhibit 193 to SCO's Opposition Exhibits; Email from J. Hunsaker to S. Wilson, dated May 19, 2003, attached at Exhibit 194 to SCO's Opposition Exhibits; Email from J. Hunsaker to E. Hughes, C. Bushman, dated July 8, 2003, attached as Exhibit 195 to SCO's Opposition Exhibits; Email from R. Broughton to S. Cutler, dated Nov. 18, 2003, attached as Exhibit 196 to SCO's Opposition Exhibits.

[200] Sullivan Declaration ¶ 17.

[201] Tibbitts Dec. 16, 2005 Depo. at 124:24–125:7; Pisano Response Report at 51.

[202] Sontag Declaration ¶ 4; McBride Mar. 15, 2006 Depo. at 105:17-106:8.

90.     SCO's business relationship with Oracle dwindled in the following years, as Oracle refused to certify on SCO's UNIX operating systems.[204] The business relationship with Oracle came to a complete end in 2003.[205] Although it initially did not object to SCO's licensing plan to protect its confidential material, Oracle has since made complaints about SCO's efforts.[206] Oracle only began taking this position after it had largely moved its business to enterprise LINUX, which would not have been possible if IBM had not advanced LINUX to the point where it was a viable alternative for Oracle and others, as set forth above.

91.     In 2003, Oracle withdrew Open Unix 8 certification.[207] Although the parties once had a close working relationship, Oracle no longer even returns SCO's calls, and has made it very clear to SCO that they do not intend to certify any new products on SCO's operating systems.[208]

92.     The lack of Oracle certifications has impacted SCO revenues.[209] As Mr. McBride explained: "We see a very direct relationship to our revenue going down and not having Oracle's support, so it's very important, and it's been very difficult for us not having their support."[210]

93.     Intel was a Tier Zero partner as SCO's UNIX operating systems run on Intel architecture and Intel is the "foundation" of these operating systems.[211]

---

[203] Deposition Transcript of Jeffrey Hunsaker, dated Feb. 28, 2006 ("Hunsaker Feb. 28, 2006 Depo."), at 321:7–21, attached as Exhibit 322 to IBM's First Exhibits; Sullivan Declaration ¶ 17.

[204] Sullivan Declaration ¶ 20.

[205] Hunsaker Nov. 10, 2005 Depo. at 22:5-7,61:21–63:1.

[206] Email from S. Wilson to SCO Exec. Group, dated May 20, 2003,  attached as Exhibit 213 to SCO's Opposition Exhibits.

[207] Sullivan Declaration ¶ 20.

[208] Hunsaker Nov. 10, 2005 Depo. at 61:21-63:1.

[209] Hunsaker Feb. 28, 2006 Depo. at 323:10-17.

[210] McBride Mar. 15, 2006 Depo. at 100:17-22.

[211] Hunsaker Nov. 10, 2005 Depo. at 32:1-6.

94.     SCO's relationship with Intel began in 1979 as SCO "offered one of the first UNIX-like systems on Intel platforms for multi users and multitasking[.]"[212]

95.     In the business relationship, Intel and SCO "work[ed] together strategically to ensure that our solutions meet downstream and [to] provide solutions to our customers and our channel partners[.]"[213] Intel and SCO would share their roadmaps with each other, participate in conferences, and Intel would provide certification of their Intel chip sets, device drivers, and white box servers for SCO's operating systems.[214]

96.     SCO had a very close alliance with Intel, and Intel contributed substantial marketing dollars to SCO.[215] The relationship between the two companies was "very strong for many, many years . . . ."[216]

97.     However, from 2001-2003, Intel only supported a limited number of servers on UnixWare. Only some servers were supported and only for UnixWare, not OpenServer. In 2003, Intel stopped sharing its processor roadmaps with SCO.[217]

98.     Neither Karen Smith (IBM's then Vice President of LINUX Strategy and Market Development, and one of IBM's LinuxWorld 2003 attendees) nor any other IBM representative ever stated to Computer Associates, Oracle, or Intel that IBM was cutting off its business ties with SCO or that IBM wanted them to cut off their business ties with SCO:

---

[212] *Id*. at 64:9-12.

[213] *Id*. at 32:21-23.

[214] *Id*. at 32:24-33:6.

[215] Deposition Transcript of Gregory S. Anderson, dated Oct. 21, 2004 ("Anderson Oct. 21, 2004 Depo."), at 138:15-17, attached as Exhibit 305 to IBM's First Exhibits.

[216] Hunsaker Nov. 10, 2005 Depo. at 64:12-15.

[217] Hughes Declaration ¶ 12c.

a.      In a sworn declaration, Samuel Greenblatt, Senior Vice President and

Strategic Technical Advocate for Computer Associates' LINUX Technology Group,

states:

> I attended the LinuxWorld 2003 convention. At no time did Karen Smith
> or any other IBM representative communicate to me that IBM was
> terminating its business relationship with The SCO Group, Inc. ("SCO")
> or that IBM wanted CA to stop doing business with SCO.
>
> To the best of my knowledge, neither Ms. Smith nor any other IBM
> representative ever, directly or indirectly, informed CA that IBM had
> decided to terminate its relationship with SCO or asked CA to stop doing
> business with SCO.
>
> To the best of my knowledge, CA has not in any way altered its
> relationship with SCO because of any statements or actions by IBM or any
> representatives of IBM.[218]

b.      In a sworn declaration, Monica Kumar, Principal Manager of Oracle's

LINUX Program Office, states:

> I attended the Linux World 2003 convention. At no time did Karen Smith
> or any other IBM representative communicate to me that IBM was
> terminating its business relationship with The SCO Group, Inc. ("SCO")
> or that IBM wanted Oracle to stop doing business with SCO.
>
> To the best of my knowledge, neither Ms. Smith nor any other IBM
> representative ever, directly or indirectly, informed Oracle that IBM had
> decided to terminate its relationship with SCO or asked Oracle to stop
> doing business with SCO.
>
> To the best of my knowledge, Oracle has not in any way altered its
> relationship with SCO because of any statements or actions by IBM or any
> representatives of IBM.[219]

c.      In a sworn declaration, Luann Gulesarian, Intel's Strategic Relationship

Manager in its Sales and Marketing Group, states:

> I attended the Linux World 2003 convention in New York, New York in
> January 2003. At no time did anyone named Karen Smith or any other

---

[218] Declaration of Samuel Greenblatt ¶¶ 2–4, attached as Exhibit 177 to IBM's First Exhibits.

[219] Declaration of Monica Kumas ¶¶ 2–4, attached as Exhibit 241 to IBM's First Exhibits.

41

IBM representative communicate to me that IBM was terminating its business relationship with SCO or that IBM wanted Intel to stop doing business with SCO.

To the best of my knowledge, neither Ms. Smith nor any other IBM representative ever, directly or indirectly, informed Intel that IBM had decided to terminate its relationship with SCO or asked Intel to stop doing business with SCO.

To the best of my knowledge, Intel has not in any way altered its relationship with SCO because of any statements or actions by IBM or any representatives of IBM.[220]

    d.    Ms. Smith likewise confirms that she had no such conversations with Computer Associates, Oracle, or Intel. In a sworn declaration, Ms. Smith states: "I did not have any contacts with Intel, Computer Associates, or Oracle, during or after the LinuxWorld 2003 conference, in which I advised them that IBM was cutting off its business relationship with SCO, or suggested that these companies not do business with SCO."[221] In addition, regardless of whether such statements were made, she did not do anything that caused these companies not to do business with SCO.[222]

    99.    For a time, SCO supported the use of LINUX with Computer Associates, Oracle, and Intel products, partnering with each of these companies to provide LINUX solutions to their end users.

    a.    SCO's Gregory Anderson, a former SCO employee responsible for SCO's relationships with its technology partners, agreed that "any change in the relationship between SCO/Caldera and Computer Associates ... had to do with SCO's [alleged] decision not to continue to distribute Linux products."[223]

---

[220] Declaration of Luann Guleserian ¶¶ 2–4, attached as Exhibit 204 to IBM's First Exhibits.

[221] Declaration of Karen Smith ("Smith Declaration") ¶ 5, attached as Exhibit 205 to IBM's First Exhibits.

[222] *Id.* ¶ 4.

[223] Anderson Oct. 21, 2004 Depo. at 149:6–19.

b.      In 2000 and 2002, "Oracle/SCO met to discuss Oracle's roadmap which phased out Unixware support[.]"[224] After being convinced by SCO to "move off of Unix to Linux," Oracle "made huge investments in supporting Linux."[225] "They [Oracle] have put all their efforts behind Linux and they are not backing off this strategy- remember we helped with this."[226] "[W]e, SCO and Oracle, determined that our best opportunity was migrating our customers to Linux, hence, we got them into [UnitedLinux] and signed support contracts to support their effort . . . we helped to convince them that the future was Linux."[227] When SCO stopped supporting LINUX in 2003 and asked Oracle to support UnixWare again, Oracle was "quite upset about [SCO's] Linux suspension strategy" because "[f]irst [SCO] told them to support UNIX, then Linux, now UNIX again."[228]

c.      Similarly, "SCO worked with Intel to get them into United Linux."[229] To the extent that there was a change in the relationship between SCO and Intel, it is attributable to SCO allegedly "ceasing to distribute a Linux operating system and Linux products more so."[230]

---

[224] Email from S. Wilson to R. Broughton, dated May 27, 2003, attached as Exhibit 71 to IBM's First Exhibits.

[225] Email, dated May 20, 2003, from S. Wilson to SCO Exec. Group, attached as Exhibit 72 to IBM's First Exhibits.

[226] Email from S. Wilson to R. Broughton, dated May 27, 2003, attached as Exhibit 71 to IBM's First Exhibits.

[227] Email from S. Wilson to D. Richter, T. McNamara, dated June 19, 2003, at SC01493226, attached as Exhibit 116 to IBM's First Exhibits.

[228] Email from S. Wilson to G. Smith, dated Aug. 13, 2003, at SC01493402, attached as Exhibit 117 to IBM's First Exhibits.

[229] *Id.* at SC01493405.

[230] Anderson Oct. 21, 2004 Depo. at 142:11–23.

### III.    Hewlett-Packard.

100.    SCO's relationship with Hewlett-Packard began in the early 1980's.[231] Hewlett-Packard works with SCO as a Tier 2 vendor, an IHV, and an independent hardware vendor.[232] Hewlett-Packard does not consume SCO's products directly; rather, they certify their hardware on SCO operating systems and various peripheral drivers.[233] Contracts between SCO and Hewlett-Packard include support contracts, certification renewals, licensing of products, and services contracts.[234]

101.    While SCO and Hewlett-Packard continue to have a relationship and continue to work together in some respects, Hewlett-Packard's support has declined in response to IBM's wrongful conduct.[235]

102.    For instance, Hewlett-Packard had previously provided SCO with $1 million annually in "market development funds." Hewlett-Packard reduced this amount to $100,000, or one tenth of its prior support.[236]

103.    When SCO first proposed its SCOSource library licensing program to Hewlett-Packard, the proposal was received without opposition.[237]

104.    Karen Smith of IBM recalls a brief conversation with Rick Becker of Hewlett-Packard at the LinuxWorld 2003 convention, but does not recall stating and does not believe she

---

[231] Hunsaker Nov. 10, 2005 Depo. at 35:19-21

[232] Hughes Declaration ¶ 13.

[233] Hunsaker Nov. 10, 2005 Depo. at 35:21–36:2.

[234] *Id*. at 87:22-88:3.

[235] Hughes Declaration ¶ 13.

[236] Hunsaker Nov. 10, 2005 Depo. at 72:12-73:11; Hughes Declaration ¶ 13.

[237] Sontag Declaration ¶ 4.

stated to Mr. Becker that IBM was going to cut off all business ties with SCO and that IBM

wanted Hewlett-Packard to do the same.[238]

106.    Mr. Becker stated that "[Ms. Smith] indicated to me that IBM was going to

withdraw all their business activities from SCO, and that in the interest of the best outcome for

our joint Linux initiatives that she was going to suggest that HP, and I was representing HP, and

following me, Intel should do the same."[239]

106.    In any case, according to Mr. Becker, the statements allegedly made by Ms. Smith

to Mr. Becker had no impact on the relationship between Hewlett-Packard and SCO. At his

deposition, Mr. Becker testified:

> Q: Did you take any actions as a result of your conversations with Ms. Smith?
>
> A: I did ... I consulted with a colleague about the appropriate actions ... And since IBM is both a competitor and a partner, as we look at the landscape, decided the best course of action was just to not have any more engagement with [Ms. Smith]."
>
> Q: ... HP has continued to do business with SCO despite Karen Smith's comments ... is that correct?
>
> A: Yes.[240]

107.    Hewlett-Packard has confirmed that to the extent its business relationship with

SCO has changed, it is for reasons having nothing to do with IBM. Joseph Beyers, Hewlett-

Packard's Vice President of Intellectual Property, states in a sworn declaration:

> HP has done business with The SCO Group, Inc. ("SCO"), or its predecessor, The Santa Cruz Operation, Inc., since the mid-1980s. HP continues to do business with SCO, and has a variety of business relationships with SCO, ranging from licensing SCO's intellectual property, including UNIX, to joint marketing and promotions activities.

---

[238] Smith Declaration ¶¶ 4, 6.

[239] Becker Oct. 15, 2003 Depo. at 54:5-11.

[240] *Id*. at 149:11–24.

To the extent HP may have reduced or altered its business relationship with SCO, HP has not in any way reduced or altered its relationship with SCO because of any statements or actions of IBM or any representatives of IBM.[241]

108.     Moreover, by SCO's own admission, the relationship between SCO and Hewlett-Packard did not decline immediately after the LinuxWorld 2003 convention and continues to be strong today:

a.     According to SCO's Mr. Anderson, who had responsibility for SCO's relationships with its technology partners, including Hewlett-Packard, the business relationship between SCO and Hewlett-Packard was "very good" from January 2003, during the LinuxWorld event, until at least May 2003, when he left SCO.[242]

b.     According to Mr. Hunsaker, Senior Vice-President and General Manager of SCO's UNIX division and former Vice-President of Worldwide Sales, the relationship continues to be "good" today.[243] Mr. Hunsaker testified:

Just recently [Computer Associates] participated, as has H-P, in various conferences, our annual SCO Forum, our launch events in New York City with our new release, OpenServer 6, which we've gathered some of our top customers and partners from around the world to demonstrate our new solutions. Both of these customers participated in those events and have certified their pro line, hardware line, H-P, their databases and management tools with Computer Associates on our platform.[244]

c.     SCO and Hewlett-Packard have had a mutual "longstanding presence" at SCO Forum and HP World and their "close relationship" has resulted in "billions of

---

[241] Declaration of Joseph Beyers ("Beyers Declaration") ¶¶ 2, 3, attached as Exhbit 597 to IBM's First Exhibits.

[242] Anderson Oct. 21, 2004 Depo. at 145:12–23.

[243] Hunsaker Nov. 10, 2005 Depo. at 70:21–23.

[244] Id. at 73:12–25.

dollars" of Hewlett-Packard products running SCO software.[245] Concerning the current

business relationship between Hewlett-Packard and SCO, SCO's website states:

> **The SCO-HP Relationship: How HP and The SCO Group Can Help You**
>
> SCO and HP have been partners in leading edge technology since the mid-1980s, when most PCs were single-task, single-user systems and the term 'server' was unknown. The HP/SCO partnership harnessed the latent power of microcomputers with SCO UNIX to bring mainframe and minicomputer capabilities like multi-user and multi-tasking to the desktop. SCO was the first to bring these features to market, leveraging the superior reliability and stability of HP systems.
>
> The SCO/HP partnership is reflected in a longstanding presence at SCO Forum and HP World. This close relationship has resulted in billions of dollars of HP hardware running SCO software worldwide. HP and SCO have a considerable presence in such vertical markets as Financial, Health Care, Manufacturing, and Transaction Processing. HP continues to support SCO operating systems across its server lines and has recently extended support to HP advanced storage technologies such as the MSAlOOO and MSA1500.[246]

     d.     SCO's website also names Hewlett-Packard as the only "Platinum

Sponsor" of its 2006 SCOForum event, the highest level of sponsorship among the

eighteen sponsors listed, while displaying Hewlett-Packard's logo in connection with the

event.[247]

## IV.    OpenSource Conference in Scottsdale, Arizona.

    109.    John Terpstra's decision to rescind the invitation to Darl McBride to speak at the

OpenSource Conference in Scottsdale, Arizona, was the result of complaints from other

participants of the OpenSource Conference, not IBM.

---

[245] The SCO – HP Relationship, http://www.sco.com/hp/relationship.html, attached as Exhibit 170 to IBM's First Exhibits.

[246] *Id.*

[247] SCO Forum 2006, http://www.sco.com/2006forum/sponsors.html, attached at Exhibit 192 to IBM's First Exhibits.

a.      Mr. Terpstra states:

Although I asked representatives from IBM to participate in the Open
Source Open Standards Conference multiple times, no one from IBM was
willing to commit to speak at the conference or to participate in it in any
way, at any time.

At no time did anyone from IBM tell me that it did not want Mr. McBride
to speak at or participate in the conference. At no time did anyone from
IBM tell me that it would not participate in the conference unless Mr.
McBride did not speak. At no time did anyone from IBM tell me that it
would withdraw its participation in the conference if Mr. McBride did
speak- as set forth above, IBM never committed to participate in the
conference at all. At no time did anyone from IBM pressure me in any
way to ask Mr. McBride or SCO not to speak at or participate in the
conference.[248]

b.      Mr. Terpstra further states:

Other potential participants in the conference did inform me, however, that
they would not participate in the conference if Mr. McBride were to be a
speaker or if SCO were present in any manner. I was able to secure their
attendance only after offering assurance that Mr. McBride and SCO would
not be present and that a list of attendees would not be made public.

As a result, I called Mr. McBride sometime before the conference was to
occur, and explained to him that overall feedback from potential
participants in the Open Source Open Standards Conference was
prejudicial to sustaining the invitation for Mr. McBride to speak and for
SCO to be present at this event.[249]

### G.  IBM's Purpose in Supporting LINUX.

110.    IBM's LINUX strategy was motivated entirely by competitive reasons. Dan Frye,

co-founder of and Vice President responsible for managing IBM's LINUX Technology Center,

states:

IBM undertook its Linux business strategy, and made contributions to Linux, in
the good faith belief that these activities were permissible. IBM did not undertake
its Linux activities with an intent to harm SCO and those activities were not

---

[248] Declaration of John H. Terpstra ¶¶ 4, 5, attached as Exhibit 267 to IBM's First Exhibits.

[249] *Id.* ¶¶ 6, 7.

motivated by any spite or ill will toward SCO. On the contrary, IBM undertook its Linux strategy for competitive reasons.[250]

111.    SCO's own experts believe that competitive forces created market pressures that led IBM to support LINUX:

a.    "[T]echnological and competitive changes in the industry in the middle and late 1990s created a need for IBM to modify its competitive strategy."[251]

b.    "In addition to the fact that this industry was moving to open architecture, there were other big changes as well. In the 1990s, the processing capacity of the Intel processor chip was increasing rapidly. . . . This continuing evolution of the Intel architecture was threatening IBM's existing server business."[252]

c.    "The simultaneous convergence of the dominance of Sun, the growth in Intel Architecture-based servers, and inroads by Microsoft created a difficult situation for IBM."[253]

d.    "[C]ompetitive reasons . . . motivated IBM to formulate and execute a Linux strategy."[254]

e.    "In mid-1998, a group of senior IBM executives met to discuss the competitive challenges facing the Server Group and the 'need to move with urgency to address the problems facing the RS/6000 business.'"[255]

f.    "In late 1998, IBM commissioned a Linux Task Force to study the market segments and applications where Linux was being used. The task force '[c]ited rapid

---

[250] Declaration of Daniel Frye ¶ 5, attached as Exhibit 586 to IBM's First Exhibits.

[251] Pisano Report at 15.

[252] *Id.* at 18–19.

[253] *Id.* at 20.

[254] *Id.* at 21.

[255] Leitzinger Report at 30.

growth and opportunity' in the Linux market and '[d]etermined IBM must engage in Linux phenomena."[256]

112.    SCO's experts acknowledge that IBM made the decision to support LINUX because of competition from Sun and Microsoft, among other factors, and that the decision had nothing to do with SCO:

     a.    "In 1999, IBM began to make statements about the use of Linux as a 'game-changer' to compete against Sun and Microsoft."[257]

     b.    "IBM internal documents from this time period refer to Linux as a 'disruptive force to change the rules of the game' and 'a distinct opportunity to unseat Sun and Microsoft as the inevitable choices and curtail their growth."[258]

     c.    "IBM had seen its mainframe revenues decline by more than half during the 1990s. When IBM started selling Linux on zSeries servers in 2000, it turned around what had been a decade long slide in mainframe revenues. . . . Through its Linux initiatives, IBM was also able to turn around its competitive position relative to Sun in the RISC-based server business. In coming to its Linux strategy, IBM noted that, 'the real near term business opportunity is to take Unix leadership away from Sun with our integrated Linux/AIX strategy."[259]

113.    SCO's own experts believe that IBM's support of LINUX constituted competition:

---

[256] *Id.* at 37.

[257] Pisano Report at 26.

[258] Leitzinger Report at 39.

[259] *Id.* at 59–60.

a.     "Linux – with its open source nature and its focus on relatively inexpensive IA hardware – provided 'an expansive homogenous platform, dramatically broader and <u>more vendor independent</u> than Solaris [with] <u>better volume dynamics</u> than Solaris/SPARC.' Linux also provided 'a low-cost, reliable and <u>more open alternative to Windows NT/2000</u>.' Linux provided a way for IBM to attack Microsoft's domination of the 'operating system control point.' In effect, 'Linux commoditizes the OS market allowing a level playing field for middleware & servers across multiple chip architectures.' This played to IBM's strengths."[260]

## H.  SCO's Lack of Injury.

114.     SCO cannot specifically identify any damages resulting from any acts of alleged interference by IBM, as explained below.

a.     When asked if he was able to provide any information about any damages that SCO may have suffered with respect to a particular company with which SCO alleges IBM interfered, Mr. Tibbitts testified, "I don't have a damage number. That's what our outside consultants are working on."[261] Similarly, when asked about a second company:

> If you're talking about a dollar amount, no, I'm not. If you're talking about in general, you know, how SCO would be damaged by people moving away from UNIX- SCO's UNIX platforms to competitors, you know, it would be lost revenue, lost profits, lost business opportunity.[262]

b.     Mr. Tibbitts also could provide no information on what SCO's revenues or profits with respect to any of entities with which IBM is alleged to have interfered may have been:

---

[260] *Id.* at 39–40 (emphasis in original).

[261] Tibbitts Dec. 16, 2005 Depo. at 81:1–2.

[262] *Id.* at 82:9–19.

Q: And are you able to provide any information concerning -well, this may be obvious, but I take it, then, that you are not able to provide any information concerning what SCO' s annual revenues or profits may have been with respect to any of those products or companies.

A: And that's correct.[263]

c.      With regard to SCO's claim for interference with the "Unix on Intel market," Mr. Tibbitts testified that SCO's "theory is not company/company specific"[264] and "IBM's taking Linux to the enterprise could conceivably have interfered with everybody, you know."[265] Thus, SCO is "not allocating a specific dollar amount to each of [those entities] anyway" because SCO's "tortious interference claim ... is more of a tortious interference perspective, business relationships for the Unix on Intel market as a whole."[266]

d.      Similarly, as to the six existing relationships with which SCO alleges IBM interfered, SCO does not claim any discrete damages resulting from IBM's alleged interference. For example, as to BayStar, Mr. Tibbitts testified:

> [W]e don't have a discreet (sic) claim about BayStar with a damage number associated with that. The BayStar story is part of our overall story about how IBM dealt with us . . . I think it's just part of the story and we're not going to say the damages related to BayStar are X dollars, but . . . it's part of the story that leads to the damages that have been submitted in our damage reports.[267]

e.      Not one of SCO's experts attempted to quantify or even address the alleged damages allegedly caused by IBM's alleged tortious interference with SCO's contractual or business relationships.

---

[263] *Id.* at 90:2–8.

[264] Tibbitts June 30, 2006 Depo. at 34:25-35:11.

[265] Tibbitts Dec. 16, 2005 Depo. at 84:23–24.

[266] Tibbitts June 30, 2006 Depo. at 26:17–22.

[267] *Id*. at 14:17–15:9.

115.    There were problems adversely affecting SCO's business from at least 1999 onward that were independent of any actions of IBM.

a.    Former SCO regional director of intellectual property licensing Gregory Pettit stated that SCO was not "successful in getting new customers" at a time when "[LINUX] hadn't established itself, didn't have the credentials" and "was relatively new and unproven."[268]

b.    Former SCO vice president Lawrence Gasparro stated that SCO customers complained that SCO's UNIX products lacked the new functions and capabilities they needed.[269] The complaints about the lack of features and capabilities for SCO's UnixWare and OpenServer products began in 2000.[270] Customer feedback about "the lack of new [SCO] products that suited their requirements" began as early as 1996.[271]

c.    Former SCO employee Gregory Anderson stated that from January 2000 to the acquisition by Caldera of Santa Cruz's UNIX business in May 2001, SCO's marketing funds for its UNIX products were declining.[272]

d.    Former SCO sales representative Philip Langer stated that after the acquisition by Caldera of SCO's UNIX business in 2001, he was "focused on maintaining the existing customers as opposed to approaching new customers" of UnixWare and OpenServer.[273]

---

[268] Deposition Transcript of Gregory A. Pettit, dated Oct. 7, 2004, at 67:16–68:4, 68:23–70:12, attached as Exhibit 304 to IBM's first Exhibits.

[269] Deposition Transcript of Lawrence Gasparro, dated Oct. 6, 2004 ("Gasparro Oct. 6, 2004 Depo."), at 208:2–14, attached as Exhibit 303 to IBM's First Exhibits.

[270] Id. at 209:24–210:6.

[271] Id. at 209:15–23.

[272] Anderson Oct. 21, 2004 Depo. at 108:25–109:22.

[273] Deposition Transcript of Philip E. Langer, dated Nov. 5, 2004, at 47:22–48:18, attached as Exhibit 308 to IBM's First Exhibits.

     e.     Langer stated that SCO's LINUX products were more expensive than the LINUX products of its competitors, so SCO was "having trouble getting the business a lot of times on the price point."[274] SCO's LINUX products were kept at "a comparative price with [SCO's] UNIX [products] because we would devalue our UNIX business[.]"[275]

     f.     According to Mr. Gasparro, SCO attempted to sell a LINUX solution to Sherwin-Williams (one of the 14 "former SCO customers" identified in SCO's Supplemental Response). However, Sherwin-Williams needed to go with another LINUX distributor instead of using Caldera/LINUX, and Mr. Gasparro stated his belief that it was because "Sherwin-Williams needed a more complete solution than what [SCO] had offered."[276]

### I.   No Disputed Facts Regarding Baystar and Lawrence Goldfarb

SCO had proposed a fact that stated that Lawrence Goldfarb, managing member of Baystar, was pressured by IBM to discontinue its support of and investment in SCO.[277] Specifically, SCO alleged that Mr. Godlfarb expressly stated to Darl McBride of SCO that IBM had been "on him, on him, on him' to retract his support from SCO."[278] IBM had presented a fact, supported by a sworn declaration from Larry Goldfarb, stating that "No one from IBM ever had any communications with me or, to my knowledge, anyone at BayStar relating to SCO."[279]

---

[274] *Id.* at 26:12–24.

[275] *Id.* at 26:17–19.

[276] Gasparro Oct. 6, 2004 Depo. at 183:7–184:9.

[277] SCO's Interference Opposition at 19 ¶¶ 57 and 75, response to ¶ 46.

[278] SCO's Interference Opposition at 19 ¶ 57.

[279] Statement of Undisputed Facts, *supra*, ¶ 79(a) (citing Goldfarb Declaration ¶ 4).

These proposed facts did not result in a genuine disputed of material fact to be resolved at trial because SCO's proposed fact was only supported by hearsay. SCO offered as support for its fact a declaration of Darl McBride, offering a recitation of what Mr. Goldfarb had allegedly said,[280] an out of court statement by a non-party offered for the truth of the matter asserted. Similarly, SCO also offered the deposition testimony of Ryan Tibbitts, there reciting what Mr. McBride had told him about what Mr. Goldfarb had allegedly said to Mr. McBride,[281] there offering multiple layers of hearsay.

The Federal Rules of Civil Procedure state that "[i]f a party fails to properly support an assertion of fact or fails to address another party's assertion of fact as required by Rule 56(c) [*i.e.* with admissible evidence], the court may consider the fact undisputed for the purposes of the motion."[282] Accordingly, IBM's fact, supported by Mr. Goldfarb's declaration, is considered an undisputed fact for the purposes of IBM's Interference Motion when faced with SCO's proposed fact and responses that were supported only by hearsay.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[283] "An issue of material fact is 'genuine' if a reasonable jury could return a verdict for the nonmoving party."[284] In moving for summary judgment, IBM "bears the burden of showing the absence of a genuine issue of material fact . . . ."[285] However, as it relates to SCO's claims, IBM "need not negate

---

[280] McBride Declaration ¶ 29.

[281] Tibbitts Dec. 16, 2005 Depo. at 86:16–19.

[282] Fed. R. Civ. P. 56(e), (e)(2).

[283] Fed. R. Civ. P. 56(a).

[284] *Universal Money Ctrs., Inc. v. Am. Tel. & Tel. Co.*, 22 F.3d 1527, 1529 (10th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)) (internal quotation marks omitted).

[285] *Universal*, 22 F.3d at 1529.

[SCO's] claim[s], but need only point out to the district court 'that there is an absence of evidence to support [SCO's] case.'"[286] Upon such a showing, SCO "must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which [SCO] carries the burden of proof."[287] "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient to defeat a properly supported motion for summary judgment."[288]

## ANALYSIS

A plaintiff must prove three elements under Utah law to succeed on claims of intentional interference with economic relations: "(1) that the defendant intentionally interfered with plaintiff's existing or potential economic relations, (2) for an improper purpose or by improper means, (3) causing injury to the plaintiff."[289] Subsequent case law has further restricted the scope of an interference claim: an improper purpose is no longer sufficient, and improper means is a necessary element.[290]

IBM's Interference Motion offers three arguments for summary judgment on SCO's interference claims: (A) SCO's allegations of interference with respect to the identified companies "are denied by the companies or entities at issue and otherwise entirely without evidentiary support;"[291] (B) "there is no causal link between any act of IBM and any specific injury to SCO;"[292] and (C) "IBM's allegedly tortious acts were not undertaken with an improper

---

[286] *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

[287] *Id.* (citing *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir.1990)).

[288] *Id.* (quoting *Anderson*, 477 U.S. at 252).

[289] *Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293, 304 (Utah 1982).

[290] *See* IBM's Interference Supplement at 6 (citing *Eldridge v. Johndrow*, 345 P.3d 553, 561 (Utah 2015); and SCO's Interference Supplement at 6 (citing IBM's Interference Supplement at 6).

[291] IBM's Interference Motion at 2.

[292] *Id.* at 3.

purpose or by improper means."[293] Because SCO's claim fails on the lack of evidence supporting

its allegations of interference and a lack of causation, it is unnecessary to further consider

whether IBM used improper means.

### A.  No Evidence Supports Direct Interference with the Companies SCO Specifically Identified and Claims Regarding Market Competition are Not Actionable.

IBM argued that "SCO cannot show any unlawful interference by IBM at all."[294] Indeed,

as shown by the undisputed facts,[295] SCO's allegations regarding Baystar,[296] Computer

Associates,[297] Oracle,[298] and Intel[299] allege no direct interference from IBM. Rather, regarding

these companies, and regarding what SCO describes as a broader claim of interference with the

UNIX-on-Intel market generally, SCO alleges nothing more than that IBM "hardened" LINUX

by misappropriation of source code to which SCO claimed some ownership (an ownership that

has since been pared following the *Novell* case[300] and subsequent partial summary judgment[301] in

this case), and subsequently, SCO's business with those companies diminished.

First, SCO has alleged no set of facts of direct interference with any company except

possibly Hewlett-Packard, which will be discussed below.[302] Second, alleged misappropriation

of source code, while potentially a breach of contract or a copyright violation, is not in and of

itself tortious interference. Third, IBM correctly argues that "Utah (like other jurisdictions)

---

[293] *Id.*

[294] IBM's Interference Memorandum at 36.

[295] *See* Statement of Undisputed Facts, *supra*, Section F.

[296] *Id.* ¶¶ 71–81,

[297] *Id.* ¶¶ 82–83, 98(a), 98(d), 99(a).

[298] *Id.* ¶¶ 84–92, 98(b), 98 (d), 99(b).

[299] *Id.* ¶¶ 93–97, 98(c), 98(d), 99(c).

[300] *SCO Group, Inv. v. Novell, Inc.*, Case No. 2:04-cv-00129-TS.

[301] Memorandum Decision and Order Granting in Part and Denying in Part IBM's Motion for Partial Summary Judgment on the Basis of the *Novell* Judgment, docket no. 1132, filed Dec. 15, 2014.

[302] *See* Analysis, *infra*, Part B.

simply does not recognize activities with respect to an entire market as a basis for recovery for 'intentional' interference with contract or business relations,"[303] and the authority SCO offered does not  support SCO's general market interference theory but actually holds that no such tort is recognized.[304]

In opposition, SCO argues that in order to meet the first element of the tort, SCO "need only show that defendant's intentional conduct interfered with existing or prospective business relationships," but SCO "is not required to identify specific contractual relationships with which defendant interfered."[305] Instead of offering any specific identification or facts, SCO argues that "Utah law recognizes that actionable business relationships include plaintiff's actual or potential customers, suppliers, and business associates," and as support, cites the Utah Supreme Court: "Driving away an individual's existing or potential customers is the archetypical injury this cause of action was devised to remedy."[306] Indeed, SCO argues that "[t]he fact that the number of potential customers with whom SCO would have completed a transaction, but for IBM's interference, exceeds the number that SCO can possibly identify, makes IBM's improper conduct no less actionable."[307]

In *Leigh Furniture*, the Utah Supreme Court was confronted with a set of facts significantly distinct from the facts of this case. In *Leigh Furniture*, the former owner of the business made "frequent visits to [the current owner]'s store during business hours to confront

---

[303] IBM's Interference Memorandum at 2 (citing *Leigh Furniture*, 657 P.2d at 307; *Bower v. Stein Eriksen Lodge Owners Ass'n., Inv.*, 201 F. Supp. 2d 1134 (D. Utah 2002)).

[304] *See Leigh Furniture*, 657 P.2d at 307 (recognizing the value of competitive activity which takes place in the "rough and tumble of the marketplace" and recognizing that interfering with *potential* customers may be actionable under this tort but not otherwise discussing a tort for indirect interference or non-interference) and *Mumford v. ITT Commercial Fin. Corp.*, 858 P.2d 1041 (Utah Ct. App. 1993) (stating that the conduct, not necessarily the resulting interference, must be intentional to satisfy the intent requirement of intentional interference).

[305] SCO's Interference Opposition at 28.

[306] *Id.* (citing *Leigh Furniture*, 657 P.2d at 306).

[307] SCO's Interference Opposition at 34.

him, question him, and make demands and inquiries regarding the manner in which he was

conducting his business[,] repeatedly interrupted sales activities, caused his customers to

comment and complain, and more than once caused a customer to leave the store."[308] This is not

what SCO alleges IBM to have done in this case.

The IBM analog in *Leigh Furniture* would have seen the previous owner running a

competing business with directly competitive products, followed by the furniture store's business

dwindling. However, those were not the facts in *Leigh Furniture*, and likewise, IBM was not

directly interrupting SCO's sales activities and thereby directly impeding and frustrating SCO's

business. SCO is correct that interference with potential customers is actionable, but its

contention that interference with unidentifiable potential customers without number is actionable

is far more tenuous. However, these points are generally irrelevant because it is the context of the

alleged interference, not the identity of potential customers, that is most strikingly fatal to SCO's

claims. This is so because while *Leigh Furniture* did recognize that interfering with *potential*

customers may be actionable under this tort, it did not recognize a tort for indirect interference or

non-interference,[309] otherwise identified as market competition.[310]

SCO argued that circumstantial evidence is sufficient to meet its burden to defeat IBM's

Interference Motion,[311] but a line must be drawn between circumstantial evidence and mere

---

[308] *Leigh Furniture*, 657 P.2d at 306.

[309] *See* IBM's Interference Memorandum at 47–51 (discussing indirect interference regarding the "UNIX-on-Intel market").

[310] *See Gull Labs, Inc. v. Diagnostic Tech., Inc.*, 695 F.Supp. 1151, 1155 (D. Utah 1988) ("Competition is a major privilege justifying interference with economic advantage, and competitors are not liable for interference with contract if the interference advances the competitors' own interest and is not otherwise unlawful."); *Leigh Furniture*, 657 P.2d at 305 n.8 ("The exercise of a legal right constitutes justification and is a complete defense to an action of tortious intervention of contractual rights") (internal quotations and citations omitted).

[311] SCO's Interference Opposition at 30.

speculation. The undisputed facts[312] contain no evidence of any interference by IBM regarding these companies. Allowing SCO's claims to survive on the bases of SCO's business dwindling after IBM "hardened" LINUX would require speculation to fill the void where no evidence, not even circumstantial, is offered. SCO's best attempt at offering circumstantial evidence comes in its response to IBM's facts regarding the lack of evidence of interference with Computer Associates, Oracle, and Intel.[313]

SCO's attempted dispute with the facts offered regarding these companies was that a conversation may have taken place between IBM's Karen Smith and Hewlett-Packard executive Rick Becker at the LinuxWorld 2003 convention in which Ms. Smith allegedly said that IBM was going to pull all of its support from SCO and suggested that Mr. Becker should do the same.[314] "Not long thereafter, companies including Computer Associates, Oracle, and Intel, further reduced their support for SCO."[315] The speculative jump SCO insinuates is not implausible: that IBM executives might have said similar things to executives of other companies[316] (ignoring the fact that those companies have sworn that no such discussions occurred, and SCO was unable to dispute those facts with admissible evidence), but without *any* evidence of such an occurrence, that possibility remains entirely speculative, and cannot salvage SCO's interference claims. SCO has alleged nothing more than noninterference, competition, and speculation, based on allegations of some kind of tortious conversion, misappropriation, or breach of contract regarding the source code added to LINUX, which is not *per se* interference without more factual context. Therefore, IBM has "point[ed] out to the district court 'that there is

---

[312] *See* Statement of Undisputed Facts, *supra*, Section F.

[313] SCO's Interference Opposition at 79.

[314] *Id.*

[315] *Id.*

[316] *Id.* at 47–48.

an absence of evidence to support [SCO's] case,'"[317] and SCO has not "set forth specific facts

showing that there is a genuine issue for trial"[318] regarding whether IBM "intentionally

interfered with [SCO]'s existing or potential economic relations."[319]

### B. IBM's Alleged Interference with Hewlett-Packard May Constitute Interference

Having determined that IBM's alleged interference with the UNIX-on-Intel market in

general is not actionable as indirect market competition and that there are no facts to salvage

claims regarding Baystar, Computer Associates, Oracle, and Intel, it remains to be determined

whether SCO has alleged actionable interference regarding Hewlett-Packard. As discussed

above, the relevant facts regarding the alleged interference with Hewlett-Packard are as follows:

> Karen Smith of IBM recalls a brief conversation with Rick Becker of Hewlett-
> Packard at the LinuxWorld 2003 convention, but does not recall stating and does
> not believe she stated to Mr. Becker that IBM was going to cut off all business
> ties with SCO and that IBM wanted Hewlett-Packard to do the same.[320]

> Mr. Becker stated that "[Ms. Smith] indicated to me that IBM was going to
> withdraw all their business activities from SCO, and that in the interest of the best
> outcome for our joint Linux initiatives that she was going to suggest that HP, and
> I was representing HP, and following me, Intel should do the same."[321]

SCO has not offered case precedent to show that a defendant actionably interferes by stating that

it "was going to cut off all business with" the plaintiff and that it "was going to suggest" that

third parties "do the same." However, resolving whether this constitutes actionable interference

is deferred because SCO's interference claims fail entirely, but also specifically regarding

Hewlett-Packard, on the issue of causation in SCO's injury,[322] discussed more fully below.

---

[317] *Universal*, 22 F.3d at 1529 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

[318] *Id.* (citing *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir.1990)).

[319] *Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293, 304 (Utah 1982).

[320] Statement of Undisputed Facts, *supra*, ¶ 104 (citing Smith Declaration ¶¶ 4, 6).

[321] *Id.* ¶ 105 (citing Becker Oct. 15, 2003 Depo. at 54:5-11).

[322] *See* IBM's Interference Memorandum at 44 (arguing that SCO's claim fails on causation, even assuming that Ms. Smith's conversation with Mr. Becker occurred as SCO alleged).

## C.  There Is No Causal Link Between IBM's Alleged Acts and SCO's Injury.

### I.   Causation and Injury Generally

SCO's interference claims fail generally for a lack of identified and articulated damages; because these claims are subsumed in other claims; and because intervening forces rather than IBM's offering of a competitive product caused SCO's decline.

IBM argues that "SCO has produced no evidence of damages specific to its interference claims with respect to" the specifically identified companies,[323] and that "none of SCO's experts calculate or even address damages resulting from IBM's alleged interference."[324] SCO responds that "SCO's damages for IBM's acts of interference are subsumed within and coterminous with SCO's damages for its breach of contract claims."[325] Although SCO's surface argument is that it has articulated a damages calculation elsewhere in this litigation, its response acknowledges that what SCO labels as tortious interference is in reality a recasting of SCO's other claims, such as breach of contract. SCO's litigation is focused on one harm: IBM's use of source code in LINUX, restyled over multiple contract and tort theories. As already discussed above,[326] any improper use of source code, although it may have breached a contract, was not in and of itself tortious interference. These interference claims incorrectly focus on the effects of IBM's use of source code, improperly reframing the effects of that use as new and distinct claims.

Even if SCO had articulated a specific damages amount tied to specifically identifiable third parties who reduced or ceased doing business with SCO, SCO's interference claims also

---

[323] IBM's Interference Memorandum at 59.

[324] *Id.*

[325] SCO's Interference Opposition at 90.

[326] *See* Analysis, *supra* Part A ("[A]lleged misappropriation of source code, while potentially a breach of contract or a copyright violation, is not in and of itself tortious interference. . . . SCO has alleged nothing more than noninterference, competition, and speculation, based on allegations of some kind of tortious conversion, misappropriation, or breach of contract regarding the source code added to LINUX, which is not *per se* interference without more factual context.").

fail for a lack of causation. "SCO does not identify any specific feature of Linux – 'a specific trade secret or confidential or proprietary information' belonging to SCO and allegedly incorporated into Linux by IBM – that caused any of these companies to decide to use or support Linux."[327] SCO repeatedly makes arguments like the "improvements to Linux directly and foreseeably caused Linux to displace SCO's UNIX operating systems in the Intel market,"[328] without acknowledging that IBM's creation of a product would not by itself displace SCO's product. Rather, SCO's customers would have to independently choose to forego continuing business with SCO for SCO's business to decline. The independent choices of SCO's customers undermine any alleged causal connection between IBM's product offering and SCO's decline.

Additionally, there were many other issues in SCO's business and relationships, at least some of which predated or were entirely independent of IBM, which could have contributed to SCO's decline,[329] further interrupting any causal chain between IBM and SCO's alleged injury. Simply stated, SCO's theory of causation and damages is based upon a common logical fallacy: *post hoc ergo propter hoc*: because one event happens after another, the first event was a cause of the second event. To the extent that SCO's decline came as a result of its customers switching to LINUX, the customer's choice, and not the offering of a viable competitive option, was the natural cause of that decline.

## II.     Causation and Injury Regarding Hewlett-Packard

As stated above,[330] although IBM's alleged conversation with Hewlett-Packard's Rick Becker may constitute intentional interference (a determination that has been deferred), SCO's claims regarding Hewlett-Packard also fail because the alleged interference did not damage the

---

[327] IBM's Interference Memorandum at 59.

[328] SCO's Interference Opposition at 31.

[329] Statement of Undisputed Fact, *supra*, ¶ 115.

[330] *See* Analysis, *supra*, Part (B).

SCO- Hewlett-Packard relationship.[331] For example, according to Mr. Becker, the statements allegedly made by Ms. Smith to Mr. Becker had no impact on the relationship between Hewlett-Packard and SCO.[332] Furthermore, Hewlett-Packard has confirmed that to the extent its business relationship with SCO has changed, it is for reasons having nothing to do with IBM.[333] Finally, the relationship between SCO and Hewlett-Packard did not decline immediately after the LinuxWorld 2003 convention and continues to be strong today.[334]

In additional to the general causation and damages arguments discussed immediately above, SCO's claims cannot succeed regarding IBM's alleged interference with Hewlett-Packard where Hewlett-Packard itself acknowledged that the alleged interference caused no course alteration within the SCO-Hewlett-Packard relationship, and where the SCO-Hewlett-Packard relationship was not only not interfered with, but continued to be strong.

### D. SCO Has Waived Any Claim Regarding the OpenSource Conference.

A portion of SCO's interference claims focused on IBM's alleged efforts to prevent SCO executive Darl MCBride from speaking at the OpenSource Conference in Scottsdale, Arizona in the spring of 2004, through contact with the conference's host John Terpstra. However, SCO has abandoned this portion of its claim, stating that "in light of Mr. Terpstra's declaration submitted in support of IBM [sic] motion for summary judgment, SCO is not pursuing this aspect of its claim."[335] Therefore, summary judgment is granted in IBM's favor regarding alleged

---

[331] *See* IBM's Interference Memorandum at 44 (arguing that SCO's claim fails on causation, even assuming that Ms. Smith's conversation with Mr. Becker occurred as SCO alleged).

[332] Statement of Undisputed Facts, *supra*, ¶ 106 (citing Becker Oct. 15, 2003 Depo. at 149:11–24).

[333] *Id.* ¶ 107 (citing Beyers Declaration ¶¶ 2, 3).

[334] *Id.* ¶ 108.

[335] SCO's Interference Opposition at 72, at response to ¶ 37(d).

interference with Mr. McBride's speaking at the OpenSource Conference in 2004, which is included in SCO's Seventh Cause of Action for direct interference.

## CONCLUSION

Summary judgment is granted to IBM on SCO's interference claims because the alleged intentional interference is either wholly unsupported by the evidence or is not actionable because it is indirect interference or privileged market competition. Furthermore, any presumed causal relationship between IBM's alleged interference and SCO's alleged injury is broken by intervening forces which truly caused SCO's decline. Rather, SCO's interference claims appear to be a repackaging of the damages portion of SCO's contract claims, and SCO even admits that the damages for these claims are subsumed in its contract claims. For the reasons stated more fully above, summary judgment is granted in IBM's favor regarding SCO's interference claims.

## ORDER

For the reasons stated above, IT IS HEREBY ORDERED that IBM's Interference Motion[336] is GRANTED, and summary judgment is granted in IBM's favor on SCO's remaining tortious interference claims (SCO's Seventh and Ninth Causes of Action).

Dated February 8, 2016.

BY THE COURT:

_____
David Nuffer
United States District Judge

---

[336] IBM's Motion for Summary Judgment on SCO's Interference Claims (SCO's Seventh, Eighth and Ninth Causes of Action), docket no. 783, filed Sept. 25, 2006.

UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| THE SCO GROUP, INC., A DELAWARE CORPORATION;<br><br>                Plaintiff,<br><br>v.<br><br>INTERNATIONAL BUSINESS MACHINES CORPORATION,<br><br>                Defendant. | **ORDER GRANTING IBM'S [782] MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>2:03-CV-00294-DN<br><br>District Judge David Nuffer |

      This case arises out of the relationship between The SCO Group, Inc. ("SCO") and International Business Machines Corporation ("IBM") regarding IBM's production of its LINUX operating system. SCO held a majority of the UNIX-on-Intel market with its UNIX operating system in 1998 when IBM and SCO agreed to collaborate to produce a new operating system, Project Monterey. SCO claimed that IBM used this project to gain access SCO's UNIX source code and then copied thousands or millions of lines of that code into LINUX. Because LINUX was offered at no cost in the open-source community, it rapidly displaced UNIX, and SCO's UNIX sales rapidly diminished. SCO publicized the alleged copyright infringement and the alleged wrongs committed by IBM, and IBM argued that SCO's tactics were improper and in bad faith, and that it had the right to use any lines of code it added to LINUX. Previously in this litigation, many claims have been resolved. This order addresses SCO's unfair competition claim, granting summary judgment on that claim in favor of IBM.

# TABLE OF CONTENTS

Table of Contents ............................................................................................................... 2
Case and Motion Background ............................................................................................. 2
Statement of Undisputed Facts .......................................................................................... 6
    A.    SCO's Unfair Competition Claim ....................................................... 7
    B.    SCO's Disclosures. ............................................................................. 8
    C.    Background on SCO .......................................................................... 12
    D.    Background on IBM and the UNIX-on-Intel Market ......................... 14
    E.    Project Monterey. ............................................................................. 15
    F.    The Release of the Project Monterey Operating System ................... 25
    G.    IBM's Use of SCO's SVR4 Code in IBM Products ......................... 26
    H.    The Acquisition of the UNIX Business by Caldera ............................ 28
    I.    Status of Project Monterey in 2002 ................................................... 29
Summary JUdgment Standard .......................................................................................... 30
Analysis ............................................................................................................................ 31
    A.    The Independent Tort Doctrine Bars Tort Claims  Where There Is An Express Contract Provision ....................................................................... 32
    B.    SCO's Unfair Competition Claim Is Subsumed by Express Contractual Provisions Specifically Governing the SVr4 Code ............................. 35
    C.    SCO Cannot Rely on the Utah Unfair Competition Act as a Basis for  an Unfair Competition Claim ........................................................................ 38
    D.    SCO and IBM Entered Into an Arms-Length Contract and Did Not Create a Joint Venture, Partnership, or Any Other Form of Fiduciary Relationship ................... 41
Conclusion ....................................................................................................................... 47
Order  .............................................................................................................................. 47

# CASE AND MOTION BACKGROUND

This case has been assigned to multiple judges in the District of Utah since it was filed in

2003. The case was administratively closed by Judge Kimball on September 20, 2007 due to

SCO's filing for bankruptcy,[1] and on September 10, 2010, Judge Campbell denied SCO's

request to re-open the case to resolve two of the several pending motions.[2] SCO filed a motion to

reopen the case to resolve some pending motions,[3] and after the case was reassigned again, that

---

[1] Order Regarding Temporary Administrative Closure of Case, docket no. 1081, filed Sept. 20. 2007.

[2] Order, docket no. 1093, filed Sept. 10, 2010.

[3] The SCO Group, Inc.'s Motion to Reopen the Case, docket no. 1095, filed Nov. 4, 2011.

motion was denied with the intent of keeping the case closed during the bankruptcy.[4] On May 7, 2013, SCO filed a motion for reconsideration of that order.[5] Because IBM did not oppose this motion or the reopening of the case, SCO's motion was granted, the previous order denying the motion to reopen[6] was vacated, and the case was reopened on June 14, 2013.[7]

Following the resolution of separate litigation between Novell, Inc. ("Novell") and SCO,[8] SCO proposed that six of SCO's claims be dismissed with prejudice: breach of IBM Software Agreement (Count I), breach of IBM Sublicensing Agreement (Count II), breach of Sequent Software Agreement (Count III), breach of Sequent Sublicensing Agreement (Count IV), copyright infringement (Count V), and interference with the 1995 Asset Purchase Agreement at issue in the *Novell* case (Count VIII).[9] On July 22, 2013, IBM filed a motion for partial summary judgment regarding remaining claims based on the *Novell* judgment.[10] On December 15, 2014, partial summary judgment was granted in IBM's favor on IBM's counterclaims seeking a declaration of non-infringement of the copyrights to the pre-1996 UNIX source code (IBM's Counterclaims IX and X), and on SCO's unfair competition claim (Count VI) and tortious interference claims (Counts VII and IX) "insofar as they alleged that SCO, and not Novell, owns the copyrights to the pre-1996 UNIX source code and/or that Novell does not have the right to

---

[4] Memorandum Decision and Order Denying Motion to Reopen the Case, docket no. 1109, filed Apr. 24, 2013.

[5] The SCO Group, Inc.'s Motion for Reconsideration of the Court's Order Denying Motion to Reopen the Case, docket no. 1110, filed May 7, 2013.

[6] Memorandum Decision and Order Denying Motion to Reopen the Case, docket no. 1109, filed Apr. 24, 2013.

[7] Order Reopening Case and Vacating Prior Order, docket no. 1115, filed June 14, 2013.

[8] *SCO Group, Inv. v. Novell, Inc.*, Case No. 2:04-cv-00129-TS.

[9] Partial Judgment Dismissing SCO Claims, docket no. 1123, filed July 10, 2013.

[10] IBM's Motion and Memorandum for Partial Summary Judgment on the Basis of the Novell Judgment, docket no. 1126, filed July 22, 2013.

waive IBM's alleged breaches of the licensing agreements pursuant to which IBM licensed pre-1996 UNIX source code."[11]

On March 13, 2015, SCO and IBM filed a Joint Status Report[12] outlining the claims and motions that remain pending. SCO's only remaining claims are unfair competition (Count VI), tortious interference with a contract (Count VII), and tortious interference with prospective a business relationship (Count IX), all of which are challenged by summary judgment motions. IBM has eight pending counterclaims, seven of which are challenged by summary judgment motions.[13] This order addresses only SCO's unfair competition claim.

On September 25, 2006, IBM filed a motion for summary judgment on SCO's unfair competition claim,[14] followed shortly thereafter by a memorandum in support.[15] On November 11, 2006, SCO filed its opposition brief,[16] to which IBM replied on January 12, 2007.[17] The parties argued the motion before Judge Kimball on March 5, 2007.[18] Pursuant to a request in the

---

[11] Memorandum Decision and Order Granting in Part and Denying in Part IBM's Motion for Partial Summary Judgment on the Basis of the *Novell* Judgment, docket no. 1132, filed Dec. 15, 2014.

[12] Docket no. 1134, filed Mar. 13, 2015.

[13] IBM's pending counterclaims are breach of contract (Counterclaim I), a violation of the Lanham Act (Counterclaim II), unfair competition (Counterclaim III), intentional interference with prospective economic relations (Counterclaim IV), a violation of the New York State Unfair and Deceptive Trade Practices Act (Counterclaim V), breach of the General Public License (Counterclaim VI), promissory estoppel (Counterclaim VII), and copyright infringement (Counterclaim VIII). SCO has not challenged IBM's breach of contract counterclaim by dispositive motions.

[14] IBM's Motion for Summary Judgment on SCO's Unfair Competition Claim (SCO's Sixth Cause of Action) ("IBM's Unfair Competition Motion"), docket no. 782, filed Sept. 25, 2006.

[15] IBM's Memorandum in Support of Its Motion for Summary Judgment on SCO's Unfair Competition Claim (SCO's Sixth Cause of Action) Filed Under Seal Pursuant to 9/16/03 Protective Order, Docket #38 ("IBM's Unfair Competition Memorandum"), docket no. 806, filed Sept. 29, 2006.

[16] Plaintiff/Counterclaim-Defendant SCO's Memorandum in Opposition to IBM's Motion for Summary Judgment on SCO's Unfair Competition Claim (SCO's Sixth Cause of Action) ("SCO's Unfair Competition Opposition"), docket no. 861, filed Nov. 11, 2006.

[17] IBM's Reply Memorandum in Further Support of Its Motion for Summary Judgment on SCO's Unfair Competition Claim (SCO's Sixth Cause of Action) Filed Under Seal Pursuant to 9/16/03 Protective Order, Docket #38 ("IBM's Unfair Competition Reply"), docket no. 947, filed Jan. 12, 2007.

[18] *See* Minute Entry, docket no. 974, filed Mar. 5, 2007.

March 2015 Joint Status Report[19] to supplement the older briefing, the parties were given the

opportunity to provide five additional pages of authority.[20] On May 21, 2015, IBM filed its

supplemental brief,[21] and SCO filed its supplement on June 5, 2015.[22]

 A status conference was held on June 11, 2015 in which the parties gave brief educational

and background summaries on the remaining claims and motions.[23] As part of this background

presentation, both parties relied heavily on both Utah and New York case law, agreeing that

there wasn't an important distinction in the bodies of law regarding this case and stipulating to

the use of both. In that hearing, the parties also agreed to engage in settlement negotiations

conducted by a magistrate judge, but were not amendable to a settlement conference when the

magistrate judge attempted to arrange one.[24]

 Having reviewed the parties' original and supplementary briefing as well as their oral

argument before Judge Kimball, it is unnecessary to hold additional oral argument to decide this

motion. Therefore, for the reasons stated more fully below, summary judgment is GRANTED in

IBM's favor on SCO's unfair competition claim.

---

[19] Docket no. 1134, filed Mar. 13, 2015.

[20] *See* Docket Text Order, docket no. 1142, filed May 28, 205.

[21] IBM's Case Law Update with Respect to Its Motion for Summary Judgment on SCO's Unfair Competition Claim (SCO's Sixth Cause of Action) and Its Motion for Summary Judgment on SCO's Interference Claims (SCO's Seventh and Ninth Causes of Action) ("IBM's Unfair Competition Supplement"), docket no. 1140, filed May 21, 2015.

[22] SCO's Response to IBM's Case Law Update with Respect to Its Motion for Summary Judgment on SCO's Unfair Competition Claim (SCO's Sixth Cause of Action) and Its Motion for Summary Judgment on SCO's Interference Claims (SCO's Seventh and Ninth Causes of Action) ("SCO's Unfair Competition Supplement"), docket no. 1144, filed June 5, 2015.

[23] *See* Minute Order, docket no. 1150, filed June 11, 2015.

[24] *See* Order Regarding Settlement Conference Referral, docket no. 1155, filed July 7, 2015.

## STATEMENT OF UNDISPUTED FACTS

The below collection of undisputed material facts is distilled from the above listed filings. IBM's Unfair Competition Memorandum provided a statement of facts[25] and separate supporting exhibits.[26] SCO's Unfair Competition Opposition responded to IBM's statement of facts[27] and provided a statement of additional facts[28] and its own set of exhibits. IBM's Unfair Competition Reply replied to SCO's responses to IBM's statement of facts[29] included a one-page addendum in which it objected to SCO's additional facts as lacking foundation and being otherwise irrelevant,[30] although no contradictory evidence was offered to rebut those facts as required under the Federal Rules of Civil Procedure. In the June 11, 2015 hearing, the parties agreed to reconcile the facts on IBM's Unfair Competition Motion and IBM's summary judgment motion[31] regarding SCO's interference claims.[32] The parties were ordered to reconcile the facts on IBM's Unfair Competition motion first, to be completed within 30 days; however, after seeking an extension, the parties failed to reconcile the facts as ordered. Determination of the undisputed facts has been made by the court.

---

[25] IBM's Unfair Competition Memorandum at 2–10.

[26] *See* Declaration of Todd M. Shaughnessy Filed Under Seal Pursuant to 9/16/03 Protective Order, Docket #38 ("IBM's First Exhibits"), docket no. 804, filed under seal on Sept. 25, 2006.

[27] SCO's Unfair Competition Opposition at 53–64, Appendix A: Response to IBM's "Statement of Undisputed Facts."

[28] *Id.* at 3–29.

[29] IBM's Unfair Competition Reply at Addendum A: IBM's Undisputed Facts: IBM Unfair Competition Brief.

[30] *Id.* at Addendum B: IBM's Objections to SCO's Alleged Evidence.

[31] IBM's Motion for Summary Judgment on SCO's Interference Claims (SCO's Seventh, Eighth and Ninth Causes of Action), docket no. 783, filed Sept. 25, 2006.

[32] *See* Minute Order, docket no. 1150, filed June 11, 2015.

The headings in this statement of facts are descriptive, not declaratory or substantive.

## A.  SCO's Unfair Competition Claim.

1.      SCO filed its original Complaint, which included a claim for unfair competition, on March 6, 2003.[33] SCO's unfair competition claim repeated many of the allegations of its other causes of action, including a claim for misappropriation of trade secrets, but labeled those same allegations as "unfair competition."[34]

2.      On July 22, 2003, SCO filed an Amended Complaint.[35] In the Amended Complaint, SCO again asserted a claim for unfair competition, and again based that claim on much of the same alleged conduct that supported each of its other causes of action.[36]

3.      SCO thereafter sought, and was granted, permission to file a Second Amended Complaint.[37]

4.      SCO's Second Amended Complaint, filed on February 27, 2004, again included an unfair competition claim (the sixth cause of action), which remained an amalgamation of many of its other claims relabeled as "unfair competition."[38] In its Second Amended Complaint, SCO abandoned its claim for misappropriation of trade secrets altogether.[39] In fact, at a hearing on December 5, 2003, SCO acknowledged that there are no trade secrets in UNIX System V. Counsel for SCO stated: "There is no trade secret in UNIX system [V]. That is on the record. No problem with that."[40]

---

[33] Complaint, attached as Exhibit 1 to IBM's First Exhibits.

[34] *Id.* ¶ 118–19.

[35] Amended Complaint, attached as Exhibit 2 to IBM's First Exhibits.

[36] *Id.* ¶¶ 147–53.

[37] Second Amended Complaint, attached as Exhibit 3 to IBM's First Exhibits.

[38] *Id.* ¶¶ 181–88.

[39] *See generally id.*

[40] Transcript of Motion to Compel, dated Dec. 5, 2003, at 46:2–3, attached as Exhibit 414 to IBM's First Exhibits.

5.      SCO then sought and was granted leave to file a Third Amended Complaint to add a tenth cause of action.[41] SCO's tenth cause of action asserted that "IBM misappropriated, and used in its own 'AIX for Power' operating system, substantial copyrighted source code relating to UnixWare System V Release 4 ['SVr4']."[42] SCO further alleged that "IBM obtained access to the copyrighted UnixWare SVr4 code through 'Project Monterey'".[43]

6.      In a decision dated July 1, 2005, this Court denied SCO's motion to add a cause of action based upon IBM's alleged copying of code obtained through Project Monterey into AIX, stating that "the court finds that SCO has unduly delayed seeking leave to assert the proposed cause of action. It appears that SCO–or its predecessor–either knew or should have known about the conduct at issue before it filed its original Complaint."[44]

### B.  SCO's Disclosures.

7.      IBM served interrogatories asking SCO to describe in detail its allegations and alleged evidence of misconduct by IBM.[45]

8.      With respect to SCO's unfair competition claim, IBM asked SCO to "describe, in detail, each instance in which plaintiff alleges that IBM engaged in unfair competition, including but not limited to: (a) the dates on which IBM allegedly engaged in unfair competition; (b) all persons involved in the alleged unfair competition; and (c) the specific manner in which IBM is alleged to have engaged in unfair competition."[46]

---

[41] Third Amended Complaint ¶¶ 217–41, attached as Exhibit 10 to IBM's First Exhibits.

[42] *Id.* ¶ 217.

[43] *Id.*

[44] Order at 4, filed July 1, 2005, attached as Exhibit 58 to IBM's First Exhibits.

[45] Defendant IBM's First Set of Interrogatories and First Request for the Production of Documents, attached as Exhibit 11 to IBM's First Exhibits.

[46] *Id.* at 4 Interrogatory No.7.

9.     Following IBM's motions to compel further discovery regarding SCO's allegedly incomplete disclosures regarding its allegations and evidence of IBM's alleged misconduct, the Court entered three different orders requiring SCO to provide detailed responses to IBM's Interrogatories.[47] In the final of those three orders, the Court set December 22, 2005, as the "final deadline for [SCO] to identify with specificity all allegedly misused material" and update its interrogatory responses accordingly.[48]

10.     Initially, SCO defined its unfair competition claim as a combination of each of its other causes of action, including its breach of contract claims, its tortious interference claims and its copyright claims.[49]

11.     SCO eventually focused its unfair competition claim upon allegations related to Project Monterey. Specifically, SCO alleges that:

a.     IBM made and continued to make investments in the development of LINUX, and secretly advanced and promoted development of LINUX without disclosing such activities to SCO, during and at a time when IBM was under a duty to deal fairly with and disclose such competing activities to SCO pursuant to its contractual obligations to SCO under Project Monterey and otherwise.[50]

---

[47] *See* Order Granting International Business Machine's Motions to Compel Discovery and Requests for Production of Documents, filed Dec. 12, 2003, attached as Exhibit 55 to IBM's First Exhibits; Order Regarding SCO's Motion to Compel Discovery and IBM's Motion to Compel Discovery, filed Mar. 3, 2004, attached as Exhibit 56 to IBM's First Exhibits; and Order, filed July 1, 2005, attached as Exhibit 58 to IBM's First Exhibits.

[48] Order, filed July 1, 2005, at 4, attached as Exhibit 58 to IBM's First Exhibits.

[49] *See* Plaintiff's Responses to Defendant's First Set of Interrogatories and First Request for the Production of Documents at 11 Interrogatory Response No.7, attached as Exhibit 31 to IBM's First Exhibits; Plaintiff's Supplemental Response to Defendant's First Set of Interrogatories at 29-31 Supplemental Interrogatory Response No.7, attached as Exhibit 32 to IBM's First Exhibits; Plaintiff's Revised Supplemental Response to Defendant's First and Second Set of Interrogatories at 44-56 Supplemental Interrogatory Responses No.7 and 8, attached as Exhibit 33 to IBM's First Exhibits; SCO's Supplemental Response to Interrogatory No. 8 at 2-13 Supplemental Interrogatory Response No.8, attached as Exhibit 46 to IBM's First Exhibits.

[50] Plaintiff's Supplemental Response to Defendant's First Set of Interrogatories at 29-31 Supplemental Interrogatory Response No.7, attached as Exhibit 32 to IBM's First Exhibits.

b.      IBM's unfair competition arose from the relationship it established with SCO as a result of the joint effort between SCO and IBM known as "Project Monterey."[51]

c.      As a result of the formal agreement between SCO and IBM and the numerous representations made by IBM that were calculated to be relied upon by SCO, IBM had a fiduciary obligation to SCO that required IBM to be forthright and truthful in all affairs related to the partnership agreement.[52]

d.      IBM unfairly took advantage of its partnership relations with SCO, unfairly gained access to SCO's business relationships, and unfairly and knowingly diverted SCO's resources away from competition with IBM and toward the purposes of the relationship.[53]

e.      During a substantial part of 1999, IBM was secretly developing plans to cease its planned strategic relationship with SCO and to begin supporting LINUX.[54]

12.      SCO alleges that "[b]ecause IBM has been developing its plan to replace UnixWare support with Linux support, and because it knew SCO had dedicated its entire enterprise resources to the IBM/UnixWare joint relationship, IBM had a fiduciary obligation to inform SCO of its Linux-related plans long before its Linux public announcement in December

---

[51] Plaintiff's Revised Supplemental Response to Defendant's First and Second Set of Interrogatories at 44-50 Supplemental Interrogatory Response No.7, attached as Exhibit 33 to IBM's First Exhibits.

[52] *Id.*

[53] *Id.*

[54] *Id.*

1999."[55] IBM made a public announcement of its intention to support LINUX at LinuxWorld in

March 1999.[56]

      13.     SCO also alleges that IBM engaged in unfair competition by copying into IBM's

AIX operating system code from the UNIX System V Release Four ("SVr4") operating system

that had been included in the Santa Cruz Operation's ("SCO" or "Santa Cruz")[57] UnixWare 7

product.[58] According to SCO, IBM obtained that code during the course of Project Monterey and

its use of that code exceeded the scope permitted by the Project Monterey joint development

agreement (the "JDA").[59]

      14.     When Santa Cruz became aware of the allegedly improper inclusion of Santa

Cruz code in AIX for Power remains in dispute[60]

      15.     In interrogatory responses, SCO has alleged that IBM began copying Santa Cruz

code obtained through Project Monterey into AIX in October 2000.[61] Similarly, in an expert

report submitted on behalf of SCO, Christine Botosan writes "I have been asked to assume that

---

[55] *Id.*

[56] IBM Linux Update, dated Sept. 23, 1999, at 4, attached as Exhibit 21 to IBM's First Exhibits; Expert Report of Jeffery Leitzinger, dated May 19, 2006 ("Leitzinger Report"), at 38, attached as Exhibit 259 to IBM's First Exhibits.

[57] The Santa Cruz Operation was historically referred to as "SCO" and many documents in this action use the term "SCO" in reference to that entity. In May 2001, Santa Cruz transferred its UNIX assets to plaintiff, which was then called Caldera International, Inc. ("Caldera"). Immediately after the sale, Santa Cruz changed its name to Tarantella. Caldera International, Inc. remained Caldera after the transaction but later, in 2002, changed its name to The SCO Group, Inc., the plaintiff in this action, in order to leverage the UNIX assets and business it had acquired. The term "SCO" is used herein, as it is in many documents, to refer to the entity in possession of the UNIX assets, although that entity changed from Santa Cruz to The SCO Group, previously Caldera, in May 2001.

[58] Plaintiff's Revised Supplemental Response to Defendant's First and Second Set of Interrogatories at 44-50 Interrogatory Response No.7, attached as Exhibit 33 to IBM's First Exhibits.

[59] *Id.*

[60] Declaration of David McCrabb ¶ 16, attached as Exhibit 227 to IBM's First Exhibits; Declaration of Jay F. Petersen ("Petersen Declaration") ¶¶ 16–18, attached as Exhibit 354 to Declaration of Brent O. Hatch ("SCO's Opposition Exhibits"), docket no. 876, filed under seal on Nov. 11, 2006; Declaration of John T. Maciazek ("Maciazek Declaration") ¶ 15, attached as Exhibit 362 to SCO's Opposition Exhibits; Declaration of Doug Michels ("Michels Declaration") ¶ 16, attached as Exhibit 351 to SCO's Opposition Exhibits; Declaration of Alok Mohan ("Mohan Declaration") ¶ 10, attached as Exhibit 17 to SCO's Opposition Exhibits.

[61] *See* SCO's Supplemental Response to Interrogatory No. 8 at 10, attached as Exhibit 46 to IBM's First Exhibits.

IBM engaged in unfair competition by misusing code provided in Project Monterey to strengthen IBM's proprietary AIX product. I have been told that the disgorgement of IBM's subsequent AIX profits is an appropriate remedy for such unfair competition and that the date from which disgorgement should begin is October 1, 2000."[62]

## C. Background on SCO

16.     Plaintiff's predecessor, Santa Cruz, was founded in 1979, and in 1983 it delivered the first packaged UNIX System for Intel processor-based PCs.[63] SCO's UNIX operating systems, UnixWare and OpenServer, run on the 32-bit Intel IA-32 microprocessor or "chip."[64]

17.     As one industry analyst described it, "SCO established the market for advanced operating systems on industry-standard Intel platforms in the 1980s, pioneering such features as a full 32-bit implementation, security, and multiprocessing."[65] At least as far back as 1989, SCO was described as "the largest vendor of Unix-like operating systems on Intel-based computers."[66]

18.     SCO sold its UNIX-on-Intel operating systems to major corporate customers located throughout the world including NASDAQ, McDonalds, Sherwin Williams, Papa Johns, Daimler Chrysler, BMW, and Lucent Technologies. SCO's UnixWare product was certified for and sold on a wide variety of OEM IA-32 systems including those from Compaq, Hewlett-

---

[62] Expert Report of Christine A. Botosan, dated May 19, 2006, at 3–4, attached as Exhibit 171 to IBM's First Exhibits.

[63] The History of the SCO Group at 1, www.sco.com/company/history.html, attached as Exhibit 250 to SCO's Opposition Exhibits.

[64] IBM Servers, *Project Monterey: A Strategic Approach to Business Computing*, dated July 1999 ("Project Monterey: A Strategic Approach to Business Computing"), at 181047252, attached as Exhibit 214 to SCO's Opposition Exhibits ("SCO is the clear leader in providing UNIX operating systems on the IA-32 architecture.").

[65] Christopher Thompson, *SCOring a Hit against Microsoft Windows NT* at 6, GARTNER (Apr. 21, 1997), attached as Exhibit 244 to SCO's Opposition Exhibits.

[66] Evan Grossman, *UNIX Users Look Forward to Advantages of Intel* '486 at 1, PC WEEK (Apr. 17, 1989), attached as Exhibit 246 to SCO's Opposition Exhibits.

Packard Company ("Hewlett-Packard"), Unisys, NCR, Data General, Siemens Nixdorf, FujitsuICL, Olivetti, and IBM.[67]

19.     In 1998, SCO was the worldwide UNIX market leader in terms of unit shipments, with roughly 40 percent of total market unit sales.[68] In terms of revenue, SCO dominated what is referred to as the "UNIX-on-Intel market" to an even greater extent, with an 80% market share.[69]

20.     At that time, the processing capacity of the Intel processor chip was increasing rapidly. By 1995, Intel began to target its chips to be used in high-performance desktops and servers, and new UNIX servers based on 32-bit Intel chips began to compete against UNIX systems based on the far more expensive RISC chip, which until then had been the preferred chip for enterprise-critical systems. From 1995 to 1999, shipments of servers based on Intel architecture approximately tripled and, by 2000, servers based on Intel architecture began to dominate the UNIX market.[70]

21.     By 1998, Intel was developing the first commercial 64-bit chip, called Itanium, with the code name Merced.[71] Capitalizing on its expertise with the Intel IA-32, SCO began work on porting its operating systems to the Itanium, IA-64 chip.[72]

---

[67] Petersen Declaration ¶ 7; Maciazek Declaration ¶ 7.

[68] Project Monterey: A Strategic Approach to Business Computing at 181047252, n. 2.

[69] Memorandum to L. Gerstner regarding IBM's UNIX Strategy, dated July 30, 1998, at 1710117641, attached as Exhibit 204 to SCO's Opposition Exhibits.

[70] Expert Report of Gary Pisano, Ph.D., dated May 19, 2006, at 18–20, attached as Exhibit 284 to SCO's Opposition Exhibits.

[71] Project Monterey: A Strategic Approach to Business Computing at 181047251–52; Kim Nash, *Behind the Merced Mystique* at 1, CNN.com (July 15, 1998), attached as Exhibit 249 to SCO's Opposition Exhibits.

[72] Petersen Declaration ¶ 8; Maciazek Declaration ¶ 8.

### D. Background on IBM and the UNIX-on-Intel Market

21.     In contrast to SCO, IBM in 1998 had almost no presence in the market for UNIX-based operating systems on Intel chips. Instead, IBM had focused its efforts on its operating system called AIX for Power, which ran on servers using IBM's RISC-type Power processor.[73]

22.     A May 6, 1998 internal IBM document proposed: "Tight partnership with SCO to exploit their code, channels, attract ISVs with a single AIX O/S marketed by both companies to be explored."[74]

23.     A July 30, 1998 summary of IBM's UNIX Strategy, addressed to IBM's CEO Lou Gerstner, stated: "While HP and Sun have been successful at driving commitments to 64-bit Intel, today's clear leader in the UNIX on Intel market is Santa Cruz Operation (SCO) with over 80% of the $3B Unix-Intel market." [75]

24.     SCO's UnixWare operating system was based on UNIX SVr4 technology, the most recent version of UNIX.[76] In contrast, IBM's AIX operating system was based on the earlier UNIX System V Release 3.2 ("SVr3.2") technology.[77] SCO alleged to own all of the UNIX source code.[78] IBM had opted not to buy from SCO an upgrade of SCO's UNIX license to the SVr4 code base.[79]

---

[73] Project Monterey: A Strategic Approach to Business Computing at 181047252; Deposition Transcript of William Sandve, dated Nov. 19, 2004 ("Sandve Nov. 19, 2004 Depo."), at 8:11–9:17, attached as Exhibit 166 to SCO's Opposition Exhibits.

[74] Port AIX to Merced Investment Fact Sheet, RS/6000 Spring Strategy, Invest/(Reduce) Bridge, dated June 16, 1998, at 1710117588, attached as Exhibit 189 to SCO's Opposition Exhibits.

[75] Memorandum to L. Gerstner regarding IBM's UNIX Strategy, dated July 30, 1998, at 1710117641, attached as Exhibit 204 to SCO's Opposition Exhibits.

[76] Petersen Declaration ¶ 9; Maciazek Declaration ¶ 9.

[77] Email from W. Sandve to J. Graham, dated Jan. 23, 2002, at 181017195, attached as Exhibit 205 to SCO's Opposition Exhibits.

[78] Email from W. Sandve to S. Gordon, H. Armitage, S. Keene, and J. Kruemcke at 181472999, attached as Exhibit 227 to SCO's Opposition Exhibits.

[79] Id.

25.     Like SCO's UnixWare, Sun Microsystems's ("Sun") UNIX operating system, Solaris, was based on SVr4 code.[80]

26.     "IBM was highly concerned about competition with Sun[,]" and believed that incorporation of SVr4 code into AIX would help it compete against Sun.[81]

### E.  Project Monterey.

27.     In 1994, Intel and Hewlett-Packard announced their collaboration to create a new 64-bit processor architecture design,[82] and "the intent of the technology agreement [was] to have a single architecture that will replace all others from either company."[83]

28.     In or around 1998, IBM began negotiating with Santa Cruz to undertake a joint development project for, among other things, a UNIX-like operating system that would run on the IA-64 platform. This project subsequently came to be known as "Project Monterey."[84] At that time, Santa Cruz sold two UNIX products that ran exclusively on Intel's existing 32-bit hardware platform: UnixWare and OpenServer.[85]

29.     Both IBM and Santa Cruz were interested in attempting to leverage and strengthen their existing UNIX-like operating system products as part of Project Monterey. The

---

[80] Email dated Jan. 23, 2002 from W. Sandve to J. Graham at 181017194, attached as Exhibit 205.

[81] Rebuttal to the Report and Declaration of Professor J.R. Kearl by Gary Pisano, dated July 17, 2006, at 76, attached as Exhibit 285 to SCO's Opposition Exhibits.

[82] Paul Barker, *New HP-Intel Pact Could Hit PC Clones Hard*, Computing Canada, July 6, 1994, attached as Exhibit 27 to IBM's First Exhibits.

[83] *Id.*

[84] Options for Distribution and Royalty Flow-Draft 1 ("Options for Distribution and Royalty Flow"), attached as Exhibit 24 to IBM's First Exhibits; Genus: An IBM/SCO UNIX Project Marketing Development Plan ("IBM/SCO UNIX Plan"), attached as Exhibit 25 to IBM's First Exhibits; Asset Purchase Agreement between Novell, Inc. and The Santa Cruz Operation, Inc., dated Sept. 19, 1995, attached as Exhibit 123 to IBM's First Exhibits; U.S. Copyright Registration Statement No. TX 5-856-472, registering IBM's copyright to its work titled "Linux Kernel Support for Series Hypervisor Terminal," dated Feb. 2, 2004, ¶ 54, attached as Exhibit 86 to IBM's First Exhibits; Leitzinger Report at 30–31.

[85] Complaint ¶¶ 26, 47, attached as Exhibit 1 to IBM's First Exhibits; Form 10-K filed by The Santa Cruz Operation, Inc., for fiscal year ended September 30, 1999, at 5–8, attached as Exhibit 115 to IBM's First Exhibits.

goal was to develop and market a "family" of UNIX-like operating system products, including a "Monterey/64" version for the IA-64 Intel processor, a version to run on IBM's proprietary "Power" processor architecture and a version to run on the IA-32 architecture.[86]

30.    In October 1998, a deal between IBM, SCO, Sequent, and Intel was announced, and this deal came to be known as Project Monterey.[87] Project Monterey was described by IBM as a "major UNIX operating system initiative"[88] that would deliver a "single UNIX operating system product line that runs on IA-32, IA-64 and IBM microprocessors, in computers that range from entry-level to large enterprise servers."[89]

31.    In the press release announcing Project Monterey, IBM stated: "We're extending into broader markets with our award-winning AIX software that delivers the reliability and security required of an enterprise-class operating system . . . . Working with these companies, we're capitalizing on the base of proven leadership technologies to deliver the world's best UNIX on Power microprocessor and high-volume Intel microprocessor systems."[90]

32.    On October 26, 1998, IBM and Santa Cruz entered into the JDA, whereby Santa Cruz and IBM agreed to, among other things, provide resources and technology to pursue these goals.[91]

---

[86] IBM-SCO Family Unix Technical Proposal, dated Sept. 2, 1998, attached as Exhibit 23 to IBM's First Exhibits; *see also* Options for Distribution and Royalty Flow; IBM/SCO UNIX Plan; Joint Development Agreement (Agreement Number 4998CR0349) between SCO and IBM, dated Oct. 26, 1998 ("JDA"), attached as Exhibit 245 to IBM's First Exhibits.

[87] Press Release, *IBM Launches Major UNIX Initiative, Significant Support from SCO, Sequent, Intel, and OEMs*, dated Oct. 26, 1998, attached as Exhibit 240 to SCO's Opposition Exhibits; Petersen Declaration ¶ 9; Maciazek Declaration ¶ 9; Mohan Declaration ¶ 9

[88] Project Monterey: A Strategic Approach to Business Computing at 181047251.

[89] Press Release, *IBM Launches Major UNIX Initiative, Significant Support from SCO, Sequent, Intel, and OEMs*, dated Oct. 26, 1998, at 1, attached as Exhibit 240 to SCO's Opposition Exhibits.

[90] Press Release, *IBM Launches Major UNIX Initiative, Significant Support from SCO, Sequent, Intel, and OEMs*, dated Oct. 26, 1998, at 1–2, attached as Exhibit 240 to SCO's Opposition Exhibits.

[91] JDA.

33.     In the JDA, the parties agreed to jointly develop an operating system that would run on Intel's forthcoming 64-bit chip. This operating system was defined as the "IA-64 Product" (sometimes referred to herein as the "Project Monterey Operating System"). The IA- 64 Product was to be the cornerstone of a "family of products" that would be sold by both IBM and SCO.[92]

34.     The agreement contemplated that SCO would continue to sell its 32-bit operating systems and would also be able to upgrade or migrate its customers to the jointly developed Project Monterey Operating System on the 64-bit chip.[93]

35.     Thus, the ultimate goal was that both SCO customers (those using Santa Cruz's UnixWare operating system software on computers with Intel's 32-bit processors) and IBM customers (those using IBM's AIX for Power operating system software on computers with IBM's Power processor) would upgrade to the jointly developed Project Monterey Operating System software (the IA-64 Product), which was to be compatible with computers using either the 32-bit or the 64-bit Intel chip or the IBM Power chip.[94]

36.     In furtherance of IBM and Santa Cruz's intention to create a compatible family of products, both companies granted licenses to the other.[95] For its part, IBM granted Santa Cruz a royalty-free license to certain AIX source code for Santa Cruz's use in its UnixWare product for

---

[92] *Id*. at Preamble and § 1.10; Sandve Nov. 19, 2004 Depo. at 21:6–9; Project Monterey: A Strategic Approach to Business Computing at 181047252; Email from W. Sandve to M. Day, dated Oct. 15, 1998, at 1710013164, attached as Exhibit 191 to SCO's Opposition Exhibits.

[93] JDA at Preamble and §§ 1.9, 9.0–9.4; Project Monterey: A Strategic Approach to Business Computing at 181047252–53; SC98, High Performance Networking and Computing: Executive Overview, draft version, dated Nov. 2, 1998, at 181441556, attached as Exhibit 176 to SCO's Opposition Exhibits.

[94] *See generally* Project Monterey: A Strategic Approach to Business Computing at 181047252–53; SC98, High Performance Networking and Computing: Executive Overview, draft version, dated Nov. 2, 1998, at 181441556, attached as Exhibit 176 to SCO's Opposition Exhibits ("IBM and SCO offer a smooth migration path from AIX to IA-64 and from UnixWare to IA-64").

[95] JDA.

the existing 32-bit Intel processor.[96] In turn, Santa Cruz granted IBM a royalty-free license to

certain UnixWare source code for IBM's use in its AIX operating system tailored to run on

IBM's Power architecture processor.[97] Each party also granted the other a license to use any

code supplied during Project Monterey for the development of the operating system that would

be marketed for use on the forthcoming IA-64 product.[98]

37.     Specifically, the JDA expressly granted to IBM:

a worldwide, non-exclusive, royalty free . . ., perpetual and irrevocable . . . right
and license under SCO's and applicable third parties' copyrights . . . and any trade
secrets or confidential information in the Licensed SCO Materials and SCO
Project Work which are included in Deliverables to (i) prepare or have prepared
Derivative Works, (ii) use, execute, reproduce, display and perform the Licensed
SCO Materials and SCO Project Work and Derivative Works thereof, (iii)
sublicense and distribute the Licensed SCO Materials and SCO Project Work and
Derivative Works thereof either directly or through Distributors, in the form of
Source Code, Object Code, Documentation, and/or in any other form whatsoever,
and (iv) grant licenses, sublicenses, and authorizations to others (including
without limitation IBM Subsidiaries, Distributors and any other third parties), on
a non-exclusive basis that is equal to the scope of the licenses granted
hereunder.[99]

38.     That "worldwide, non-exclusive, royalty free . . . perpetual and irrevocable

. . . right and license" was limited as follows:

When IBM sublicenses the IA-64 Product containing Licensed SCO Materials
and/or SCO Project Work in Source Code form or when SCO sublicenses the IA-
64 Product containing Licensed IBM Materials and/or IBM Project Work in
Source Code form, the parties shall not grant the third party the right to further
grant source sublicenses to the other party's Licensed Materials or Project Work.
Further, when licensing such Source Code, both e parties shall only grant the right
to create Derivative Works required for the following purposes:
1.  Maintenance and support;
2.  Translation [sic] and localization;
3.  Porting, optimization and extensions;

---

[96] *Id*. § 2.0(c)(2).

[97] *Id*. §2.0(d)(2); Declaration of David McCrabb ¶ 16, attached as Exhibit 227 to IBM's First Exhibits.

[98] JDA. §§ 2.0(c)(2), 2.0(d)(2).

[99] *Id*. § 2.2(d)(2).

4.   Any other Derivative Works agreed to by SCO and IBM.[100]

39.     In the JDA, IBM also stated its intention to engage in certain marketing activities including to "market, promote and sell the Unixware and IA-32 Product on IBM systems in 1999[.]"[101]

40.     IBM also agreed to make a certain minimum of middleware available for the UnixWare 7 and IA-32, based on IBM's determination of commercial considerations. IBM's plan included Tivoli, WebSphere, and DB2.[102]

41.     Section 15.2 of the JDA, which is entitled "Change of Control," provides:

Notwithstanding Section 15.1, IBM shall have the right to terminate this Agreement immediately upon the occurrence of a Change of Control of SCO which IBM in its sole discretion determines will substantially and adversely impact the overall purpose of the cooperation set forth by this Agreement and applicable Project Supplements or will create a significant risk or material and adverse exposure of IBM's confidential and/or technical proprietary information (which is subject to, and to the extent of, confidentiality restrictions) ("Information"). For the purposes of this Agreement, control shall be deemed to be constituted by rights, contract or any other means which, either separately or jointly and having regard to the consideration of fact or law involved, confer the possibility of exercising decisive influence (other than by an entity currently exercising such influence or any entity controlled by or controlling such entity) on SCO by: (1) owning more than half the equity, capital or business assets, or (2) having the power to appoint more than half of the members of the supervisory board, board of directors or bodies legally representing SCO, or (3) having the right to directly manage SCO's business activities.[103]

42.     Section 22.12 of the JDA, which is entitled "Assignment," provides, in relevant part: "Neither party may assign, or otherwise transfer, its rights or delegate any of its duties or obligations under this Agreement without the prior written consent of the other party."[104]

---

[100] *Id*. § 2.2(e).

[101] *Id*. at Attachment A, § I.

[102] *Id*. at Attachment A, § II.

[103] *Id*. §15.2.

[104] *Id*. § 22.12.

43.  Section 22.3 of the JDA, which is entitled "Choice of Law/Venue," provides:

This Agreement shall be governed by, and the legal relations between the parties hereto shall be determined in accordance with, the substantive laws of the State of New York, without regard to the conflict of law principles of such State, as if this Agreement was executed and fully performed within the State of New York. Each party hereby waives any right to a trial by jury in any dispute arising under or in connection with this Agreement, and agrees that any dispute hereunder shall be tried by a judge without a jury. Any legal or other action related to a breach of this Agreement must be commenced no later than two (2) years from the date of the breach in a court sited in the State of New York.[105]

44.  Consistent with the JDA arrangement, IBM repeatedly referred to SCO as a "partner" during the course of Project Monterey:

a.  On May 6, 1998, IBM proposed a "tight partnership with SCO."[106]

b.  In 2000, one IBM employee stated in an email that "we need to recognize that we must treat [SCO] as we would another business partner and follow the appropriate rules and laws regarding … competitive issues."[107]

c.  Even as late as 2002, Mr. Sandve stated in an internal email that "due to our partnership with SCO, we have been able to make AIX closer to SVR4 as best we can."[108]

45.  Although development of the Project Monterey IA-64 operating system proceeded throughout 1999 and 2000, the project encountered substantial difficulties due to delays in Intel's IA-64 processor development schedule. Intel's release of the initial Intel IA-64 processor, code-named "Merced" and officially named Itanium, was substantially delayed. In

---

[105] *Id*. § 22.3.

[106] Port AIX to Merced Investment Fact Sheet, RS/6000 Spring Strategy, Invest/(Reduce) Bridge, dated June 16, 1998, at 1710117588, attached as Exhibit 189 to SCO's Opposition Exhibits.

[107] Email from R. Roth to W. Sandve, dated Feb. 23, 2000, at 181427972, attached as Exhibit 218 to SCO's Opposition Exhibits.

[108] Email from W. Sandve to J. Graham, dated Jan. 23, 2002, at 181017195, attached as Exhibit 205 to SCO's Opposition Exhibits.

1995 and 1996, executives of Itanium co-developer HP hinted that the processor was well underway, and might ship as early as 1997. That date came and went, and eventually 1999 was stated as the target. But that date also came and went. Itanium did not end up shipping until mid-2001.[109]

46.     Once Itanium did arrive, it performed poorly relative to alternatives in the marketplace. As a result, Intel and Hewlett-Packard re-positioned it as primarily an evaluation and development platform, a precursor to the second-generation Itanium 2 "McKinley" release that would enable true production deployments. Neither IBM nor Santa Cruz had any involvement in or control over the development of the Itanium processor.[110]

47.     In addition to creating development difficulties, these delays caused a substantial decrease in market interest and confidence in the forthcoming IA-64 product and thereby the IA-64 operating system then under development by IBM and Santa Cruz.[111]

48.     In early 1999, IBM executives cautioned that the "SCO/Monterey plans should not be stopped until we have a better plan to move to."[112] An IBM team prepared an undated memorandum detailing five options, one of which was the "elimination of SCO" and the "replacing of UnixWare with Linux" as IBM's vehicle for entry into the "low end" segment of

---

[109] Stephen Shankland, *Itanium: A Cautionary Tale*, CNET News.com (Dec. 8, 2005), attached as Exhibit 22 to IBM's First Exhibits; Expert Report of Jonathan Eunice, dated July 17, 2006 ("Eunice Report"), ¶ 57, attached as Exhibit 186 to IBM's First Exhibits; John G. Spooner, *Intel Set To Rattle Server Market With Itanium*, CNET News.com (Jan. 2, 2002), attached as Exhibit 394 to IBM's First Exhibits.

[110] Brian Pereira, *Mckinley Is One to Watch*, NETWORK MAGAZINE INDIA (Mar. 2002), attached as Exhibit 26 to IBM's First Exhibts; Michael Kanellos, *Is Merced Doomed?*, CNET News.com (Jan. 2, 2002), attached as Exhibit 28 to IBM's First Exhibits; Eunice Report ¶ 58.

[111] Brian Pereira, *Mckinley Is One to Watch*, NETWORK MAGAZINE INDIA (Mar. 2002), attached as Exhibit 26 to IBM's First Exhibits; Michael Kanellos, *Is Merced Doomed?*, CNET News.com (Jan. 2, 2002), attached as Exhibit 28 to IBM's First Exhibits; Eunice Report ¶ 59.

[112] Email from R. LeBlanc to S. Mills, dated Jan. 19, 199, at 181349130, attached as Exhibit 234 to SCO's Opposition Exhibits.

the UNIX-on-Intel market.[113] However, the team cautioned that, under this option, IBM would not attain the right to use the SVr4 code, and therefore SCO and its UnixWare "should be retained in order to have access to SCO's SVr4/5 and other technologies."[114]

49.     IBM then began cutting the Project Monterey budget, causing employees to question the viability of the project:

a.     A January/February 1999 IBM department staffing memo observed: "Current budget outlook which factors in a substantial challenge from SG Development and additional unfunded Monterey family line item content, would result in an uncompetitive AIX/Monterey product line by 2000."[115]

b.     At the same time, an IBM employee stated in an internal email that IBM was not "investing in the tools to make Monterey successful."[116]

c.     Another IBM employee stated that "working on both Linux and Monterey [was] defocusing."[117]

d.     Yet another IBM employee related "the high degree of concern I am hearing from my technical team and others concerning Linux strategy and the collision with Monterey."[118]

e.     In March of 1999, IBM publicly announced its support of LINUX at the LinuxWorld event.[119]

---

[113] Document Objective at 181526163, attached as Exhibit 371 to SCO's Opposition Exhibits.

[114] *Id.* at 181526164.

[115] Dept HHTS Status, dated Jan./Feb. 1999, at 181442681, attached as Exhibit 368 to SCO's Opposition Exhibits.

[116] Email from W. Sandve to T. Moore, dated Feb. 24, 1999, at 181016130, attached as Exhibit 242 to SCO's Opposition Exhibits.

[117] Email from P. Horn to R. LeBlanc, dated Aug. 17, 1999, at 181349188, attached as Exhibit 236 to SCO's Opposition Exhibits.

[118] Email from M. Kiehl to W. Yates, dated Feb. 23, 1999, at 181016068, attached as Exhibit 187 to SCO's Opposition Exhibits.

f.      In an August 10, 1999 article about IBM's support of both LINUX and

Project Monterey, IBM assuaged concerns:

> IBM's John Prial said Big Blue is comfortable with many operating
> systems under its roof, and that AIX today and Monterey tomorrow will
> sell in a different area than Linux. "We're very comfortable having many
> operating systems," he said. "Monterey will be popular in high business-
> value transactional systems and heavy-duty business intelligence," Prial
> said. Linux, on the other hand, currently is popular in Web servers, file
> and print servers, and other smaller-scale computers, though that could
> change two or three years down the line.[120]

IBM made similar representations privately to SCO.[121]

50.     SCO believed IBM's representations.[122] In an August 19, 1999 article about

IBM's support of Trillian (the IA-64 project for LINUX), SCO CEO Doug Michels was quoted

as follows:

> "IBM is not looking at Trillian as an alternative to Monterey. The real interest in
> Linux is coming from all the software companies that sell databases and
> transaction based tools because they are frustrated that Microsoft moreorless [sic]
> gives these things away as part of the Back Office bundle. So they say 'if you
> give us a free OS, we'll make money from it'."
>
> But Trillian is not intended to make Linux an enterprise class OS and there are no
> real efforts elsewhere to do so either, he claimed.[123]

51.     Behind the scenes, IBM executives recognized the inherent conflict in supporting

both LINUX and Project Monterey: in November 1999, IBM executive Sheila Harnett stated:

> The distinction used to position Monterey versus Linux is that Monterey is
> targeted for high-end servers, whereas Linux comes in at the lower to mid range

---

[119] IBM Linux Update, dated Sept. 23, 1999, at 4, attached as Exhibit 21 to IBM's First Exhibits.

[120] Stephen Shankland, *IBM Joins Advanced Linux Effort* at 2, CNET News.com (Jan. 2, 2002), attached as Exhibit 252 to SCO's Opposition Exhibits.

[121] IBM Meeting, dated Jan. 28, 2000, at SCO1235090–91, attached as Exhibit 186 to SCO's Opposition Exhibits; Michels Declaration ¶¶ 17, 22.

[122] Michels Declaration ¶¶ 17–18; Mohan Declaration ¶ 10.

[123] Cath Everett, *SCO Forum: Trillian Project No Threat to Monterey, Claims SCP President* at 1–2, http://www.pcw.co.uk/articles/print/2107749 (Aug. 19, 1999), attached as Exhibit 253 of SCO's Opposition Exhibits; Michels Declaration ¶ 18.

of servers. However, this distinction is a fragile one, since IBM is working as fast as it can to bolster Linux's ability to compete in the mid to high end range of servers.[124]

52.     In late 1999 and 2000, IBM executives began to recommend internally that IBM take more definitive steps to drop Project Monterey and transition even more support to LINUX:

     a.      In October 1999, IBM executive Irving Wladawsky-Berger recommended internally that IBM "embrace Linux in a very major way," "drop Monterey," and "move at lightning speed."[125]

     b.      In May 2000, IBM executive Steve Mills recommended to Samuel Palmisano: "As soon as possible we should announce the following . . . A transition of our AIX and Monterey efforts to Linux"; he explained: "Monterey will not gain enough industry following to be viable," and, "Our resources and messages are fragmented. We need a bold move that is without qualification. We need a single marketing and sales message."[126]

     c.      An IBM internal memorandum expressly recognized that, if IBM opted for this strategy, it "may squeeze target opportunities for [SCO's] UnixWare from low end" and result in "loss of revenue for SCO."[127]

53.     Notwithstanding these recommendations and predictions, IBM did not drop Project Monterey.[128] Rather, without telling SCO, IBM continued Project Monterey while it tried

---

[124] Email from E. Lynch to K. Norsworthy, dated Nov. 30, 1999, at 181436864, attached as Exhibit 175 to SCO's Opposition Exhibits (emphasis added).

[125] Email from I. Wladawsky-Berger to S. Mills, et al., dated Oct. 22, 1999, at 181668451, attached as Exhibit 183 to SCO's Opposition Exhibits.

[126] Email from S. Mills to S. Palmisano, et al., dated Apr. 24, 1998, at 181669431–32, attached as Exhibit 184 to SCO's Opposition Exhibits.

[127] Document Objective at 181526162, attached as Exhibit 371 to SCO's Opposition Exhibits.

[128] Mohan Declaration at ¶ 10; Petersen Declaration ¶ 15; Maciazek Declaration ¶ 14.

to "to make Linux scale up as quickly as possible."[129] By June 2000, the IBM Academy of

Technology OS Consultancy recommended a "significant reduction in emphasis" in Project

Monterey and that IBM "should further develop for Monterey only what is in common with

Power."[130]

54.     In direct contrast to IBM's internal de-emphasis on Project Monterey, at a

December 21, 2000 OEM Council Meeting, IBM's Charlie Reese stated: "We have a strong

commitment to remain focused on Itanium."[131]

### F.  The Release of the Project Monterey Operating System

55.     On January 27, 2001, an internal IBM email proposed: "Release AIX 5.1 for IA-

64 as an I-Listed PRPQ on the planned April schedule" and "Compilers are not included in the

PRPQ. . . ."[132] Internally at IBM, an I-Listed PRPQ (Programming Request for Price Quote)

requires IBM lab approval.[133]

56.     IBM employee Rose Ann Roth stated: "I think the compiler MUST be available

in some form or the whole thing just doesn't make any sense (i.e. SCO won't buy it)."[134]

57.     Nevertheless, on April 17, 2001, IBM announced the availability of AIX 5L for

Itanium as an I-Listed PRPQ, and made it "available" on May 4, 2001.[135] Unlike the PRPQ of

---

[129] Email from I. Wladwsky-Berger to R. LeBlanc, et al., dated Mar. 1, 2000, at 181668964, attached as Exhibit 235 to SCO's Opposition Exhibits.

[130] Report of the IBM Academy of Technology Consultancy on Operating Systems Evolution, dated July 13, 2000, at 181291944, attached as Exhibit 239 to SCO's Opposition Exhibits.

[131] OEM Council Meeting, dated December 21, 2000, at 181005905, attached as Exhibit 172 to SCO's Opposition Exhibits.

[132] Email from R. Acosta to M. Payne, dated Jan. 29, 2001, at 181014956, attached as Exhibit 97 to SCO's Opposition Exhibits.

[133] Sandve Nov. 19, 2004 Depo. at 135:2–4.

[134] Email from R. Acosta to M. Payne, dated Jan. 29, 2001, at 181014956, attached as Exhibit 97 to SCO's Opposition Exhibits.

[135] AIX 5L for Itanium Strategy at 181015076, attached as Exhibit 89 to SCO's Opposition Exhibits; Email from R. Acosta to M. Payne, dated Jan. 29, 2001, at 181014956, attached as Exhibit 97 to SCO's Opposition Exhibits.

AIX 5L for Power in October 2000, the PRPQ of AIX 5L for Itanium did not have a compiler to make it work and there was "no confirmed compiler plan."[136] Moreover, the PRPQ was offered free of charge, without support.[137]

58.     Code not containing a compiler cannot be executed.[138]

59.     Indeed, IBM distributed only 32 copies of the PRPQ in 2001.[139] The PRPQ was not on IBM's price lists, and was not marketed.[140]

55.     Despite the delays in the launch of the IA-64 processor, in late April 2001, IBM and Santa Cruz announced the first release of AIX SL for the IA-64 processor on May 4, 2001.[141] That release occurred as scheduled,[142] although it is disputed whether that release was legitimate or pretextual.[143]

### G.  IBM's Use of SCO's SVR4 Code in IBM Products

56.     On October 24, 2000, IBM placed SCO's SVr4 source code into a PRPQ (IBM's internal name for a beta test version), "early adopters" of AIX for Power (named AIX 5L for Power 5.0), which was intended for certified software developers and "not intended for general production use."[144]

---

[136] Unix Vision – proposed, attached as Exhibit 300 to SCO's Opposition Exhibits.

[137] *Id.*

[138] Sandve Nov. 19, 2004 Depo. at 81:7–9.

[139] Letter from J. Fair to K. Madsen, dated Apr. 29, 2002, at 1710118968–69, attached as Exhibit 159 to SCO's Opposition Exhibits.

[140] *Id.*

[141] IBM Press Release, *IBM Breaks Barriers Between Linux and UNIX with AIX 51*, dated Apr. 23, 2001, attached as Exhibit 593 to IBM's First Exhibits; Caldera Systems, Inc. Press Release, *SCO and Caldera Release Technology Preview of AIX 5L-64 Bit UNIX OS for Intel Itanium Processors*, dated Apr. 23, 2001, attached as Exhibit 594 to IBM's First Exhibits; The Santa Cruz Operation, Inc. and Caldera Systems, Inc. Press Release, *SCO and Caldera Release Technology Preview of AIX 5L-64 Bit UNIX OS for Intel Itanium Processors*, dated Apr. 23, 2001, attached as Exhibit 595 to IBM's First Exhibits.

[142] Third Amended Complaint ¶ 236, attached as Exhibit 10 to IBM's First Exhibits; Leitzinger Report at 44.

[143] Third Amended Complaint ¶ 236, attached as Exhibit 10 to IBM's First Exhibits.

[144] AIX 5L For Power Version 5.0, attached as Exhibit 289 to SCO's Opposition Exhibits.

57.     Then, on May 4, 2001, IBM included SCO's code, from Project Monterey, in the first "generally available" version (AIX 5L for Power 5.1).[145]

58.     IBM's "AIX 5L for Itanium strategy" was to "continue to ship AIX 5L as a PRPQ" in "stealth mode only."[146] In addition, even as it was announcing the PRPQ, IBM stated internally: "At the appropriate time announce plan not to GA AIX 5L and withdraw the PRPQ."[147]

59.     On April 4, 2001, IBM executive William Saulnier sent IBM counsel Helene Armitage an email containing a draft proposal for the "AIX 5L Announce Positioning Re Itanium."[148] He stated: "I believe this proposal does the best possible job to announcing what we intend to do . . . ."[149] Ms. Armitage largely rejected his proposal, indicating that she took a "heavy hack" at his thoughts.[150] She stated: "I'm concerned that your words define a delayed GA to 2H01 for the AIX product, and do not call the PRPQ GA." In other words, Ms. Armitage was concerned that Saulnier did not describe the premature PRPQ as "GA" or "generally available." Ms. Armitage then explained: "As you know, we need to GA this PRPQ to gain rights to SCO code we want for our base AIX product delivery – and every [one] is rather tired of me remaining and harping on this point." She then went on to articulate the external position she wanted to see on the product, but acknowledged, "I know the fine lines we are walking here."[151]

---

[145] Deposition Transcript of Bill Sandve, dated Jan. 26, 2006, at 30:12–15, 30:22–31:10, 33:8–23, 107:21–32, attached as Exhibit 229 to IBM's First Exhibits.

[146] AIX 5L for Itanium Strategy at 181015076, attached as Exhibit 89 to SCO's Opposition Exhibits.

[147] *Id.*

[148] Email from S. Dobbs to H. Armitage, dated Apr. 4, 2001, at 181028285, attached as Exhibit 88 to SCO's Opposition Exhibits.

[149] *Id.*

[150] *Id.* at 181028284.

[151] *Id.*

60.     IBM's Ron Saint Pierre stated on November 1, 2001 that "Monterey has not gone GA and never will."[152]

## H.  The Acquisition of the UNIX Business by Caldera

61.     On May 7, 2001, three days after the PRPQ of the Project Monterey Operating System, Santa Cruz finalized the sale of its Server Software and Professional Services divisions and its UNIX-related assets to Caldera, ending Santa Cruz's investment in and support of the Project Monterey development effort.[153]

62.     Santa Cruz did not obtain IBM's prior written consent to an assignment of the JDA. Instead, Santa Cruz informed IBM of the sale of its Server Software and Professional Services divisions and its UNIX-related assets to Caldera in a letter dated June 6, 2001.[154]

63.     Several weeks before the public announcement, Santa Cruz complied with Section 16.1 of the JDA and provided IBM with a detailed notice of the proposed transaction and an opportunity to tender a counteroffer within 15 days, pursuant to Section 16.2 of the JDA.[155]

64.     Although IBM thus had notice of the pending transaction for almost a year, IBM never told Santa Cruz or Caldera that it would not consent to the assignment of the JDA from Santa Cruz to Caldera.[156]

---

[152] Email from P. Malone to R. Saint Pierre, dated Nov. 2, 2001, at 1710066677, attached as Exhibit 86 to SCO's Opposition Exhibits.

[153] Form 10-K, filed by Caldera International, Inc. for the fiscal year ended October 31, 2001, at 52, attached as Exhibit 111 to IBM's First Exhibits; Letter from Kimberlee A. Madsen to R. Lauderdale, dated June 6, 2001 ("June 6, 2001 Madsen-Lauderdale Letter"), attached as Exhibit 244 to IBM's First Exhibits.

[154] *See* June 6, 2001 Madsen-Lauderdale Letter.

[155] Letter from S. Sabbath and G. Seabrook to R. Lauderdale, dated June 21, 2000, attached as Exhibit 206 to SCO's Opposition Exhibits.

[156] Petersen Declaration ¶¶ 12–13; Maciazek Declaration ¶¶ 10–11; Declaration of Jeff Hunsaker ("Hunsaker Declaration") ¶ 6, attached as Exhibit 356 to SCO's Opposition Exhibits.

65.     Moreover, long after the announcement of the transaction, IBM reiterated its "strong commitment" to Project Monterey, and at various meetings with executives of both Caldera and Santa Cruz, IBM reiterated its support.[157]

66.     On May 4, 2001, IBM released the PRPQ of the Project Monterey Operating System[158] and the first "generally available" version of the SVr4-enhanced AIX 5L for Power.[159]

67.     IBM declined to consent to the assignment of Santa Cruz's rights and obligations under the JDA. Pursuant to Section 22.12 of the JDA, IBM's consent was necessary for such assignment to take effect. On the contrary, IBM invoked its right to cancel the JDA under Section 15.2 in a letter dated June 19, 2001.[160]

68.     Caldera did not acquire Santa Cruz, which continued in business, albeit changing its corporate name to "Tarantella."[161]

69.     After the start of this litigation, Caldera changed its name to "The SCO Group, Inc."[162]

## I.  Status of Project Monterey in 2002

70.     In an October 2002 email, Bill Bulko (assistant to IBM executive Anthony Befi) stated:

> Tony and I were in a conference call with SCO Group (formerly called Caldera)
> on Friday. . . . During our discussion, they asked about Project Monterey and
> what its current status and positioning are. We told them that it's a PRPQ, and

---

[157] OEM Council Meeting, dated Dec. 21, 2000, at 181005905, attached as Exhibit 172 to SCO's Opposition Exhibits; Mohan Declaration ¶ 10; Michels Declaration ¶ 17; Hunsaker Declaration ¶ 6; Declaration of Robert Bench ¶ 15, attached as Exhibit 6 to SCO's Opposition Exhibits.

[158] AIX 5L for Itanium Strategy, attached as Exhibit 89 to SCO's Opposition Exhibits.

[159] U.S. Copyright Registration Statement No. TC 5-856-468, dated Feb. 2, 2004, attached as Exhibit 82 to SCO's Opposition Exhibits.

[160] Letter from R. Lauderdale to K. Madsen, dated June 19, 2001, attached as Exhibit 220 to IBM's First Exhibits.

[161] *See* June 6, 2001 Madsen-Lauderdale Letter.

[162] Form 10-K, filed by SCO for the fiscal year ended October 31, 2003, at 4, attached as Exhibit 113 to IBM's First Exhibits.

explained what that meant – but neither Tony nor I were confident that we were up-to-date on what the current 'official response' should be.[163]

71.     On November 6, 2002, Mr. Bulko then sent a "Project Monterey update" to Mr. Befi, indicating, "Tony: you asked me to collect some data on the current status of Project Monterey in order to update you before you meet with SCO (Caldera) again. Here is a capsule summary of our position with Project Monterey."[164] He gave a background summary of the Project Monterey relationship, and then explained: "Even though SCO code is now embedded within AIX, we would only have to pay royalties to SCO when we distributed Monterey."[165] He further instructed: "Our initial license to SCO code was contingent on our making an attempt to distribute an IA-64 product. Consequently, we need to be clear that we have been trying to distribute Monterey, but no one wants it."[166] Mr. Bulko further disclosed that IBM had "no plans to make AIX available on the Itanium platform" and was "planning to EOL [end of life] Monterey by the end of this year."[167]

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[168] "An issue of material fact is 'genuine' if a reasonable jury could return a verdict for the nonmoving party."[169] In moving for summary judgment, IBM "bears the burden of showing the absence of a genuine

---

[163] Email from C. Yount to B. Bulko, dated Oct. 22, 2002, at 1710015451, attached as Exhibit 57 to SCO's Opposition Exhibits.

[164] Email from B. Bulko to A. Befi, dated Nov. 6, 2002, at 1710015441, attached as Exhibit 84 to SCO's Opposition Exhibits.

[165] Id.

[166] Id.

[167] Id.

[168] FED. R. CIV. P. 56(a).

[169] Universal Money Ctrs., Inc. v. Am. Tel. & Tel. Co., 22 F.3d 1527, 1529 (10th Cir. 1994) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)) (internal quotation marks omitted).

issue of material fact . . . ."[170] However, as it relates to SCO's claims, IBM "need not negate [SCO's] claim[s], but need only point out to the district court 'that there is an absence of evidence to support [SCO's] case.'"[171] Upon such a showing, SCO "must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which [SCO] carries the burden of proof."[172] "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient to defeat a properly supported motion for summary judgment."[173]

## ANALYSIS

IBM's Unfair Competition Motion states three grounds for summary judgment regarding SCO's unfair competition claim: "(1) it is untimely; (2) SCO cannot show that IBM engaged in unfair competition regarding Monterey; and (3) the claim is preempted by federal copyright law."[174] IBM's Unfair Competition Memorandum further develops those arguments. Most important for this ruling is the second argument: that SCO cannot show that IBM engaged in unfair competition because, among other reasons, IBM's alleged conduct would constitute a breach of contract, and "[s]uch claims may not be transmuted into a tort claim such as unfair competition." Because this argument is correct, it is unnecessary to discuss IBM's other bases for summary judgment. As discussed more fully below, (A) tort claims are subsumed in contract claims when the issue is addressed by an express contract provision and not addressed by a separate legal duty; (B) SCO's unfair competition claim is subsumed by express contractual provisions of the JDA that specifically govern the licensing and use of SCO's code; and (C) SCO

---

[170] *Universal*, 22 F.3d at 1529.

[171] *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

[172] *Id.* (citing *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir.1990)).

[173] *Id.* (quoting *Anderson*, 477 U.S. at 252).

[174] IBM's Unfair Competition Motion at 2.

and IBM were not joint venturers or partners, and no fiduciary relationship existed, meaning that IBM owed no heightened legal duties to SCO. For these reasons, summary judgment is granted on SCO's unfair competition claim in IBM's favor.

### A.  The Independent Tort Doctrine Bars Tort Claims Where There Is An Express Contract Provision

In the original briefing on IBM's Unfair Competition Motion in 2006, although the parties argued over the application, they generally agreed on the law regarding the independent tort doctrine: under New York precedent, "[i]t is a well-established principle that a simple breach of contract is not to be considered a tort unless a duty independent of the contract itself has been violated," and the tort claim "must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract."[175] The tort "must be sufficiently distinct from the breach of contract claim in order to be legally sufficient," and "[i]n order to be independently viable, [it] must arise from a separate legal duty, or be collateral and extraneous to the terms and conditions of the contract that were allegedly breached or cause special damages that are not recoverable under the contract."[176] The law is the same in Utah: where there exists an "express contract provision dealing with the issue, there is no independent duty created here which would create a tort apart from the contractual obligations between the parties."[177]

SCO argued that "[a]lthough some New York cases suggest that a plaintiff may not 'transmogrify' a contract claim into one for tort, this is limited to instances where 'the only

---

[175] *Productivity Software Intern, Inc. v. Healthcare Technologies, Inc.*, 1995 WL 437526 (S.D.N.Y.) (quoting *Clark-Fitzpatrick, Inc. v. Long Island Rail Road Co.*, 70 N.Y.2d 382, 389 (N.Y. 1987)).

[176] *Medinol Ltd. v. Boston Scientific Corp.*, 346 F.Supp.2d 575, 607 (S.D.N.Y 2004) (citing *Great Earth International Franchising Corp. v. Milks Development*, 311 F.Supp.2d 419, 425 (S.D.N.Y. 2004)).

[177] *Deer Crest Associates I, L.C. v. Deer Crest Resort Group, L.L.C.*, No. 2:04-CV-00220-TS, 2006 WL 722216, *3 (D.Utah Mar. 15, 2006).

interest at stake is that of holding the defendant to a promise.'"[178] However, SCO's citation of

the Second Circuit's discussion of the policy underlying the independent tort doctrine does not

weaken the doctrine to be less than stated in the more recent cases cited above and acknowledged

by SCO. Regardless of the "interest[s] at stake,"[179] "a contract claim may not be pleaded as a tort

claim unless a *legal duty independent of the contract* itself has been violated."[180]

SCO also suggests a wrinkle in the independent tort doctrine articulated by the Tenth

Circuit in *Equilease Corp. v. State Fed. Sav. And Loan. Assn.*: "where a contract is the mere

inducement creating the state of things that furnishes the occasion for the tort, the tort, not the

contract, is the basis of the action. . . . [I]f a duty to take care arises from the relation of the

parties irrespective of a contract, the action is one of tort."[181] However, the Tenth Circuit's

statement relies on a 1926 Oklahoma Supreme Court case. The parties have presented no Utah or

New York case law that would suggest that contractual duties could be disregarded by finding

that the contract was an inducement to facilitate a tort. However, as the Tenth Circuit stated, it is

important to consider "if a duty to take care arises from the relation of the parties irrespective of

the contract."[182]

SCO cites a New York appellate decision for the proposition that "[t]he same conduct

which constitutes a breach of a contractual obligation may also constitute the breach of a duty

arising out of the contract relationship which is independent of the contract itself."[183] The line of

---

[178] SCO's Unfair Competition Opposition at 39–40 (citing *Hargrave v. Oki Nursery, Inc.*, 636 F.2d 897, 899 (2nd Cir. 1980) and *Hammer v. Amazon.com*, 392 F.Supp.2d 423 (E.D.N.Y. 2005).

[179] *Id.* (citing *Hargrave*, 636 F.2d at 899).

[180] *Hammer*, 392 F.Supp.2d at 432–33 (internal citations omitted) (emphasis added).

[181] 647 F.2d 1069, 1074 (10th Cir. 1981) (applying Oklahoma law).

[182] *Equilease Corp.*, 647 F.2d at 1074.

[183] SCO's Unfair Competition Opposition at 41 (quoting *Dime Sav. Bank of N.Y. v. Skrelja*, 642 N.Y.S.2d 84 (N.Y. App. Div. 1996)).

cases supporting that proposition deals with claims for breach of a fiduciary duty, which is necessarily a legal duty independent of the contract. Similarly, the Utah Supreme Court has also "recognize[d] that in some cases the acts constituting a breach of contract may also result in breaches of duty that are independent of the contract and may give rise to causes of action in tort."[184] The line of cases used by the Utah Supreme Court references intentional torts and statutorily imposed duties, which again are necessarily legal duties independent of contracts. The consideration of these independent relations is consistent with *Equilease Corp.*

The supplemental briefing by the parties reflects an unchanged independent tort doctrine.[185] SCO again argues that IBM misstates the independent tort doctrine as too narrow. IBM argued that where parties' interests are aligned and plaintiffs reasonably rely on representations of contractual performance, "a 'legal duty . . . would arise out of the independent characteristics of the relationship between' the parties, supporting an independent tort claim, even where that duty was 'assessed largely on the standard of care and the other obligations set forth in the contract.'"[186] However, the case upon which SCO bases this argument dealt with financial investors suing their financial advisor, meaning the "independent characteristics of the relationship" were effectively a fiduciary relationship. Most contracting parties have aligned interests and rely on one another to perform. However, a common contract relationship cannot reasonably create the "independent characteristics" that would give rise to fiduciary-like duties

---

[184] *Culp Const. Co. v. Buildmart Mall*, 795 P.2d 650 (Utah 1990).

[185] *See, e.g.*, *Dorset Industries, Inc. v. Unified Grocers, Inc.*, 893 F.Supp.2d 395, 414 (E.D.N.Y. 2012); *Taizhou Zhongneng Import and Export Co., Ltd. v. Koutsobinas*, 509 F. App'x 54, 57 (2nd Cir. 2013) (the tort claim "cannot arise out of the same facts that serve as the basis for a plaintiff's causes of action for breach of contract (internal citations and quotations omitted)); *Board of Managers of Soho North 267 West 124th Street Condominium v. NW 124 LLC*, 984 N.Y.S.2d 17, 18–19 (N.Y. App. Div. 2014).

[186] SCO's Unfair Competition Supplement at 4–5 (citing *Bayerische Landesbank, N.Y Branch v. Aladdin Capital Magmt. LLC*, 692 F.3d 42, 58–59 (2nd Cir. 2012)).

without other, far more defining circumstances, like the financial advisor context referenced by SCO.

It appears that the theme in these New York and Utah cases is that where a heightened duty is imposed as in the fiduciary context or by statute, essentially "aris[ing] from the relation of the parties irrespective of the contract,"[187] those duties are not subsumed in contractual duties. However, where the parties have agreed to certain heightened contractual standards which do not create the independent tort duty, common torts are subsumed in those express contractual duties. For example, in *Sidney Frank Importing Co.*, a whisky importer sued a distillery for breach of contract and unfair competition.[188] The Southern District of New York identified the type of unfair competition claim that could be contract-related but not expressly subsumed in the breach of contract claim: "Cooley's alleged duty under the Agreement to provide whiskey to Plaintiff in quantities specified by purchase orders . . . is distinct from Cooley and Beam's duty not to misappropriate Plaintiff's property for their own use."[189] Simply stated, the independent tort doctrine remains unchanged: an express contractual duty subsumes tort claims that are not based on an independent legal duty.[190]

### B. SCO's Unfair Competition Claim Is Subsumed by Express Contractual Provisions Specifically Governing the SVr4 Code

In *Sidney Frank Importing Co.*, which SCO offered, the Southern District of New York describes the claim of unfair competition:

> New York courts have recognized two theories of unfair competition claims: "palming off" and misappropriation. Palming off is the sale of goods of one manufacturer as those of another. Misappropriation, the theory which Plaintiff

---

[187] *Equilease Corp.*, 647 F.2d at 1074.

[188] *Sidney Frank Importing Co., Inc. v. Beam Inc.*, 998 F.Supp.2d 193, 210 (S.D.N.Y. 2014).

[189] *Id.*

[190] *Deer Crest Associates I, L.C.*, 2006 WL 722216 at *3; *Medinol Ltd.*, 346 F.Supp.2d at 607 (citing *Milks Development*, 311 F.Supp.2d at 425).

asserts here, concerns the taking and use of the plaintiff's property to compete against the plaintiff's own use of the same property. Misappropriation is also described as taking the skills, expenditures, and labor of a competitor, and misappropriating for the commercial advantage of one person . . . a benefit or property right belonging to another.

To state a claim for the misappropriation theory of unfair competition, a plaintiff must allege that the defendant: (1) misappropriated the plaintiff's labors, skills, expenditures, or good will; and (2) displayed some element of bad faith in doing so.[191]

Here, SCO specifically places its claim, at least in part, within the misappropriation prong of unfair competition,[192] alleging that IBM engaged in "[m]isappropriation of source code, methods, and confidential information" and "[c]ontribution of protected source code and methods for incorporation into one or more Linux software releases, intended for transfer of ownership to the general public."[193] Therefore, the question is whether an express contract provision treats the appropriation of SCO's source code.

In this case, the JDA expressly granted to IBM:

a worldwide, non-exclusive, royalty free . . ., perpetual and irrevocable . . . right and license under SCO's and applicable third parties' copyrights . . . and any trade secrets or confidential information in the Licensed SCO Materials and SCO Project Work which are included in Deliverables to (i) prepare or have prepared Derivative Works, (ii) use, execute, reproduce, display and perform the Licensed SCO Materials and SCO Project Work and Derivative Works thereof, (iii) sublicense and distribute the Licensed SCO Materials and SCO Project Work and Derivative Works thereof either directly or through Distributors, in the form of Source Code, Object Code, Documentation, and/or in any other form whatsoever, and (iv) grant licenses, sublicenses, and authorizations to others (including without limitation IBM Subsidiaries, Distributors and any other third parties), on a non-exclusive basis that is equal to the scope of the licenses granted hereunder.[194]

---

[191] *Sidney Frank Importing Co.*, 998 F.Supp.2d at 210.

[192] SCO's Unfair Competition Supplement at 4.

[193] Second Amended Complaint ¶ 184(a) and (e), docket no. 108, filed Feb. 27, 2014.

[194] JDA § 2.2(d)(2).

That "worldwide, non-exclusive, royalty free . . ., perpetual and irrevocable . . . right and

license" was limited as follows:

> When IBM sublicenses the IA-64 Product containing Licensed SCO Materials
> and/or SCO Project Work in Source Code form or when SCO sublicenses the IA-
> 64 Product containing Licensed IBM Materials and/or IBM Project Work in
> Source Code form, the parties shall not grant the third party the right to further
> grant source sublicenses to the other party's Licensed Materials or Project Work.
> Further, when licensing such Source Code, both e parties shall only grant the right
> to create Derivative Works required for the following purposes:
> 1. Maintenance and support;
> 2. Translation and localization;
> 3. Porting, optimization and extensions;
> 4. Any other Derivative Works agreed to by SCO and IBM.[195]

The use or appropriation of SCO's source code is expressly addressed in the JDA. It is

clear that use of the code is not "collateral and extraneous to the terms and conditions of the

contract that were allegedly breached,"[196] but rather, there exists an "express contract provision

dealing with the issue, [and therefore,] there is no independent duty created here which would

create a tort apart from the contractual obligations between the parties."[197] In fact, determining

that IBM misappropriated the code in question would require a legal conclusion that IBM had

breached the contract. This is unlike the *Sidney Frank Importing Co.* case, discussed above,

where the Southern District of New York was able to distinguish the alleged breach of contract

and the alleged tort because they embraced separate duties. Here, the alleged misappropriation is

inseparable from an alleged breach of the JDA and its licensing provisions because IBM's legal

right to use the source code is at the heart of each claim.

---

[195] *Id*. § 2.2(e).

[196] *Medinol Ltd.*, 346 F.Supp.2d at 607 (citing *Milks Development*, 311 F.Supp.2d at 425).

[197] *Deer Crest Associates I, L.C.*, 2006 WL 722216, at *3.

Even more telling, although the alleged tort claim "must be sufficiently distinct from the breach of contract claim in order to be legally sufficient,"[198] SCO actually based its claim on the allegations that IBM engaged in "[b]reach of contract," "[v]iolation of confidentiality provisions running to the benefit of plaintiff," and "[i]nducing and encouraging others to violate confidentiality provisions."[199] Furthermore, SCO's briefing is replete with characterizations of the IA-64 product being a "sham," but the quality of the IA-64 product is only relevant to the use of SCO's code in the context of the JDA, and SCO essentially sought to drive home the point that IBM's did not sufficiently perform its contractual obligations to reap the benefits of the contract. Although SCO may argue that its unfair competition claim is not subsumed in the parties' contractual duties, not only does the JDA clearly addresses IBM's use of the code, but SCO's own Second Amended Complaint specifically alleges breach of contract as many of the bases for its unfair competition claim. SCO's unfair competition claim cannot survive summary judgment.

### C.  SCO Cannot Rely on the Utah Unfair Competition Act as a Basis for an Unfair Competition Claim

In the 2006 briefing, SCO had originally argued that unfair competition is not simply limited to "palming off" and misappropriation, extending to "broadly encompass[] all forms of 'commercial immorality.'"[200] However, cases SCO cited in 2015 from the same court upon which SCO relied in 2006 for its "commercial immorality" theory clearly stated that "New York courts have recognized two theories of unfair competition claims: 'palming off' and

---

[198] *Medinol Ltd.*, 346 F.Supp.2d at 607 (citing *Milks Development*, 311 F.Supp.2d at 425).

[199] Second Amended Complaint ¶ 184(b)–(d), docket no. 108, filed Feb. 27, 2014.

[200] SCO's Unfair Competition Opposition at 43 (citing *Too, Inc. v. Kohl's Dep't Stores*, 210 F.Supp.2d 402, 405 (S.D.N.Y 2002) ("[u]nfair competition may be based on a wide variety of illegal practices, including misappropriation and other forms of commercial immorality.)).

misappropriation."[201] In SCO's 2006 discussion of the broad unfairness standard, SCO argued in

a footnote that a portion of the Utah Code (enacted in 2004 *after* IBM's allegedly tortious acts)

created a statutory right to damages for the unlawful, unfair, or fraudulent infringement of a

copyright or the violation of a software license.[202] Given the importance of statutorily imposed

legal duties under the independent tort doctrine, it is necessary to discuss this statutory argument.

The relevant portion of the Definitions section of the Unfair Competition Act stated in

2004 that:

> "unfair competition" means an intentional business act or practice that:
> (i)     (A) is unlawful, unfair, or fraudulent; and
>         (B) leads to a material diminution in value of intellectual property; and
> (ii) is one of the following:
>         (A) cyber-terrorism;
>         (B) infringement of a patent, trademark or trade name;
>         (C) a software license violation; or
>         (D) predatory hiring practices.[203]

SCO argued that "[e]ven if applied only prospectively, IBM is liable under the statute for SCO's

post-2004 damages, because unfair competition is a continuing tort and each sale of AIX for

Power is an independent cause of action. . . . Moreover, the statute may be applied retroactively,

because, as an addition to the previously existing Unfair Practices Act, it clarified existing

law.[204]

SCO was ordered multiple times to disclose the basis of each of its claims but never

disclosed any intent to rely upon this statute, and therefore, may not do so now.[205] Although

---

[201] *Sidney Frank Importing Co.*, 998 F.Supp.2d at 210.

[202] SCO's Unfair Competition Opposition at 44 n.11 (citing UTAH CODE ANN. § 13-5a-102(4)(a)).

[203] UTAH CODE ANN. § 13-5a-102(4)(a)

[204] SCO's Unfair Competition Opposition at 44 n.11 (citing *Dep't of Soc. Serv. V. Higgs*, 656 P.2d 998, 1001 (Utah 1982)).

[205] *See* Order Affirming Magistrate Judge's Order of June 28, 2006, docket no. 884, filed Nov. 29, 2006.

SCO's failure to disclose this statute as a basis for its unfair competition claim is alone sufficient, there are other reasons SCO cannot rely on this statute.

First, the statute cannot be applied retroactively because the 2004 enactment of this language was not a clarification, but rather a legislative change. Contrary to SCO's argument, the "clarification" exception, permitting the retroactive application of statutory amendments that only clarify existing law, cannot apply here. The enumeration of a breach of a software license as a form of unfair competition is not a new statutory provision that does not alter a party's substantive rights.[206]

Rather, "the legislature fundamentally altered the substantive rights accorded under Utah law, which previously restricted common law unfair competition claims to palming-off and misappropriation."[207] Describing the enactment of novel statutory language as nothing more than a clarification would result in the unreasonable conclusion that much of newly enacted legislation is generally mere clarification, and therefore, retroactive. Additionally, IBM correctly points out that no Utah statute is retroactive unless expressly stated.[208]

Second, SCO's prospective application argument is flawed because IBM's alleged breach of the JDA occurred nearly four years prior to the effective date of Section 13-5-a-102(4)(a), and therefore, IBM's breach would not have constituted unfair competition. SCO has offered no authority to support an argument that the continuing tort doctrine functions to create, *after* the enactment of a statute, a continuing tort from an alleged breach that did not constitute a tort when

---

[206] *See, e.g.*, *Okland Constr. Co. v. Industrial Comm'n*, 520 P.2d 208, 210-11 (Utah 1974) (applying clarification exception where the phrase "312 weeks" for earlier language of "six years ... weekly compensation" in statute).

[207] IBM's Unfair Competition Reply at 10–11 n.7 (citing *Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1280 (10th Cir. 2000).

[208] IBM's Unfair Competition Reply at 10 (citing UTAH CODE ANN. § 68-3-3).

it occurred. For these reasons, SCO cannot rely on Utah's subsequently enacted Unfair Competition Act to salvage its unfair competition claim.

### D. SCO and IBM Entered Into an Arms-Length Contract and Did Not Create a Joint Venture, Partnership, or Any Other Form of Fiduciary Relationship

SCO's Unfair Competition Opposition understandably does not focus on the contractual provisions at issue; rather, SCO argued that a fiduciary duty exists between the parties, thereby rendering IBM's actions actionable as unfair competition.

SCO argued that it "is not seeking to hold IBM to a promise. . . . Nothing in the JDA expressly required IBM to inform SCO of its intent to string the project along. SCO['s] complain[t]s are not about a contractual breach, but of IBM's pattern of deceptive and unfair conduct."[209] More specifically, SCO complains that IBM deceived Santa Cruz and SCO about its Project Monterey and LINUX intentions, made a "sham" IA-64 product, and pretended to support Project Monterey long after it decided to terminate the project, in addition to misappropriating code.[210]

Preliminarily, the IA-64 product was the central purpose of Project Monterey and the JDA, and therefore a failure to perform under that contract by offering a "sham" IA-64 product would necessarily constitute a breach of contract or a breach of the implied covenant of good faith and fair dealing. Therefore, SCO's remaining allegations include deception regarding intentions and pretended support. Although SCO's Second Amended Complaint grandly alleges "conduct that is intentionally and foreseeably calculated to undermine and/or destroy the economic value of UNIX anywhere and everywhere in the world,"[211] the pleading lacks

---

[209] SCO's Unfair Competition Opposition at 40.

[210] *Id.*

[211] SCO's Second Amended Complaint ¶ 183.

specificity and substance, otherwise identifying these allegations as "[u]se of deceptive means and practices in dealing with plaintiff with respect to its software development efforts."[212]

SCO argued that "despite the fact that SCO's unfair competition claim is, in certain respects, *related* to the contract . . . the claim is actionable because, in view of the joint venture relationship, IBM has independent fiduciary and common law confidentiality duties that are distinct and wholly separate from the contract."[213] Bizarrely, SCO argued that IBM should be precluded from even responding to SCO's allegations of a fiduciary and confidential relationship because they were not disputed in IBM's Unfair Competition Memorandum.[214] However, the local rules limit a reply memorandum to rebuttal of matters raised in the memorandum opposing the motion,[215] necessarily allowing IBM to respond to SCO's discussion of a fiduciary relationship.

SCO's arguments regarding a fiduciary relationship fail for three reasons. First, although SCO offers the alleged fiduciary relationship as a counter to the independent tort doctrine issue, SCO has offered no authority to support its implied argument that an independent fiduciary duty somehow constitutes a claim of unfair competition. To the extent SCO would argue that any alleged fiduciary duties are independent from the JDA and therefore not subsumed in breach of contract, that argument would only support a claim for breach of a fiduciary duty, not unfair competition. Alleging that an independent legal duty exists does not allow SCO to avoid the independent tort doctrine in order to pursue a tort claim that is not based on a breach of that duty.

---

[212] *Id.* ¶ 184(f).

[213] SCO's Unfair Competition Opposition at 42.

[214] *Id.* at 42 n.10.

[215] DUCivR 7-1(b)(3).

Second, the parties did not have a fiduciary relationship. "A fiduciary relationship exists under New York law when one person is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation."[216] In Utah, a fiduciary relationship "imparts a position of peculiar confidence placed by one individual in another" and "implies a condition of superiority of one of the parties over the other," while a fiduciary "is a person with a duty to act primarily for the benefit of another" and "is in a position to have and exercise and does have and exercise influence over another."[217] Although "[t]here is no invariable rule which determines the existence of a fiduciary relationship . . . there must exist a certain inequality, dependence, weakness of age, of mental strength, business intelligence, knowledge of the facts involved, or other conditions, giving to one advantage over the other."[218] Clearly, SCO and IBM were two sophisticated business entities, and the facts SCO included in its briefing laud SCO's expertise and capabilities,[219] and are not indicative of inequality, weakness, and dependency in the SCO-IBM relationship.

Moreover, "[b]y their nature, arms-length commercial transactions ordinarily do not involve relationships defined by the New York court as fiduciary."[220] "Under special circumstances a fiduciary duty may be found notwithstanding the existence of a contract— specifically, when there is a 'relationship of higher trust than would arise from the . . . agreement alone.'"[221]

---

[216] *Muller-Paisner v. TIAA*, 289 F. App'x 461, 465 (2nd Cir. 2008) (citations omitted).

[217] *First Sec. Bank of Utah N.A. v. Banberry Dev.Corp.*, 786 P.2d 1326, 1333 (Utah 1990) (citations omitted).

[218] *Id.*

[219] *See* Statement of Undisputed Facts, *supra*, ¶¶ 16–19.

[220] *Muller-Paisner*, 289 F. App'x at 466.

[221] *Zorbas v. U.S. Trust Co. N.A.*, 48 F.Supp.3d 464, 479 (E.D.N.Y. 2014) (citing *EBC I, Inc. v. Goldman, Sachs & Co.*, 5 N.Y.3d 11, 20).

SCO argued that "the 'tight partner' relationship though [sic] SCO placed its 'trust and confidence' in IBM gives rise to a fiduciary relationship."[222] However, the case SCO cites does not apply to the SCO-IBM relationship. In *Muller-Paisner*, the Second Circuit determined that an annuity broker owed a fiduciary relationship to a 70-year-old woman where the defendants had targeted specific advertisements regarding their expertise to her class of people, retired educators, focusing on the defendants' roles as advisors, knowing their advice would be relied upon.[223]

Subsequently, the Southern District of New York specified that *Muller-Paisner* and other similar cases "are inapposite to this case involving two sophisticated business entities" because "those cases . . . involve *unsophisticated* parties, the *elderly*, or the *infirm*."[224] The Southern District of New York further distinguished *Muller-Paisner* from cases like this case: "*Muller-Paisner* dealt with an insurer who allegedly made representations to an *infirm* purchaser of an annuity insurance contract" and "is inapplicable to the arm's-length commercial transaction" where the plaintiff "is not like the *infirm* decedent in *Muller-Paisner* who was *preyed upon* by the defendant in this case."[225] SCO did not attempt to argue that it should be considered as one of those "unsophisticated parties, the elderly, or the infirm," or how IBM should be considered more like the insurance broker who "*preyed upon*" those types of disadvantaged people.[226] Nevertheless, SCO's attempt at creating such a relationship of trust and confidence fails.

---

[222] SCO's Unfair Competition Supplement at 5 (citing *Muller-Paisner v. TIAA*, 289 F. App'x 461, 466 (2nd Cir. 2008)* ("[A] fiduciary duty may arise in the context of a commercial transaction upon a requisite showing of trust and confidence.")).

[223] *Muller-Paisner*, 289 F. App'x at 466.

[224] *Banco Industrial de Venezuela, C.A. v. CDW Direct, L.L.C.*, 888 F.Supp.2d 508, 513 (S.D.N.Y. 2012) (emphasis added).

[225] *Id.* (emphasis added).

[226] *Id.* (emphasis added).

Third, SCO's allegations fall well short of what is required to show the existence of a

joint venture or partnership. In New York, "[t]o demonstrate the existence of a partnership, a

plaintiff must prove four elements: (1) the parties' sharing of profits and losses; (2) the parties'

joint control and management of the business; (3) the contribution by each party of property,

financial resources, effort, skill, or knowledge to the business; and (4) the parties' intention to be

partners."[227] Similarly, to demonstrate the existence of a joint venture, a plaintiff must prove

that:

> (1) two or more parties entered an agreement to create an enterprise for profit, (2)
> the agreement evidences the parties' mutual intent to be joint venturers, (3) each
> party contributed property, financing, skill, knowledge, or effort to the venture,
> (4) each party had some degree of joint management control over the venture, and
> (5) there was a provision for the sharing of both losses and profits.[228]

"The absence of any one element is fatal to the establishment of a joint venture. . . . Further, a

joint venture represents more than a simple contractual relationship. Thus, it is insufficient for a

plaintiff to allege mere joint ownership, a community of interest, or a joint interest in

profitability."[229] Importantly, "[i]n formulating an agreement to be joint venturers, 'the parties

must be clear that they intend to form a joint venture, which is a fiduciary relationship, and not a

simple contract.'"[230] An essential element is the requirement that the parties provided for the

sharing in profits and losses.[231]

The process of establishing a joint venture is similar if not identical in Utah. The

requirements for the relationship are not exactly defined, but certain elements are essential:

---

[227] *Kids Cloz, Inc. v. Officially For Kids, Inc.*, 320 F.Supp.2d 164, 171 (S.D.N.Y. 2004).

[228] *Id.* (internal quotations and citations omitted).

[229] *Id.* (internal quotations and citations omitted).

[230] *Id.* (citing *Precision Testing Laboratories v. Kenyon Corp.*, 644 F.Supp. 1327, 1349 (S.D.N.Y. 1986)).

[231] *See id.*

> The parties must combine their property, money, effects, skill, labor and knowledge. As a general rule, there must be a community of interest in the performance of the common purpose, a joint proprietary interest in the subject matter, a mutual right to control, a right to share in the profits, and unless there is an agreement to the contrary, a duty to share in any losses which may be sustained.

> While the agreement to share losses need not necessarily be stated in specific terms, the agreement must be such as to permit the court to infer that the parties intended to share losses as well as profits.[232]

In this case, several elements are lacking. Most directly, the parties unambiguously stated in the JDA that they were not forming a joint venture or partnership:

> Each party is acting solely as an independent company. This Agreement shall not be construed to establish any form of partnership, agency, franchise or joint venture of any kind between SCO and IBM, nor to constitute either party as an agent, employee, legal representative, or any other form of representative of the other. This Agreement shall not be construed to provide for any sharing of profits or losses between the parties.[233]

This provision undercuts SCO's argument.

Although SCO is correct that "courts look to economic realities and disregard labels when the agreement as a whole and surrounding facts show an intent to create" a joint venture or partnership,[234] the economic realities of this case support rather than contradict the parties' express rejection of any sort of partnership. For example, SCO states that the JDA required sharing of profits and losses,[235] but the sections SCO cites, §§Sections 11.3 and 12.0–12.5, relate respectively to the ownership of joint inventions and provisions regarding royalties. Provisions governing joint inventions and royalties fall substantially short of a partnership bearing all profits and losses.

---

[232] *Bassett v. Baker*, 530 P.2d 1, 2 (Utah 1974) (citing 48 C.J.S. Joint Adventures s 2a).

[233] JDA § 22.5.

[234] SCO's Unfair Competition Opposition at 36–37 n.6.

[235] *Id.*

The existence of fiduciary duties would not result in salvaging SCO's unfair competition claim. SCO and IBM did not have an unequal and unbalanced relationship that would give IBM fiduciary duties toward SCO. SCO and IBM did not create a joint venture or partnership, meaning that IBM owed SCO no fiduciary duties.

## CONCLUSION

Summary judgment is granted to IBM on SCO's unfair competition claim because the alleged misappropriation at the heart of the claim is subsumed in SCO's breach of contract claim, and the independent tort doctrine prevents SCO's re-framing of its contract claim as a tort claim. SCO's alternative arguments also fail. SCO cannot use a later-enacted portion of the Utah Code that was not offered as a basis for this claim or create a joint venture or fiduciary relationship from an otherwise arm's-length contract between two sophisticated business entities.

## ORDER

For the reasons stated above, IT IS HEREBY ORDERED that IBM's Unfair Competition Motion[236] is GRANTED, and summary judgment is granted in IBM's favor on SCO's unfair competition claim (SCO's Sixth Cause of Action).

Dated February 5, 2016.

BY THE COURT:

David Nuffer
United States District Judge

---

[236] IBM's Motion for Summary Judgment on SCO's Unfair Competition Claim (SCO's Sixth Cause of Action), docket no. 782, filed Sept. 25, 2006.

# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

| | |
|---|---|
| **THE SCO GROUP, INC.,** | |
| **Plaintiff/Counterclaim-Defendant,** | **ORDER** |
| **vs.** | |
| **INTERNATIONAL BUSINESS MACHINES CORPORATION,** | **Case No.  2:03CV294 DAK** |
| **Defendant/Counterclaim-Plaintiff.** | |

This matter is before the court on (1) Plaintiff The SCO Group, Inc.'s ("SCO") Motion to Compel IBM to Produce Samuel J. Palmisano for Deposition, (2) SCO's Motion for Leave to File Third Amended Complaint, and issues pertaining to the parties' proposed Amended Scheduling Orders.  A hearing on the motions was held on April 21, 2005.   The court also heard brief argument on IBM's Motion for Entry of Order Limiting Scope of IBM's Ninth Counterclaim, which was not set for argument, but which is related to SCO's Motion for Leave to File Third Amended Complaint.   At the hearing, IBM was represented by David R. Marriott and Todd M. Shaughnessy. SCO was represented by Sean Eskovitz, Edward Normand, and Brent O. Hatch.  Before the hearing, the court considered carefully the memoranda and other materials submitted by the parties.  Since taking the motions under advisement, the court has further considered the law and facts relating to the motions.   The court has also considered the

letter dated April 25, 2005, sent to the court from SCO's counsel and also the letter dated April

28, 2005, sent to the court from IBM's counsel in response to SCO's April 25, 2005 letter.  Now

being fully advised, the court renders the following Order.

## I.  SCO's Motion to Compel IBM to Produce Samuel J. Palmisano for Deposition

SCO Seeks to Compel IBM to Produce its Chairman and Chief Executive Officer,

Samuel J. Palmisano, for Deposition.  IBM argues that SCO has failed to demonstrate that Mr.

Palmisano has unique personal knowledge of the claims in the instant suit and that the

information sought by SCO is available from other sources.

The court finds that Mr. Palmisano could have unique personal knowledge related to the

claims in this action.  Thus, IBM must produce Mr. Palmisano for a deposition.  To minimize the

disruption of IBM's operations, SCO has agreed to depose Mr. Palmisano in New York.

Although SCO seeks a seven-hour deposition, the court imposes a limit of four hours, not

including any breaks taken during the deposition.

## II.   SCO's Motion to File Third Amended Complaint and IBM's Motion to Limit Scope of Ninth Counterclaim

In its Ninth Counterclaim, IBM seeks declaratory judgment that "IBM does not infringe,

induce the infringement of, or contribute to the infringement of any SCO copyright through the

reproduction, improvement, and distribution of AIX and Dynix."  IBM, however, seeks to limit

the scope of the Ninth Counterclaim, arguing that it intended to seek only a declaration that

because IBM has not breached IBM's license agreements with AT&T, and because SCO's

purported termination of those licenses is invalid, IBM's continued distribution of AIX and

Dynix products does not infringe SCO's alleged copyrights. In seeking a narrow interpretation of its Ninth Counterclaim, IBM contends, among other things, that the Ninth Counterclaim must be read in the context in which it was asserted. At that time, SCO had sued IBM for copyright infringement with respect to its continued distribution of AIX and Dynix, but it had not sued IBM for copyright infringement with respect to other non-Linux activities. IBM asserts that SCO had not even threatened to sue IBM for copyright infringement with respect to non-Linux activities other than IBM's "post-termination" distribution of AIX and Dynix. Thus, IBM claims, it did not have a reasonable apprehension of being sued by SCO, thus there was not a case or controversy, and IBM could not have properly sued SCO for a declaration of non-infringement with respect to IBM's non-Linux activities, other than the "post-termination" distribution of AIX and Dynix. Moreover, IBM argues that it should not be required to litigate a claim it did not intend to make, does not believe it asserted, and has no reason to pursue.

SCO, on the other hand, claims that IBM is attempting to recharacterize its Ninth Counterclaim now that SCO has found clear evidence that IBM infringed SCO's copyrights. Based on this purported evidence, SCO seeks not only to defend against IBM's Ninth Counterclaim, but to add a claim for affirmative relief. Specifically, SCO seeks to assert a cause of action for copyright infringement based on IBM's alleged unauthorized use of copyrighted SCO code in IBM's AIX for Power products.

The court will permit IBM to narrow the scope of its Ninth Counterclaim. In the context in which the Ninth Counterclaim was asserted, the court finds that IBM did not intend for the counterclaim to be interpreted as broadly as it has been interpreted. Having determined that the Ninth Counterclaim was not intended to sweep so broadly, SCO's proposed amendment is no

3

longer the mirror-image of IBM's Ninth Counterclaim.  To permit the proposed amendment

would expand this already sizable and complex litigation and would serve only to delay its

resolution.   Furthermore, SCO has twice amended its Complaint during this litigation, and the

deadline for seeking leave to further amend has long-since passed.  SCO has not demonstrated

the "extremely compelling circumstances" required by this court's June 10, 2004 Order.  In

addition, it has not demonstrated "good cause" under Rule 16(b) of the Federal Rules of Civil

Procedure, and the court finds that SCO has unduly delayed seeking leave to assert the proposed

cause of action.  It appears that SCO–or its predecessor–either knew or should have known about

the conduct at issue before it filed its original Complaint.  Accordingly, the court declines to

permit the filing of a Third Amended Complaint.

## III.   REVISED SCHEDULING ORDER

Having considered the parties' proposed Amended Scheduling Orders and the briefing

related to the proposed Orders, the court sets forth the following deadlines:

| EVENT | DEADLINE |
|---|---|
| IBM's Complete Production of Discovery Pursuant to the Order of April 20, 2005 | August 1, 2005 |
| Interim Deadline for Parties to Disclose with Specificity All Allegedly Misused Material Identified to Date and to Update Interrogatory Responses Accordingly | October 28, 2005 |
| Final Deadline for Parties to Identify with Specificity All Allegedly Misused Material | December 22, 2005 |

4

| | |
|---|---|
| Close of All Fact Discovery Except As to Defenses to Claims Relating to Allegedly Misused Material | January 27, 2006 |
| Close of All Remaining Discovery (i.e., Fact Discovery As to Defenses to Any Claim Relating to Allegedly Misused Material) | March 17, 2006 |
| Initial Expert Reports | April 14, 2006 |
| Opposing Expert Reports | May 19, 2006 |
| Rebuttal Expert Reports | June 16, 2006 |
| Final Deadline for Expert Discovery | July 10, 2006 |
| Dispositive Motions | July 28, 2006 |
| Oppositions to Dispositive Motions | September 1, 2006 |
| Reply Briefs on Dispositive Motions | September 29, 2006 |
| Rule 26(a)(3) Disclosures | January 12, 2007 |
| Final Pretrial Order | January 19, 2007 |
| Deadline for Exchanging Proposed Jury Instructions[1] | January 22, 2007 |
| Motions in Limine | January 26, 2007 |
| Special Attorney Conference and Settlement Conference | January 30, 2007 |

---

[1] Approximately six weeks prior to trial, the court will send to the parties a Trial Order that sets forth deadlines regarding the exchange of jury instructions between the parties, filing of stipulated instructions and proposed instructions to which the parties could not agree, objections to proposed instructions, and responses to the objections. In the Trial Order, the court will also provide deadlines for filing proposed voir dire and proposed special verdict forms.

| Oppositions to Motions in Limine | February 5, 2007 |
|---|---|
| Reply Briefs on Motions in Limine | February 9, 2007 |
| 5-week Jury Trial | February 26, 2007 |

## IV.   UNSEALING OF DOCUMENTS

The parties have been in the process of unsealing various documents.  To ease the burden on the Clerk's Office, the court requests that the parties comply with the following procedure for all papers that are unsealed in the future.

If a party seeks to unseal an entire document, that party shall file only a Notice that sets forth the name and docket number of the document to be unsealed.  The Clerk's Office will then unseal that document.  The parties shall not refile the entire document.

If, however, only parts of a document are to be unsealed (i.e., various exhibits from an appendix containing many exhibits), that party shall file a Notice indicating each specific paper to be unsealed, the docket number of the document containing the papers, and actual copies of each paper to be unsealed.

## CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that (1) SCO's Motion to Compel IBM to Produce Samuel J. Palmisano for Deposition is GRANTED; (2) SCO's Motion for Leave to File Third Amended Complaint is DENIED, (3) International Business Machines Corp.'s ("IBM") Motion for Entry of Order Limiting Scope of IBM's Ninth Counterclaim is

GRANTED.  IBM is directed to file a proposed Order that restates its Ninth Counterclaim.[2]  An

Amended Scheduling Order is set forth above, as is a procedure to follow when unsealing

documents that were previously filed under seal.

DATED this 1st day of July, 2005.

BY THE COURT:

_____

DALE A. KIMBALL
United States District Judge

_____

[2]  IBM has previously submitted a proposed Order on this issue, but the language of the
proposed Order is less than clear.  Thus, the court directs IBM to file another proposed Order
that clarifies the scope of the Ninth Counterclaim.

7